# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| THOMAS GRAY SKIPPER, as trustee of the Helen O'Melia Skipper Trust of 1967, and its successor trusts, namely, the Helen O'Melia Skipper Child Trust FBO George W. Skipper IV, the Helen O'Melia Skipper Child Trust FBO Thomas Gray Skipper, the Helen O'Melia Skipper Child Trust FBO Richard Carmichael Skipper, and the Helen O'Melia Skipper Child Trust FBO David O'Melia Skipper, and as attorney in fact for the trustee of the George W. Skipper IV Trust of 1989, the Thomas Gray Skipper Trust of 1989, the Richard Carmichael Skipper Trust of 1989, and the David O'Melia Skipper Trust of 1989; SKIPPER LAND HOLDINGS LLC; PHALYN LLC; and FOREST LANDOWNERS ASSOCIATION, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FISH AND WILDLIFE SERVICE; UNITED STATES DEPARTMENT OF THE INTERIOR; SCOTT DE LA VEGA, Acting Secretary of the Interior, in his official capacity; MARTHA WILLIAMS, Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service, in her official capacity, <br><br> Defendants. | Case No. _____ |

## PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.    For generations, the Skipper family has owned and managed working timberland in Clarke County, Alabama. They have also been active stewards of this land, maintaining forest health and native habitat. From 1956 to 2016, the Skippers participated in the State of Alabama's Wildlife Management Area (WMA) program, opening the land for public recreation and the state's wildlife conservation efforts. In 2020, the U.S. Fish and Wildlife Service designated the land as critical habitat for the black pinesnake, imposing significant regulatory burdens on them and reducing the land's value. The Service made this designation despite the Skipper family's objections, the best evidence suggesting that the black pinesnake does not occupy their land, and the perverse incentives such designations create for landowners like the Skipper family who actively steward land to conserve forest habitat. Moreover, the Service declined to consider the economic impact of the designation on the Skipper family and similar landowners, despite Congress requiring it to do so under both the Endangered Species Act and the Regulatory Flexibility Act. Because of these substantial harms to the Skipper family, the Goodloe family, and other forest landowners, the Service's unlawful and arbitrary critical habitat designation should be vacated.

2.    Plaintiffs Thomas Gray Skipper, as trustee and attorney in fact for the trustee of several family trusts identified below; Skipper Land Holdings LLC; Phalyn LLC; and Forest Landowners Association (collectively, "the Forest Landowners"), seek declaratory and injunctive relief against Defendants the United States Fish and Wildlife Service, the United States Department of the Interior, Acting Secretary of the Interior Scott de la Vega, and Principal Deputy Director and Acting Director Martha Williams (collectively the "Service"). By designating 324,679 acres of privately owned land in Alabama and Mississippi, including the Forest

Landowners' property, as critical habitat for the black pinesnake, the Service violated the Endangered Species Act (ESA), the Regulatory Flexibility Act (RFA), and the Administrative Procedure Act (APA). 85 Fed. Reg. at 11,238 (Feb. 26, 2020) (Final Rule).

3.     The ESA authorizes the Service to designate private land as critical habitat for species, subject to judicially enforceable limits. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018). The black pinesnake designation violates those limits for at least two reasons. First, the Service's determination that Units 7 and 8, where the Forest Landowners' property is located, were occupied by the pinesnake is not supported by the best available science but rests on unreliable speculation. Second, Units 7 and 8 could not be designated under the ESA's more demanding unoccupied standard because they are not essential for the pinesnake's conservation and the Service made no finding to the contrary.

4.     Recognizing that critical habitat designations impose serious burdens on private landowners, Congress requires the Service to consider the economic and other impacts of these designations, again with courts acting as a backstop to prevent designations where costs exceed benefits. *Weyerhaeuser*, 139 S. Ct. 361. Here, the designation will impose costs and regulatory burdens on landowners and timber businesses that the Service failed to adequately consider.

5.     Congress also requires agencies to engage in more searching scrutiny of the burdens imposed on "small entities," like the Forest Landowners' small businesses. The Service expressly declined to engage in that scrutiny here, relying on the assertion that critical habitat designations do not burden the land designated but only other federal agencies. On the contrary, critical habitat designations directly regulate land for purposes of the RFA. *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282, 287–88 (D.D.C. 2018). Moreover, the Service's own economic analysis demonstrates that the designation will reduce the value of designated land.

Consequently, the Service's categorical certification that critical habitat does directly burden small entities is invalid under the RFA.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction); 16 U.S.C. § 1540(c) (actions arising under the ESA) and (g) (actions arising under the citizen suit provision of the ESA); 5 U.S.C. § 611 (judicial review of final agency action under the RFA, as amended); and 5 U.S.C. § 702 (judicial review of agency action under the Administrative Procedure Act).

7.     More than 60 days ago, by identical letters dated December 14, 2020, and December 19, 2020, the Forest Landowners provided the Secretary of the Interior and the Director of the U.S. Fish and Wildlife Service with written notice of the violations that are the subject of this complaint, in accordance with 16 U.S.C. § 1540(g)(2)(C). This notice is attached as Exhibit 1 and is incorporated herein by reference. The Service responded to this notice by letter dated February 23, 2021. In its response letter the Service takes the position that it previously considered all of the issues raised in the Forest Landowners' letter during the notice and comment period and addressed them in the Final Rule. This response is attached as Exhibit 2.

8.     The Forest Landowners seek relief under 28 U.S.C. § 2201 (authorizing declaratory relief) and § 2202 (authorizing injunctive relief).

9.     The Forest Landowners assert that the Service's designation of critical habitat for the black pinesnake within the State of Alabama constitutes unlawful, arbitrary and capricious agency action. An actual, justiciable controversy now exists between the Forest Landowners and the Service.

10.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

11.     The Forest Landowners have exhausted all available administrative remedies.

12.     The Forest Landowners are injured by the designation of critical habitat for the black pinesnake in the State of Alabama. Invalidation of the designation will redress those injuries.

13.     Venue is proper in the Southern District of Alabama under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e), because Defendants are agencies and officers of the United States, and a substantial part of the events or omissions giving rise to the claim occurred in this district, or a substantial part of property that is the subject of the action is situated in it.

## INTRADISTRICT ASSIGNMENT

14.     This case is properly assigned to the Southern Division because a substantial part of the events or omissions giving rise to the claim occurred in Clarke County, or a substantial part of property that is the subject of the action is situated in it. General L.R. 77.

## PARTIES

### Plaintiffs

15.     The Skipper family has, through its Harrigan family lineage, owned and managed timberland in Clarke County, Alabama since 1902. Over multiple generations, the Skipper family has played an integral role in maintaining the health of the region's forests through its responsible management practices and participation in stewardship initiatives.

16.     **Mr. Thomas Gray Skipper** is the trustee of the Helen O'Melia Skipper Trust of 1967, and its successor trusts, namely, the Helen O'Melia Skipper Child Trust FBO George W. Skipper IV, the Helen O'Melia Skipper Child Trust FBO Thomas Gray Skipper, the Helen O'Melia Skipper Child Trust FBO Richard Carmichael Skipper, and the Helen O'Melia Skipper Child Trust FBO David O'Melia Skipper (collectively, "the Helen O. Skipper Trust of 1967"). He is an agent/attorney in fact for George W. Skipper III: the trustee of the George W. Skipper IV Trust of 1989, the Thomas Gray Skipper Trust of 1989, the Richard Carmichael Skipper Trust of

1989, and the David O'Melia Skipper Trust of 1989 (collectively, the "Skipper Family Trusts of 1989"). Mr. Skipper is also a beneficiary of the Helen O'Melia Skipper Trust of 1967 and a beneficiary of the Thomas Gray Skipper Trust of 1989. The Skipper Family Trusts of 1989 and the Helen O. Skipper Trust of 1967 own forested property located within Unit 7 of the designation.

17.     The Skipper family is in the process of winding up the Skipper Family Trusts of 1989 and the Helen O. Skipper Trust of 1967 and transferring their assets to a family holding company, **Skipper Land Holdings LLC,** a limited liability company organized under the laws of the State of Alabama. To that end, title to the Unit 7 property owned by the Skipper Family Trusts of 1989 and the Helen O. Skipper Trust of 1967 is in the process of being transferred to Skipper Land Holdings LLC. It is expected that these transfers will be finalized within the coming months.

18.     The Skipper family manages its timber operations for the purpose of growing high-quality pine and hardwood sawtimber. They utilize rotation age targets between forty and sixty years and perform thinning and prescribed burns to maintain a complex and healthy forest ecosystem on their property.

19.     By participating in the State of Alabama's Wildlife Management Area (WMA) program between 1956 and 2016, the Skipper family opened its land for public recreation and the state's wildlife conservation efforts.

20.     The boundaries of Unit 7 are roughly contiguous with the former Scotch WMA, thereby singling out and punishing landowners like the Skippers for their voluntary participation in the WMA program and for their efforts to conserve southern longleaf pine habitat and a complex forest ecosystem on their property. Rather than being rewarded for their conservation efforts and responsible management, the Skippers now, due to the designation, face regulatory obstacles to the productive use of their property and a diminution in its value. As a result, they have withdrawn their property from the WMA program after sixty years of participation.

21.     The critical habitat designation imposes significant regulatory burdens on the use of the Skipper family's property and timber operations, including the imposition of an arbitrary presumption that their land is occupied by the pinesnake, and increased scrutiny of any uses of the land that may require a federal permit or would receive federal funding.

22.     Further, due to the designation of their land as "occupied" critical habitat—and the subsequent imposition of an assumption that their property is occupied by the pinesnake—the Skippers have had to modify their silvicultural management practices by shifting from an even-aged to an all-aged rotation in the stands on their property dominated by longleaf pine. They have done so because the assumption imposed by the critical habitat designation increases the potential for take liability resulting from habitat modification under the pinesnake's ESA Section 4(d) rule. This has resulted in a loss of revenue from timber harvested on their property.

23.     The critical habitat designation also subjects the Skippers to the risk of citizen suits and agency enforcement actions under the Endangered Species Act, further adding to their operational costs.

24.     In addition to these regulatory burdens, the designation has reduced the value of the Skippers' property within Unit 7.

25.     These injuries are fairly traceable to the illegal designation of critical habitat for the pinesnake. Overturning the designation will redress these injuries by removing the regulatory burden imposed upon the Skippers' property.

26.     The Skipper Family Trusts of 1989 and the Helen O. Skipper Trust of 1967 are small entities for purposes of the RFA because they are timber tract operations with gross annual revenues not exceeding $12,000,000. *See* 13 C.F.R. § 121.201. The trusts' successor-in-interest, Skipper Land Holdings LLC is also a small entity for purposes of the RFA because its gross annual revenues will not exceed $12,000,000.

27.     The Skipper Family Trusts of 1989 and the Helen O. Skipper Trust of 1967 each submitted comments in opposition to the proposed critical habitat designation for the pinesnake.

28.     **Phalyn LLC** is a limited liability company organized under the laws of the State of Alabama. Phalyn owns approximately 270 acres of forested property within Unit 8 of the designation. The Goodloe family, owners of Phalyn, has owned timberland in southwestern Alabama since the mid-1990s.

29.     Although their Unit 8 tract is managed to grow loblolly pine, the Goodloe family has voluntarily stewarded the land by maintaining several natural and planted stands of native longleaf pine on the property and by actively managing the land to prevent the spread of invasive species.

30.     The critical habitat designation injures Phalyn by imposing significant regulatory burdens on Phalyn's property, including the imposition of an arbitrary presumption that the land is occupied by the species and increased scrutiny of any uses of the land that may require a federal permit or would receive federal funding.

31.     In addition to these regulatory burdens, the designation of Unit 8 has reduced the value of Phalyn's property.

32.     These injuries are traceable to the illegal designation of critical habitat for the pinesnake. Overturning the designation will redress these injuries by removing the regulatory burden imposed upon Phalyn's property.

33.     Phalyn is a small entity for purposes of the RFA because it is a timber tract operation with gross annual revenues not exceeding $12,000,000. *See* 13 C.F.R. § 121.201.

34.     J. Russell Goodloe, Jr., owner and manager of Phalyn, and his son John R. Goodloe, III (who manages the Unit 8 property on behalf of Phalyn), each submitted comments in opposition to the proposed critical habitat designation for the pinesnake.

- 8 -

35.     **Forest Landowners Association (FLA)** is a nonprofit association representing roughly 5,000 family forest landowners who own 50 million acres of forestland in 45 states, including Alabama. FLA is committed to preserving America's tradition of private forest ownership, promoting the importance of forest resources, and helping forest landowners secure a legacy that can be passed on to the next generation. By serving as an advocate for America's family forest landowners in legislative, regulatory, and judicial matters, it seeks to protect private forestry from a variety of threats, including arbitrary and overreaching regulation.

36.     Many of FLA's annual dues-paying members have been, and continue to be, burdened by ESA regulations. FLA therefore devotes substantial resources to ensuring that ESA regulations are consistently and transparently applied.

37.     Acting on behalf of its membership, FLA, through its elected leadership, acts as an advocate on ESA issues, publishes information to educate its members, performs research on ESA regulation, and submits comments to government agencies addressing concerns about how regulations under the ESA affect its members.

38.     The Service's illegal designation of critical habitat for the black pinesnake in Alabama frustrates FLA's objectives and forces FLA to expend additional resources advocating for and educating its effected members.

39.     FLA's membership includes landowners who own land and operate businesses within the pinesnake's critical habitat designation.

40.     The critical habitat designation injures these FLA members by imposing significant regulatory burdens on the use of their property, including the imposition of an arbitrary presumption that the land is occupied by the species and increased scrutiny of any uses of the land that may require a federal permit or would receive federal funding. In addition to these regulatory burdens, the designation has reduced the value of these members' property.

41.     Many of FLA's member landowners are small businesses which meet the definition of a small entity under the RFA.

42.     On behalf of its effected members, FLA submitted a comment in opposition to the proposed critical habitat designation.

## Defendants

43.     The **United States Fish and Wildlife Service** is an agency of the Department of the Interior. The Service has been delegated responsibility by the Secretary of the Interior for the day-to-day administration of the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species. This includes the designation of critical habitat. The Service's designation of critical habitat for the black pinesnake is the subject of this action.

44.     Defendant **United States Department of the Interior** is an agency of the United States that administers and implements the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species. This includes the designation of critical habitat. The Department's designation of critical habitat for the black pinesnake is the subject of this action.

45.     Defendant **Scott de la Vega** is the Acting Secretary of the United States Department of the Interior. In that capacity Acting Secretary de la Vega is responsible for the administration of the ESA. He is sued in his official capacity.

46.     Defendant **Martha Williams** is the Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service. In that capacity, Acting Director Williams oversees the Fish and Wildlife Service's administration of the ESA. She is sued in her official capacity.

## LEGAL FRAMEWORK

### Endangered Species Act

#### Listing of Threatened or Endangered Species

47.     Under Section 4 of the Endangered Species Act, the Service lists species as "threatened" or "endangered" based on certain factors, including loss of habitat, overutilization, disease or predation, and existing regulatory mechanisms. *See* 16 U.S.C. §§ 1532(20), 1533(a).

48.     An "endangered" species is one "which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion if its range." 16 U.S.C. § 1532(20).

49.     The ESA provides for citizen enforcement of the Act. 16 U.S.C. § 1540(g).

#### Critical Habitat Designation

50.     Under Section 4 of the ESA, when a species is listed as threatened or endangered, the Service must designate critical habitat for that species "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A).

51.     Critical habitat is defined as:

> (i)   the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
> (ii)  specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A)(i)–(ii).

52.     By regulation the Secretary must "first evaluate areas occupied by the species" and may "only consider unoccupied areas to be essential where a critical habitat designation limited to

geographical areas occupied would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(b)(2). Additionally, "for an unoccupied area to be considered essential, the Secretary must determine that there is a reasonable certainty that the area will contribute to the conservation of the species . . . ." *Id.*

53.     The term "conservation" means the use of all methods and procedures necessary to bring a threatened or endangered species to "the point" at which the protections of the ESA are no longer required. 16 U.S.C. § 1532(3).

54.     The term "occupied" is not defined in either the ESA or its implementing regulations. Isolated sightings separated by long periods of time are not sufficient to show present occupation by a species. *See N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1226 (10th Cir. 2020).

55.     The ESA requires that all critical habitat designations be based on "the best scientific data available" after taking into consideration "the economic impact . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). The requirement to consider economic and other impacts is "categorical." *Weyerhaeuser*, 139 S. Ct. at 371.

56.     As such the Service must perform an economic analysis of the effects of a designation before it is finalized. *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1280 (10th Cir. 2001).

57.     The ESA also provides that the Service "may exclude any area" from the designation if the benefits of exclusion outweigh the benefits of inclusion, so long as the exclusion would not result in the species' extinction. 16 U.S.C. § 1533(b)(2).

*Consultation*

58.     Whenever an agency proposes to issue a permit, fund, or carry out an activity that "may" affect designated critical habitat, the agency must "consult" with the U.S. Fish and Wildlife Service over those effects and identify modifications or mitigation measures to "ensure" that the activity will not adversely modify critical habitat. 16 U.S.C. § 1536(a)(2).

59.     This consultation requirement applies to activities on both private and public land.

60.     Under Section 7, the Service must provide the consulting federal agency and applicant (if any) with a Biological Opinion detailing how the project will affect a species or its critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A). If it is determined that the project is likely to jeopardize the species' "continued existence" or "result in the destruction or adverse modification of critical habitat" of such species, the opinion must suggest "reasonable and prudent alternatives" that may be taken by the consulting agency or applicant to avoid such impacts. *Id.* § 1536(a)(4), (b)(3)(A).

61.     If it is determined that the "taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the species' continued existence, or result in the destruction or adverse modification of critical habitat of such species, a written "incidental take statement" must be issued that: (1) specifies the impact of such incidental taking on the species; (2) specifies those reasonable and prudent measures that are necessary or appropriate to minimize such impact; and (3) sets forth the terms and conditions with which the agency or applicant must comply to implement the specified measures. 16 U.S.C. § 1536(b)(4)(B)(c)(i), (ii), and (iv).

62.     In practice, the result of consultation under the ESA is almost always the imposition of additional restrictions on the federally funded or permitted activity. For example, the Service predicts that as a result of consultations involving the pinesnake designation it will recommend project modifications, such as relocating activities outside of habitat deemed to be occupied, and

mitigation requirements such as the retention of downed logs in project areas. *See* U.S. Fish & Wildlife Service, *Incremental Effects Memorandum for the Economic Analysis of the Proposed Rule to Designate Critical Habitat for the Black Pinesnake* at 11–12 (Aug. 14, 2014) (hereinafter "Incremental Effects Memorandum"), *available at* https://www.regulations.gov/document?D= FWS-R4-ES-2014-0065-0002.

**Regulatory Flexibility Act**

63.    The Regulatory Flexibility Act was passed by Congress to minimize unnecessary impacts of federal regulations on "small entities." A "small entity" is any small business, small organization, or small governmental organization. *Id*. § 601(3), (6). The term "small business" is used as it is defined in the Small Business Act. *Id.* § 601(3). Pursuant to the Small Business Act, the Administrator of the Small Business Administration (SBA) has specified detailed standards by which an entity will qualify as a "small business." 15 U.S.C. § 632(a)(2)(A).

64.    Under these standards, the timber tract operations within the pinesnake's critical habitat designation—such as those managed by the Forest Landowners—are small businesses if their gross annual revenues do not exceed $12,000,000. 13 C.F.R. § 121.201.

65.    The RFA requires that whenever an agency publishes a general notice of proposed rulemaking, it must also "prepare and make available for public comment" an "initial regulatory flexibility analysis," describing the impact of the proposed rule on small entities. 5 U.S.C. § 603(a).

66.    This initial regulatory flexibility must include, among other things, an estimate of the number of small entities likely to be affected by the rule, a description of less burdensome alternatives to the proposed rule, and a description of projected compliance requirements. 5 U.S.C. § 603.

67.    The RFA also requires the agency to complete a final regulatory flexibility analysis when adopting a final rule. This analysis must include, among other things, "a description of the

steps the agency has taken to minimize the significant economic impact on small entities." 5 U.S.C. § 604.

68.     These requirements apply unless the head of the agency correctly "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

69.     The RFA provides that "any small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with the [APA]." 5 U.S.C. § 611(a).

## Administrative Procedure Act

70.     The Administrative Procedure Act provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

71.     Pursuant to the Administrative Procedure Act, a court must set aside agency action that fails to meet statutory, procedural, or constitutional requirements; or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)–(D).

## FACTUAL ALLEGATIONS

## Listing and Designation of Critical Habitat

72.     The black pinesnake (*Pituophis melanoleucus lodingi*) is a large non-venomous, constricting snake endemic to the longleaf pine forests of the American southeast. It is one of three recognized pinesnake subspecies and is primarily distinguished by its dark brown to black coloration. Its range is limited to parts of Alabama, Mississippi, and Louisiana.

73.     The pinesnake is a relatively immobile species. The Service cites studies estimating a mean home range area for an individual snake as between 106 acres (the mean for an adult

female) and 551 acres (the mean for an adult male), with a range of 979 acres being the maximum ever recorded. 85 Fed. Reg. at 11,248.

74.     On October 6, 2015, the Service listed the pinesnake as threatened under the Endangered Species Act. 80 Fed. Reg. 60,468 (Oct. 6, 2015). Population decline within the pinesnake's historic range in recent decades was a primary factor contributing to its listing as a threatened species. 80 Fed. Reg. 60,468, 60,470, 60,482, 60,485 (Oct. 6, 2015).

75.     The Service also issued a "4(d) rule" prohibiting take except that incidental to certain forest management activities, prescribed burning, and herbicide applications. *See* 50 C.F.R. § 17.42; 80 Fed. Reg. at 60,489. Incidental take resulting from "conversion of long-leaf-pine dominated forests" and "significant subsurface disturbance" are prohibited. *See id.*

76.     Prior to finalizing its listing, on March 11, 2015, the Service published a proposed rule to designate critical habitat for the pinesnake. 80 Fed. Reg. 12,846. On October 11, 2018, the Service published a revised proposed rule to designate critical habitat and reopened the comment period. 83 Fed. Reg. 51,418.

77.     On February 26, 2020, the Service published a final rule designating critical habitat for the pinesnake. 85 Fed. Reg. 11,238 (Feb. 26, 2020).

78.     In total, the Service designated an area of approximately 324,679 acres in eight units within Clarke County in Alabama; and Forrest, George, Greene, Harrison, Jones, Marion, Perry, Stone, and Wayne Counties in Mississippi. 85 Fed. Reg. at 11,252. This includes approximately 93,208 acres of privately owned property. *Id.*

79.     Much of the private land within the designation is managed for the production of timber. *Id.* at 11,242–45. This includes the lands owned by the Forest Landowners in Units 7 and 8.

80.     Unit 7, located in Clarke County, Alabama, consists of 33,395 acres of privately owned timberland. *Id.* at 11,254. Land use activities within Unit 7 "that may require special management considerations or protection of the [pinesnake's] PBFs include: Fire suppression and low fire frequencies; detrimental forestry practices that could cause significant subsurface disturbance such as disking, bedding, or whole root ball stump removal; land use conversion and fragmentation, primarily urban development and conversion to agriculture and pine plantations; [and] gas, water, electrical power, and sewer easements . . . ." *Id.* at 11,254.

81.     Unit 8, also located in Clarke County, Alabama, consists of 5,943 acres of forested land, of which 2,100 acres is privately owned. *Id.* The remaining 3,843 acres in Unit 8 consist of land within the Fred T. Stimpson Special Opportunity Area, owned by the State of Alabama. *Id.* Land use activities within Unit 8 "that may require special management considerations or protection of the [pinesnake's] PBFs include: Fire suppression and low fire frequencies; detrimental forestry practices that could cause significant subsurface disturbance such as disking, bedding, or whole root ball stump removal; land use conversion and fragmentation, primarily urban development and conversion to agriculture and pine plantations; [and] gas, water, electrical power, and sewer easements . . . ." *Id.* at 11,254.

## Designation of Units 7 and 8 as Occupied

82.     In designating critical habitat for the pinesnake, the Service deemed each unit to have been "occupied" at the time of listing, and no area was determined to meet the stricter requirements for unoccupied critical habitat. *Id.* at 11,250.

83.     In determining that the private lands in Unit 7 were "occupied" by the pinesnake in 2015, the Service relied on five observations of the pinesnake between 1990 and 2015. *Id.* at 11,254. Four of these sightings occurred in a cluster more than twenty years before the species was listed, with only one snake observed in the area near the time of listing. *Id.* A 2008-09 survey of

the area now comprising Unit 7, conducted with the intention of locating black pinesnakes, failed to locate any pinesnakes. *Id.* at 11,239.

84.     In determining that the lands within Unit 8 were occupied in 2015, the Service relied upon two observations of the pinesnake between 1990 and 2015. *Id.* at 11,254. Each of these sightings occurred within the Fred T. Stimpson Special Opportunity Area and there have been no recorded observations on any of the privately owned lands within the Unit. *Id.*

85.     Peer review comments and numerous public comments criticized the Service's reliance on these old and sporadic sightings, arguing that there had been too few recent observations to support the Service's assumption that Units 7 and 8 were occupied in 2015. *Id.* at 11,239. The Service responded by acknowledging the weakness of this evidence, while claiming that occupation of the lands within Units 7 and 8 could be inferred from the presence of "suitable forested habitat." *See* 85 Fed. Reg. at 11,239.

## Economic Impacts Analysis

86.     Prior to finalizing the designation, the Service produced an analysis of the economic impacts of the proposed designation as required by the ESA. *Id.* at 11,256–59.

87.     As part of the agency's preparation for the economic analysis, the Service issued a memorandum to Industrial Economics, Inc. The memo's purpose was "to provide information to serve as a basis for conducting an economic analysis for the proposed designation of critical habitat for the black pinesnake." *See* Incremental Effects Memorandum.

88.     The Incremental Effects Memorandum describes several impacts of the critical habitat designation and states that, among other things, the designation will affect timber and forest management activities, as well as agricultural conversion, development, and construction projects. Incremental Effects Memorandum at 10–15.

89.    On October 22, 2014, Industrial Economics issued a screening memorandum along with its analysis of the economic impacts of the proposed critical habitat designation. Indus. Econ., Inc., *Screening Analysis of the Likely Economic Impacts of Critical Habitat Designation for the Black Pinesnake* (Oct. 22, 2014) (hereinafter "Screening Memorandum"), *available at* https://www.regulations.gov/document?D=FWS-R4-ES-2014-0065-0004.

90.    The Screening Memorandum analyzed "the incremental costs" of designating critical habitat for the black pinesnake. *See* Screening Memorandum at 7. The "incremental costs" include those costs "over and above" baseline costs. *Id*. Baseline costs are "any existing regulatory and socio-economic burden imposed on landowners, managers, or other resource users affected by the designation of critical habitat" including "the economic impacts of listing the species under the Act . . . ." *Id.*

91.    Industrial Economics conducted its analysis based on the information the Service provided in the Incremental Effects Memorandum. Screening Memorandum at 2.

92.    The Service deemed the critical habitat to have minimal economic impact because the designated land is purportedly occupied by the snake and, therefore, the majority of economic impacts are attributable instead to its listing. 85 Fed. Reg. at 11,257.

93.    Despite the errors alleged below, the Screening Memorandum still estimated that the designation would lead to a significant decrease in land values. The Service failed to analyze or justify these costs beyond stating the land was relatively valuable prior to the designation and concluding that some undetermined portion of the roughly $100 million private estate within the designation would be lost as a result of the designation. *See* Screening Memorandum at 19–20.

94.    Consequently, the Service did not exclude any private lands from the designation. 85 Fed. Reg. at 11,256–59.

**The Service's Certification Under RFA, 5 U.S.C. § 605(b)**

95.    In the proposed rule, the Service took the position that the RFA does not apply to critical habitat designations, because any impacts to small entities are insufficiently "direct." 80 Fed. Reg. at 12,862. It therefore certified "that, if promulgated, the proposed critical habitat designation will not have a significant economic impact on a substantial number of small entities." *Id*. For that reason, the Service did not include an initial regulatory flexibility analysis with its publication of the proposed rule.

96.    Likewise, when it published the Final Rule, the Service did not publish a final regulatory flexibility analysis.

97.    Instead, the Service restated its position that critical habitat does not directly regulate small entities. It therefore certified under 5 U.S.C. § 605(b) that its designation of 90,000 acres of private timberland would not have a "significant impact" on a "substantial number of small entities." *Id*. at 11,259–60.

98.    The Service made its Section 605(b) certification despite dozens of comments—including those of the Forest Landowners—identifying the designation's impact on small silvicultural operations and independent landowners. *See id.* at 11,242–11,245.

99.    Contrary to the Service's longstanding position that the RFA does not apply to critical habitat designations because the impacts of critical habitat on small entities are insufficiently "direct," the Small Business Administration Office of Advocacy interprets the RFA to apply to critical habitat designations. The Office of Advocacy is an independent office within the SBA and was established to represent the views of small entities before federal agencies and Congress. Likewise, the National Marine Fisheries Service acknowledges that the RFA applies when designating critical habitat for marine and anadromous species. *See* 82 Fed. Reg. 39,160 (Aug. 17, 2017).

## INJUNCTIVE RELIEF ALLEGATIONS

100.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1 through 99.

101.    The Forest Landowners have been injured by the Service's designation of critical habitat for the black pinesnake in violation of the ESA, RFA, and APA. If an injunction does not issue against the Service's enforcement of the critical habitat designation for the black pinesnake, the Forest Landowners will be irreparably harmed. This harm includes, but is not limited to, devaluation of their property and the continued imposition of significant regulatory burdens on their property.

102.    The Forest Landowners have no plain, speedy, or adequate remedy at law.

103.    The Forest Landowners' claims for relief are ripe.

104.    If not enjoined by the Court, the Service will continue to enforce or rely on the critical habitat designation in derogation of the Forest Landowners rights.

105.    Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

106.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1 through 99.

107.    An actual and substantial controversy exists between the Forest Landowners and the Service as to their legal rights and duties with respect to the ESA, APA, and RFA in the designation of critical habitat for the black pinesnake.

108.    This case is presently justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to the Forest Landowners. Because the designation has devalued their property and imposed substantial regulatory burdens on the use of their property, the Forest Landowners

have a vital interest in knowing whether the critical habitat designation, to which they are subject, is statutorily valid.

109.    Declaratory relief is therefore appropriate to resolve this controversy.

**FIRST CLAIM FOR RELIEF**
**Arbitrary and Capricious Agency Action**
**Units 7 and 8 Occupied at Time of Listing**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2); Alternatively, APA, 5 U.S.C. § 706)**

110.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-3, 6-25, 27-32, 34-40, 42-55, 58-62, and 70-85.

111.    The ESA defines critical habitat as those areas "within the geographic area occupied by the species, at the time it is listed" and areas "outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

112.    The ESA requires that all critical habitat designations be based on "the best scientific data available." 16 U.S.C. § 1533(b)(2).

113.    The Service considers Unit 7 to have been occupied by the pinesnake at the time of its listing based upon evidence of five observations of the pinesnake, recorded between 1990 and 2015. 85 Fed. Reg. at 11,254. Four of these observations occurred in a cluster more than twenty years before the pinesnake was listed, with only one pinesnake observed in the area near the time of its listing in 2015.

114.    The Service considers Unit 8 to have been occupied by the pinesnake at the time of its listing in 2015 based upon evidence of two observations of the pinesnake, recorded between 1990 and 2015. *Id.* Each of these sightings occurred in the mid-1990s within the Fred T. Stimpson Special Opportunity Area and there have been no recorded sightings on any of the privately owned lands within Unit 8. *Id.*

115.    These isolated sightings are inadequate as a matter of law to establish Units 7 and 8 were occupied by the pinesnake at the time of its listing in 2015.

116.    The Service states elsewhere in the Final Rule that despite this outdated evidence, occupation of Units 7 and 8 can be inferred from the presence of "suitable forested habitat" in these areas. *See* 85 Fed. Reg. at 11,239. This inference is inadequate as a matter of law to establish that either unit was occupied in 2015. Its reliance on mere suitability unlawfully short-circuits the distinction between "occupied" and "unoccupied" critical habitat and renders the requirement of the species' occupation at the time of listing meaningless.

117.    Even if this inference were not inadequate as a matter of law, the usefulness of historic, isolated sightings for determining present occupation is undermined by the fact that population decline in southern Alabama during the same period was a primary factor contributing to the pinesnake's 2015 listing as a threatened species. 80 Fed. Reg. 60,468, 60,470, 60,482, 60,485 (Oct. 6, 2015); 85 Fed. Reg. at 11,251. Further, a 2008-09 survey conducted with the intention of locating black pinesnakes failed to locate any individual snakes in the area now designated as Unit 7. 85 Fed. Reg. at 11,239.

118.    Even if isolated sightings were not inadequate as a matter of law to establish occupation under the ESA, the size of Unit 7 is disproportionately large. Given the low mobility of the pinesnake—for which the maximum range ever recorded is less than 1,000 acres, 85 Fed. Reg. at 11,248—an isolated sighting of a single pinesnake cannot justify the assumption that the entire 33,395-acre Unit 7 is occupied.

119.    Unit 8 is likewise disproportionately large. Based on two sightings, the Service assumed a 5,943-acre area was occupied (including 2,100 acres of adjacent privately owned land on which there have been *zero* sightings of the snake).

- 23 -

120.     By relying on isolated sightings of the pinesnake over the course of three decades, the Service failed to establish that Units 7 and 8 were occupied by the pinesnake at the time of its listing in 2015.

121.     By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and alternatively, the APA, 5 U.S.C. § 706. Therefore, the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake is invalid and must be set aside.

### SECOND CLAIM FOR RELIEF
### Failure to Make Threshold Determination
### for Designating Critical Habitat – Unoccupied at Time of Listing
### (Violation of ESA, 16 U.S.C. § 1533(b)(2);
### 50 C.F.R. § 424.12; Alternatively, APA, 5 U.S.C. § 706)

122.     The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-3, 6-25, 27-32, 34-40, 42-55, 58-62, and 70-85.

123.     The ESA defines critical habitat as those areas "within the geographic area occupied by the species, at the time it is listed" and areas "outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

124.     By regulation, the Service must "first evaluate areas occupied by the species" and "will only consider unoccupied areas to be essential where a critical habitat designation limited to geographical areas occupied would be inadequate to ensure the conservation of the species." 50 C.F.R. § 424.12(b)(2). Additionally, "for an unoccupied area to be considered essential, the Secretary must determine that there is a reasonable certainty that the area will contribute to the conservation of the species . . . ." *Id*.

125.     The Service made no finding that Units 7 and 8 are "essential" to the pinesnake's conservation. It did not find that all other occupied areas are "inadequate" for the pinesnake's

conservation and it did not find there exists "a reasonable certainty" that Units 7 and 8 "will contribute to the conservation of the species." 50 C.F.R. § 424.12(b)(2).

126.   And without Units 7 and 8, there would still exist 285,341 acres of critical habitat deemed "occupied" by the Service. *See* 85 Fed. Reg. at 11,252. This makes it unlikely the Service could make the "onerous" showing that a designation of unoccupied critical habitat is "essential" for the pinesnake's conservation. *See Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).

127.   As such, Units 7 and 8 do not alternatively qualify as "unoccupied" critical habitat.

128.   By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(b)(2); federal regulation 50 C.F.R. § 424.12; and alternatively, the APA 5 U.S.C. § 706. Therefore, the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake is invalid and must be set aside.

**THIRD CLAIM FOR RELIEF**
**Inadequate Economic Analysis**
**Incremental Effect Analysis**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

129.   The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-2, 4, 6-25, 27-32, 34-40, 42-51, 55-62, 70-81, and 86-94.

130.   The ESA requires that all critical habitat designations be based on "the best scientific data available" after taking into consideration "the economic impact . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). This has been described as "impos[ing] a 'categorical requirement' that the Secretary 'tak[e] into consideration' economic and other impacts before such a designation." *Weyerhaeuser*, 139 S. Ct. at 371 (quoting *Bennett v. Spear*, 520 U.S. 154, 172 (1997)).

131.    To meet the requirements of the ESA the Service must therefore perform an economic analysis of the effects of the designation before it is finalized. *See N.M. Cattle Growers Ass'n*, 248 F.3d at 1280. And in doing so, the Service must assess *all* of the costs of designating critical habitat, even if those costs are co-extensive with other causes. *Id.* at 1285.

132.    In other words, the ESA requires that the Service "conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes," such as listing the species. *Id.*

133.    Thus, the ESA prohibits the Service from only measuring the incremental economic impacts of a critical habitat designation.

134.    The final economic analysis for the black pinesnake designation is contained within the Screening Memorandum. *See* 85 Fed. Reg. at 11,257.

135.    By the Service's own admission, the Screening Memorandum assessed economic impacts solely through the "incremental method." Screening Memorandum at 7 ("This screening analysis focuses on the likely incremental effects of the critical habitat designation."). The analysis in the remainder of the document confirms that the Service did not analyze the economic impacts of the designation under a co-extensive approach, as required by the ESA.

136.    In its final economic analysis, the Service did not consider costs resulting from consultation under Section 7. *Id.* at 3. Such costs include the relocation of activities outside of habitat deemed to be occupied, mitigation requirements such as the retention of downed logs in project areas, and a range of other project modifications likely to be recommended to avoid adverse modification. Incremental Effects Memorandum" at 11–12. Rather than analyzing these impacts, the Service only considered minor administrative costs associated with expanded consultation. Screening Memorandum at 3.

137.    By failing to analyze all of the economic impacts, the final economic analysis underestimates the impacts of designating critical habitat for the pinesnake and violates Section 4(b)(2)'s "categorical requirement" to assess the economic impact of the critical habitat designation. As a result of this faulty analysis, the Service was unable to make a fully informed decision about whether to exclude certain areas from the designation, including those areas where the Forest Landowners own property.

138.    By these acts or omissions the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and alternatively, the APA, 5 U.S.C. § 706. Therefore, the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake is invalid and must be set aside.

**FOURTH CLAIM FOR RELIEF**
**Inadequate Economic Analysis**
**Certain Costs Underestimated or Ignored**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

139.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-2, 4, 6-25, 27-32, 34-40, 42-51, 55-62, and 70-94.

140.    The ESA requires that all critical habitat designations be based on "the best scientific data available" after taking into consideration "the economic impact . . . and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). This "imposes a 'categorical requirement' that the Secretary 'tak[e] into consideration' economic and other impacts before such a designation." *Weyerhaeuser*, 139 S. Ct. at 371 (quoting *Bennett*, 520 U.S. at 172).

141.    To meet the requirements of the ESA the Service must therefore perform an economic analysis of the effects of the designation before it is finalized. *N.M. Cattle Growers*, 248 F.3d at 1280.

142.    Even if the Service's use of the "incremental method" were proper, the Service's analysis of the economic impacts of designating Units 7 and 8 was still deficient, for at least three reasons.

143.    First, as the Service acknowledged in the Screening Memorandum, a critical habitat designation reduces the value of private property due to the stigma effect of anticipated regulatory burdens. *See* Screening Memorandum at 3, 7, 18–22. Critical habitat designations significantly reduce land values. *See* Maximilian Aufhammer et al., *The Economic Impact of Critical-Habitat Designation: Evidence from Vacant-Land Transactions*, 96 Land Econ. 188–206 (2020) (finding that two critical habitat designations reduced land values by 48 percent and 78 percent, respectively). Yet, although the Screening Memorandum recognized the potential for these costs to private property values, the Service made no attempt to measure or analyze them. *Id.* at 3.

144.    Second, the Screening Memorandum underestimates the costs to forestry projects in the area. The Final Rule designates a large amount of land as "occupied." However, individual members of the species are not likely to be present throughout all of this purportedly "occupied" area, at all times. To minimize the risk of liability, prudent land managers must nonetheless respond to this "occupied" designation as if individual pinesnakes are present on their land, even when they are not.

145.    The designation of occupied critical habitat therefore effectively extends the restrictions associated with the pinesnake's Section 4(d) rule to areas where members of the species are not present. The Service, however, failed to analyze the incremental costs associated with resulting changes to forest management and timber harvesting practices.

146.    Third, the Service failed to recognize the costs to conservation and public recreation programs that will result from the designation. A critical habitat designation makes it less likely that private landowners will manage their land to maintain longleaf pine habitat and other original

features important to species that depend upon it. And by infringing upon private management and imposing regulatory burdens, a critical habitat designation will disincentivize landowners from participating in voluntary wildlife conservation programs. *See* Lauren K. Ward, et al., *Family Forest Landowners and the Endangered Species Act: Assessing Potential Incentive Programs*, 116 J. Forestry 529, 536 (2018). Yet, in its analysis, the Service failed to account for these potential costs to conservation programs.

147.    Likewise, the Service failed to consider costs resulting from the fact that critical habitat discourages landowners from making their property available for public recreation through programs such as the State of Alabama's WMA program.

148.    By not analyzing these incremental costs, the Service violated Section 4(b)(2)'s "categorical requirement" to assess the economic impact of the critical habitat designation.

149.    By these acts or omissions the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and alternatively, the APA, 5 U.S.C. § 706. Therefore, the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake is invalid and must be set aside.

**FIFTH CLAIM FOR RELIEF**
**Inadequate Economic Analysis**
**Failure to Exclude**
**(Violation of ESA, 16 U.S.C. § 1533(b)(2);**
**Alternatively, APA, 5 U.S.C. § 706)**

150.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-2, 4, 6-25, 27-32, 34-40, 42-51, 55-62, and 70-94.

151.    The ESA provides that the Service "may exclude any area" from a designation of critical habitat if the benefits of exclusion outweigh the benefits of inclusion, so long as the exclusion would not result in the species' extinction. 16 U.S.C. § 1533(b)(2).

152.    Even accepting the economic analysis as sufficient, the Service acted arbitrarily and capriciously, abused its discretion, and otherwise failed to act in accordance with law when it failed to explain its reasoning for not excluding Units 7 and 8 from the critical habitat designation.

153.    The purpose of the required economic analysis is to identify those areas that should be excluded from the critical habitat designation.

154.    Notwithstanding its flaws, the economic analysis demonstrates the high economic impacts of critical habitat designation in areas where there is a large amount of private property. The Screening Memorandum recognizes that the pinesnake's critical habitat designation could potentially impose large costs on private land values, possibly reaching $100 million. Screening Memorandum at 21–22. Although the Service alleges that the exact costs cannot be measured, even a fraction of that $100 million will significantly affect the private landowners whose land is burdened by the pinesnake designation.

155.    In the final decision designating critical habitat, the Service declined to exclude Unit 7 or 8 from the designation, despite both units containing large areas of private property. *Id.* at 11,258. In doing so the Service simply restated its economic analysis and said it was not excluding any areas from the designation based on economic impacts. 85 Fed. Reg. at 11,258.

156.    The Service never offered a rationale that weighed the costs and benefits of excluding Unit 7 or 8. The Service's failure to explain its decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See National Mining Ass'n v. U.S. Dept. of Labor*, 812 F.3d 843, 865 (11th Cir. 2016) ("agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

157.    By these acts or omissions the Service violated the ESA, 16 U.S.C. § 1533(b)(2); and alternatively, the APA, 5 U.S.C. § 706. *See Weyerhaeuser*, 139 S. Ct. at 371 (entertaining a challenge to the Service's failure to exclude from critical habitat on the ground that "the agency did not appropriately consider all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion"). *See also id.* ("when reviewing an agency action, we must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)). Therefore, the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake is invalid and must be set aside.

**SIXTH CLAIM FOR RELIEF**
**Failure to Issue Regulatory Flexibility Analyses**
**(Violation of RFA, 5 U.S.C. §§ 603, 604, 605(b), 611(a);**
**Alternatively, APA 5 U.S.C. § 706)**

158.    The Forest Landowners re-allege and incorporate by reference all of the allegations set forth in paragraphs 1-2, 5, 6-51, 58-81, 86-91, 93, and 95-99.

159.    Sections 603 and 604 of the RFA require federal agencies to issue initial and final regulatory flexibility analyses detailing the impact of any final agency action on small entities. Each federal agency must do so unless it can certify under Section 605(b) of the RFA that the action will not have a significant impact on a substantial number of small entities.

160.    In designating critical habitat for the pinesnake the Service did not issue an initial or final regulatory flexibility analysis. Instead, the Service erroneously claimed (or certified) that the designation of critical habitat only regulates federal agencies (not small entities), and therefore under Section 605 is exempt from Section 603 and 604 of the RFA.

161.    The Service's reliance on Section 605 in this case is unlawful because the Service wrongfully maintains the designation of critical habitat only directly regulates federal agencies,

and not small entities, like the Forest Landowners. In fact, a designation directly affects those individuals and businesses whose properties are encumbered by the designation and whose activities form the basis for any consultations required by Section 7. The Service's certification therefore ignores what is truly regulated by a critical habitat designation—land. *See Cal. Cattlemen's*, 315 F. Supp. 3d at 287–88.

162.    This is demonstrated by the fact that the Service's own economic analysis acknowledges that the designation will reduce the value of designated private land. Screening Memorandum at 21–22.

163.    The Service's failure to issue the initial and final regulatory flexibility analyses, based on an erroneous and categorical certification that the Final Rule will not have a significant economic impact on a substantial number of small entities, violates the RFA and is unlawful.

164.    By these acts or omissions the Service violated the RFA, 5 U.S.C. §§ 603, 604, 605(b), 611(a); and alternatively, the APA, 5 U.S.C. § 706. Therefore, the Final Rule designating critical habitat for the black pinesnake is invalid and must be set aside.

**PRAYER FOR RELIEF**

Wherefore, the Plaintiffs respectfully request the following relief:

**As to the First Claim for Relief:**

1.    Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law when they designated Units 7 and 8 as critical habitat for the black pinesnake because they failed to establish these areas were occupied, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively 5 U.S.C. § 706.

**As to the Second Claim for Relief:**

2.    Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law when they designated Units 7 and 8 as critical

habitat for the black pinesnake because they failed to apply the proper standard for designating unoccupied critical habitat, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), federal regulation, 50 C.F.R. § 424.12, or alternatively 5 U.S.C. § 706.

**As to the Third Claim for Relief:**

3.      Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law when they analyzed only incremental costs of the critical habitat designation, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively 5 U.S.C. § 706.

**As to the Fourth Claim for Relief:**

4.      Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law by their failure to analyze certain incremental costs of the critical habitat designation, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively 5 U.S.C. § 706.

**As to the Fifth Claim for Relief:**

5.      Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law by their failure to explain their decision not to exclude critical habitat for all or part of Units 7 and 8, in violation of Section 4(b)(2) of the ESA, 16 U.S.C. § 1533(b)(2), or alternatively 5 U.S.C. § 706.

**As to the Sixth Claim for Relief:**

6.      Declare the designation of critical habitat under the ESA is not categorically exempt from the requirements of Sections 603 and 604 of the RFA.

**As to the First, Second, Third, Fourth, and Fifth Claims for Relief:**

7.      Set aside the Final Rule designating Units 7 and 8 as critical habitat for the black pinesnake or enjoin its enforcement.

8.      Remand the Final Rule for redesignation of critical habitat in accordance with the

ESA and APA.

**As to the Sixth Claim for Relief:**

9.      Set aside the Final Rule or enjoin its enforcement against small entities, including

the Plaintiffs.

10.     Remand the Final Rule for the Defendants to complete initial and final regulatory

flexibility analyses.

**As to all Claims for Relief:**

11.     Award Plaintiffs reasonable attorney fees and cost; and

12.     Award Plaintiffs any other relief the Court deems just and proper under the

circumstances of this case.

DATED:   February 25, 2021.

Respectfully submitted,

/s/ Charles T. Yates

CHARLES T. YATES*
JEFFREY W. McCOY*
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
Email:  JMccoy@pacificlegal.org
Email:  CYates@pacificlegal.org

JONATHAN WOOD*
Pacific Legal Foundation
3100 Clarendon Boulevard, Suite 610
Arlington, VA 22201
Email:  JWood@pacificlegal.org
Telephone:  (202) 888-6881
Facsimile:  (916) 419-7747

*Attorneys for Plaintiffs Thomas Gray Skipper,*

*Skipper Land Holdings LLC, Phalyn LLC, and Forest Landowners Association*

*\*Pro Hac Vice Pending*