**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| THOMAS GRAY SKIPPER, *et al.*, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*, | Civil Case No. 1:21-cv-00094 |
| Federal Defendants, and | |
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Defendant-Intervenor. | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION
<u>FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................... 1

LEGAL BACKGROUND ............................................................................................... 2

    A.    Endangered Species Act ...................................................................................... 2

    B.    The Administrative Procedure Act ...................................................................... 5

    C.    Regulatory Flexibility Act ................................................................................... 6

FACTUAL BACKGROUND .......................................................................................... 6

ARGUMENT .................................................................................................................. 8

I.     PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE UNRIPE ........................... 9

II.    THE SERVICE REASONABLY CONCLUDED THAT UNITS 7 AND 8 OF THE
       DESIGNATION WERE OCCUPIED AT THE TIME OF LISTING. ................................ 12

    A.   The Service's Interpretation that All Units in the Designation are "Occupied" is Entitled
        to Deference. ....................................................................................................... 12

    B.   The Service's Analysis is Fully Supported by the Administrative Record. ........................... 14

III.   THE SERVICE CORRECTLY ASSESSED THE ECONOMIC COSTS OF THE
       DESIGNATION. ................................................................................................ 16

    A.   The Service Appropriately Utilized the Incremental Approach to Calculating the Costs of
        the Designation. ................................................................................................. 16

    B.   The Service Fully Accounted for, and Analyzed, the Costs of the Designation. ................... 20

IV.   THE SERVICE REASONABLY OPTED NOT TO EXCLUDE UNITS 7 AND 8. ........... 22

V.    THE SERVICE REASONABLY DETERMINED THAT NO REGULATORY
       FLEXIBILITY ANALYSIS WAS REQUIRED. ................................................... 24

      A.   The Service's Interpretation of the ESA is Entitled to Deference. ................................ 25

      B.   The Service Had a Rational Basis to Invoke RFA Section 605(b). .............................. 26

CONCLUSION .............................................................................................................. 30

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                    <u>PAGE</u>

*Alaska Oil & Gas Ass'n v. Jewell,*
    815 F.3d 544 (9th Cir. 2016) ................................................................ 21

*Am. Trucking Ass'ns v. EPA,*
    175 F.3d 1027 (D.C. Cir. 1999) .......................................................... 27

*Arizona Cattle Growers' Ass'n v. Salazar,*
    606 F.3d 1160 (9th Cir. 2010) ............................................... 13, 14, 16, 20

*Atlantic States Legal Found., Inc. v. EPA,*
    325 F.3d 281, 285 (D.C. Cir. 2003) ..................................................... 11

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,*
    462 U.S. 87 (1983) ............................................................................. 13

*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................... 22

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
    781 F.3d 1271 (11th Cir. 2010) .......................................................... 11

*California Cattlemen's Ass'n. v. U.S. Fish and Wildlife Service,*
    369 F. Supp. 3d 141 (D.D.C. 2019) .................................................... 29

*California Cattlemen's Ass'n v. U.S. Fish and Wildlife Service,*
    315 F. Supp. 3d 282 (D.D.C. 2018) .................................................... 29

*Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior,*
    344 F. Supp. 2d 108 (D.D.C. 2004) .................................................... 20

*Cement Kiln Recycling Coal. v. EPA,*
    255 F.3d 855 (D.C. Cir. 2001) ............................................................ 27

*Chevron v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984) ..................................................................... 19, 26

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct. 1138 (2013) ................................................................... 9, 11

*Colo. Dep't of Nat. Res. v. FWS,*
    362 F. Supp. 3d 951 (D. Colo. 2018) ............................................... 1, 20

*Conserv. Council for Haw. v. Babbitt*,
   2 F. Supp. 2d 1280 (D. Haw. 1998) ........................................................................ 26

*Council for Urological Interests v. Burwell*,
   790 F.3d 212 (D.C. Cir. 2015) ................................................................................ 30

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*,
   871 F. Supp. 2d 1312 (S.D. Ala. 2012) ................................................................... 10

*Defs. of Wildlife v. U.S. Dep't of the Navy*,
   733 F.3d 1106 (11th Cir. 2013) ................................................................................. 3

*Fisher v. Salazar*,
   656 F. Supp. 2d 1357 (N.D. Fla. 2012) ............................................................ *passim*

*Fla. Key Deer v. Paulison*,
   522 F.3d 1133 (11th Cir. 2008) ............................................................................... 10

*Fla. Wildlife Federation, Inc. v. Jackson*,
   853 F. Supp. 2d 1138 (N.D. Fla. 2007) ............................................................. 27, 30

*Food & Water Watch v. Vilsack*,
   79 F. Supp. 3d 174 (D.D.C. 2015) ........................................................................... 11

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*,
   378 F.3d 1059 (9th Cir. 2004) ........................................................................... 18, 20

*Holder v. Martinez Gutierrez*,
   566 U.S. 583 (2012) ................................................................................................ 26

*Humane Soc'y of the United States v. Perdue*,
   290 F. Supp. 3d 5 (D.D.C. 2018) ............................................................................. 10

*Idaho Cty. v. Evans*,
   2003 U.S. Dist. LEXIS 23459, at *18-19 (D. Idaho Sept. 30, 2003) ....................... 28

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................. 9

*Maddalena v. FWS*,
   (S.D. Cal. Aug. 5, 2010) ......................................................................................... 20

*Markle Interests, LLC v. FWS*,
   827 F.3d 452 (5th Cir. 2016) ................................................................................... 26

iii

*Miami-Dade County v. U.S. EPA,*
   529 F.3d 1049 (11th Cir. 2008) ................................................................ 13

*Miccosukee Tribe of Indians v. United States,*
   566 F.3d 1257 (11th Cir. 2009) .................................................................. 5

*Michigan v. EPA,*
   213 F.3d 663 (D.C. Cir.) ................................................................... 27, 28

*Mid-Tex Elec. Coop. v. FERC,*
   773 F.2d 327 (D.C. Cir. 1985) ................................................................ 26

*Motor & Equip. Mfrs. Ass'n v. Nichols,*
   142 F.3d 449 (D.C. Cir. 1998) ................................................................ 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29, 50 (1983) ......................................................................... 31

*New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.,*
   248 F.3d 1277 (10th Cir. 2001) ................................................... 17, 18, 19

*New Mexico Farm and Livestock Bureau v. United States Department of the Interior,*
   952 F.3d 1216 (10th Cir. 2020) .............................................................. 14

*Nat. Res. Def. Council v. U.S. Dep't of Interior,*
   113 F.3d 1121 (9th Cir. 1997) ................................................................ 26

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
   551 U.S. 644 (2007) .............................................................................. 25

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.,*
   416 F. Supp. 2d 92 (D.D.C. 2006) .......................................................... 28

*Northern New Mexico Stockman's Assoc. v. U.S. Fish and Wildlife Service.,*
   494 F. Supp. 3d 850 (D.N.M. 2020) ................................................. 18, 20

*North Carolina Fisheries Association v. Daley,*
   16 F. Supp. 2d 647 (E.D. Va. 1997) ........................................................ 28

*North Carolina Fisheries Ass'n, Inc. v. Daley,*
   27 F. Supp. 2d 650 (E.D. N.C. 1998) ...................................................... 29

*Otay Mesa Property, LP v. DOI,*
   144 F. Supp. 3d 35 (D.D.C. 2015) .......................................................... 20

*Sierra Club v. U.S. Fish and Wildlife Service,*
   245 F.3d 434 (5th Cir. 2001) ........................................................... 18

*Sierra Club v. Marsh,*
   816 F.2d 1376 (9th Cir. 1987) ......................................................... 16

*Sierra Club v. Van Antwerp,*
   526 F.3d 1353 (11th Cir. 2008) ......................................................... 5

*Southern Offshore v. Daley,*
   995 F. Supp. 1411 (M.D. Fla. 1998) .......................................... 6, 28, 29

*S.W. Ctr. for Biol. Div. v. Babbitt,*
   215 F.3d 58 (D.C. Cir. 2000) ........................................................... 13

*Swanson Grp. Mfg. LLC v. Jewell,*
   790 F.3d 235 (D.C. Cir. 2015) ....................................................... 9, 10

*Tennessee Valley Authority v. Hill,*
   437 U.S. 153 (1978) ............................................................... 2, 16, 23

*Weyerhaeuser v. U.S. Fish and Wildlife Service,*
   139 S. Ct. 361 (2018) ..................................................... 16, 22, 25, 27

*Wyoming State Snowmobile Ass'n v. U.S. Fish and Wildlife Service,*
   741 F. Supp. 2d 1245 (D. Wyo. 2010) .............................................. 21

## STATUTES

5 U.S.C. § 601 ...................................................................................... 6

5 U.S.C. § 605(b) ............................................................................. 6, 27

5 U.S.C. § 611(a)(1) ............................................................................. 6

5 U.S.C. § 611(a)(2) ............................................................................. 6

5 U.S.C. § 611(c) ................................................................................. 6

5 U.S.C. § 701(a)(2) ........................................................................... 23

5 U.S.C. § 704 ...................................................................................... 5

5 U.S.C. § 706 .................................................................................... 31

5 U.S.C. § 706(2)(A) ............................................................................. 5

16 U.S.C. § 1532(5)(A) .................................................................. 12, 26

16 U.S.C. § 1532(6),(20) ...................................................................... 3

16 U.S.C. § 1532(19) ................................................................................................ 5, 26

16 U.S.C. § 1533(a)(1) .................................................................................................. 3

16 U.S.C. § 1533(a)(3)(A),(b)(2) .................................................................................. 3

16 U.S.C. § 1533(b)(2) .................................................................................. 16, 19, 22

16 U.S.C. § 1533(b)(1)(A) ............................................................................................ 3

16 U.S.C. § 1533(d) ...................................................................................................... 5

16 U.S.C. § 1536(a)(2) ............................................................................................ 4, 26

16 U.S.C. § 1536(b) ...................................................................................................... 4

16 U.S.C. § 1536(b)(3)(A) ............................................................................................ 4

16 U.S.C. § 1538(a) ...................................................................................................... 5

16 U.S.C. § 1538(a)(1) ................................................................................................ 26

## FEDERAL REGULATIONS

50 C.F.R. § 17.3 ........................................................................................................... 5

50 C.F.R. § 402.01(b) ................................................................................................... 3

50 C.F.R. § 402.02 .......................................................................................... 11, 17, 18

50 C.F.R. § 402.13 ........................................................................................................ 4

50 C.F.R. § 402.13(a) ............................................................................................. 4, 10

50 C.F.R. § 402.14 ................................................................................................. 4, 10

50 C.F.R. § 402.14(a) ......................................................................................... 4, 10, 26

50 C.F.R. § 402.14(g) ............................................................................................ 4, 11

50 C.F.R. § 424.02 ........................................................................................................ 3

50 C.F.R. § 424.19(b) ................................................................................................. 19

50 C.F.R. § 402.13(a) ................................................................................................. 10

## <u>INTRODUCTION</u>

This case involves the ("Service") designation of critical habitat for the black pine snake, a large non-venomous constricting snake found in an isolated pocket of Mississippi and Alabama, listed as a threatened species under the Endangered Species Act ("ESA"). Unlike determinations of threatened or endangered status, which are based solely on biological factors, critical habitat designations consider economic and other non-biological factors. In accordance with this requirement, the Service issued the pine snake critical habitat rule only after consideration of the impacts of the designation, including economic effects on third parties.

Plaintiffs raise a number of challenges to this designation, including the Service's reliance on allegedly outdated sightings of the pine snake, its consideration of economic impacts, and the agency's determination that the designation had no direct impacts on small entities. Plaintiffs' arguments are unavailing for a number of reasons.

First, Plaintiffs have failed to demonstrate a concrete, imminent injury to their interests that can be traced to the designation itself, as opposed to a speculative future action by some unidentified agency. Nor have they shown causation or that their alleged harm is redressable. Plaintiffs do not meet their burden to demonstrate standing here because designating land as critical habitat does not, in and of itself, restrict the use of that land. Rather, it imposes a requirement on federal agencies to consult with the U.S. Fish and Wildlife Service ("Service") before taking actions that may appreciably diminish the conservation value of the land for listed species. Plaintiffs do not describe any loss of value to their property or particular project that would require ESA Section 7 consultation between a federal agency and the Service.

Even if the Court has jurisdiction, Plaintiffs' arguments miss the mark. The Service carefully exercised its expert judgment and reasonably relied on a combination of species

sightings and habitat suitability analysis to conclude that the pine snake likely occupied the designated areas at the time of listing. The Service's reliance on this combination of factors was entirely proper, especially in light of the fact that the species is elusive and spends the majority of its time underground. The Service also satisfied is obligation to consider the economic impacts of the critical habitat designation by conducting an economic analysis that was consistent with the ESA, applicable regulations, and agency policy, and thoroughly addressing the likely economic impacts and benefits of designating critical habitat for the imperiled pine snake in deciding not to exclude any areas from the designation.

Plaintiffs' claim that the Service erred by deciding that it was not necessary to conduct an analysis under the Regulatory Flexibility Act ("RFA") claim also lacks merit. Even if the Court has jurisdiction, Plaintiffs' RFA claim fails on the merits because the RFA applies only to small businesses that are *directly* regulated by the rule. The Service does not impose legal requirements on private parties by designating critical habitat. Rather, it imposes a requirement on federal agencies to consult with the Service before taking actions that may jeopardize listed species or destroy or adversely modify their critical habitat. Accordingly, private parties are not directly regulated by the designation of critical habitat.

For these reasons, as explained more fully below, the Court should grant Defendants' cross-motion for summary judgment, and deny Plaintiffs' motion for summary judgment.

## LEGAL BACKGROUND

### A.    Endangered Species Act

Congress enacted the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("*TVA*"). "In accordance with this policy, the ESA provides for the listing of species as threatened or endangered and the

2

designation of their critical habitat." *Defs. of Wildlife v. U.S. Dep't of the Navy*, 733 F.3d 1106, 1111 (11th Cir. 2013). The Secretaries of the Interior and Commerce are responsible for implementing the ESA, and they have delegated their respective responsibilities to the Service and the National Marine Fisheries Service ("NMFS"). In general, the Service has responsibility for terrestrial and freshwater species such as those at issue in this case, and NMFS has responsibility for marine species and anadromous fish. *See* 50 C.F.R. § 402.01(b); *see also id.* §§ 17.11, 224.101. The Secretary with responsibility for a species must determine whether the species should be listed as threatened or endangered because of one or more of five statutory factors, 16 U.S.C. § 1533(a)(1), solely on the basis of the best scientific and commercial data available. *Id.* § 1533(b)(1)(A). An endangered species is "in danger of extinction throughout all or a significant portion of its range" while a threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(6), (20).

To promote conservation, the Service must also designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact" of "specifying any particular area as critical habitat." *Id.* § 1533(a)(3)(A), (b)(2). In determining which areas constitute occupied critical habitat, the Secretary must consider those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. *Cons. of Sw. Fla. v. FWS*, 677 F.3d 1073, 1079 (11th Cir. 2012). These include, *e.g.*, space for population growth, normal behavior, cover or shelter, and sites for breeding, reproduction, and rearing of offspring. 50 C.F.R. § 424.02.

Designating an area as critical habitat does not automatically affect land use or prohibit activities in that area. Rather, ESA Section 7(a)(2) requires that:

> Each federal agency shall, in consultation with and with the assistance of the
> Secretary, ensure that any action authorized, funded, or carried out by such
> agency . . . is not likely to jeopardize the continued existence of any endangered
> species or threatened species or result in the destruction or adverse modification
> of [critical] habitat.

16 U.S.C. § 1536(a)(2). Accordingly, only activities that involve a Federal permit, license, or

funding, and that are likely to destroy or adversely modify critical habitat would be affected by a

critical habitat designation. The federal agency proposing the action ("action agency") first

determines whether the action "may affect" a listed species or critical habitat. 50 C.F.R. §

402.14(a). If the action agency determines that its action will have no effect, no consultation is

required. *Id.* If, on the other hand, the action agency determines that its action "may affect" listed

species or critical habitat, it must pursue either informal or formal consultation with the Service

and/or NMFS (the "consulting agency"). *Id.* §§ 402.13, 402.14. Informal consultation concludes

when the consulting agency concurs with the action agency's determination that the proposed

action is "not likely to adversely affect" listed species or critical habitat. *Id.* § 402.13. Formal

consultation is required if the action agency or the consulting agency determines that the

proposed action is "likely to adversely affect" listed species or critical habitat. *Id.* §§ 402.13(a),

402.14(a), (b)(1).

Following formal consultation, the Service or NMFS issues a biological opinion stating

whether the proposed action is likely to jeopardize the continued existence of the listed species

or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If the

consulting agency concludes in a biological opinion that the proposed action will result in

jeopardy or destruction or adverse modification of critical habitat, it must identify any

"reasonable and prudent alternatives" available to the action agency. *See* 16 U.S.C. § 1536

(b)(3)(A); 50 C.F.R. § 402.14(g), (h). Therefore, in the event the Service concludes that a project

is likely to destroy or adversely modify critical habitat, the Service works with its partners to amend the project to minimize harm and avoid destruction or adverse modification, enabling the project to move forward.

ESA Section 9 makes it unlawful for any person to engage in certain activities with respect to endangered species, including importing, exporting, or "taking" such species. 16 U.S.C. § 1538(a); *see also* 85 Fed. Reg. 11,297.[1] "Take" is broadly defined under the ESA to include, *inter alia*, "harm," "wound," and "kill" any listed species. *Id.* § 1532(19).[2]

## B.     The Administrative Procedure Act

The Administrative Procedure Act ("APA") authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA defines agency action to include agency rules. *Id.* § 551(13). The reviewing court shall hold unlawful "agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). The standard of review is "exceedingly deferential." *Fisher v. Salazar*, 656 F. Supp. 2d 1357, 1365-66 (N.D. Fla. 2012) (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008)). "While a court must ensure that the agency came to a rational conclusion, the court may not substitute its own judgment for the agency's decision." *Id.* (citing *Miccosukee Tribe of Indians of Fla. v. U.S.*, 566 F.3d 1257, 1264 (11th Cir. 2009)).

---

[1] ESA Section 4(d) provides that the Service may by regulation extend some or all of the Section 9 prohibitions to threatened species. 16 U.S.C. § 1533(d). The Service has done so for the pine snake. 80 Fed. Reg. 60,468 (Oct. 15, 2015).

[2] The Service's regulations further define "harm" to include those acts that "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

C.      **Regulatory Flexibility Act**

The RFA requires federal agencies to consider the likely impacts of their rules on small entities by publishing, along with proposed and final rules, an analysis of the rule's impacts on small businesses, non-profits, and local governments. *See* 5 U.S.C. §§ 601, 603, 604. However, to avoid "duplicative or unnecessary analyses," no initial or final regulatory flexibility analyses are required "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

Congress limited judicial review to claims regarding "agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610. . . ." 5 U.S.C. § 611(a)(1); *see also id.* § 611(c). Where an agency invokes Section 605(b) of the RFA, certifying that no regulatory flexibility analysis is required, the APA's standard of review applies. *See* 5 U.S.C. § 611(a)(2). Failure to comply with the RFA does not necessarily require the vacatur of a rule. *S. Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411, 1437 (M.D. Fla. 1998).

## FACTUAL BACKGROUND

The black pinesnake (*Pituophis melanoleucus lodingi*) is endemic to the longleaf pine forests that once blanketed the southeastern United States. 80 Fed. Reg. 60,468-69 (final listing rule); AR147-150. Its prey base consists primarily of rats and mice. AR397. It is "cryptic," spends the majority of its time underground, and thus is "difficult to locate even in areas where it is known to occur." AR396. It is protected in Alabama as a non-game animal. AR13, 38.

Today, the snake's range is limited to fragmented pockets of Mississippi and Alabama. 80 Fed. Reg. at 60,470; AR383. This is attributable to a number of factors, but chief among them is large-scale land use conversion—primarily conversion to agriculture and densely-stocked pine plantations, and to the development of urban areas. *Id.* at 60,481. Most of the remaining patches of

longleaf pine forests (the species' habitat) on private land are fragmented, degraded, second-growth forests. *Id*. AR7 (only 4% of original longleaf pine habitat remains). This degradation and loss of longleaf pine habitat within the range of the pine snake is continuing. The coastal counties of southern Mississippi and Mobile County, Alabama, are being developed at a rapid rate to accommodate growing populations. AR7, 66. As urban development and silviculture operations persist, so too does the habitat fragmentation threatening the continued existence of all black pinesnake populations, particularly those on private lands. *Id*. When patches of available habitat become separated beyond the natural dispersal range of a species, populations are more sensitive to genetic, demographic, and environmental variability, and extinction becomes possible.

    Private landowners hold more than 86 percent of forested land in the South and forecasts predict a loss of 4.5 million to 9.3 million hectares of this private forest land by 2060. *Id*. This loss, combined with expanding urbanization in many areas and ongoing splitting of land ownership as estates are divided, is expected result in further fragmentation of remaining forest holdings. *Id*.

    In 1999, the Service placed the pine snake on the list of candidate species for listing. AR61. On October 7, 2014, the Service published a proposed rule to list the pine snake as threatened. *Id*.; 70 Fed. Reg. 60,406. Five months later, the Service published a proposed rule to designate critical habitat and opened a public comment period. AR61, 78. In October 2015, the Service listed the pine snake as threatened because it determined that the species was likely to become an endangered species within the foreseeable future throughout all of its range. 80 Fed. Reg. 60,468; AR61. In addition to listing the species, the Service issued a rule pursuant to section 4(d) of the ESA prohibiting, among other things, incidental take resulting from conversion of longleaf pine forests and significant subsurface disturbing activities. *Id*. at 60,487.

    On February 26, 2020, the Service issued the final rule designating critical habitat for the

pine snake ("the Designation"). AR397, 384. The rule designated as critical habitat 324,679 acres in

eight units in Mississippi and Alabama. AR411. The Service identified (a) open-canopied pine

forest habitat and abundant native herbaceous groundcover; (b) areas containing naturally

burned-out or rotted-out pine stumps; and (c) sandy soils characteristic of historically longleaf-

dominated pine forest as the physical and biological features that are essential for the species'

conservation. AR113-114; AR396 (describing methodology employed). "[O]nly 29 percent of

the lands [designated as critical habitat] are privately owned." *Id*. 416. Of the 5,940 acres

designated as Unit 7, one of the two units at issue here, 36 percent are privately owned. AR391.

Less than 40 percent of Unit 8, the other unit at issue, is on private land. AR428. All physical

and biological features are present in all eight designated units. AR402.

The Service evaluated the applicability of the RFA, concluding that no regulatory

flexibility analysis was required because the final rule would not have a significant economic

impact on a substantial number of small entities. AR 418-19. The Service based this conclusion

on the fact that the RFA requires evaluation of the potential effects of rulemaking only on those

entities that are directly regulated by a rule, and critical habitat designations only directly

regulate federal agencies. AR419.[3]

## ARGUMENT

The Court need not reach the merits of Plaintiffs' claims because they have not met their

burden to establish standing. Even if Plaintiffs have standing, their claims fail on the merits. The

Service's decision should be upheld under the deferential APA "arbitrary and capricious"

standard of review.

---

[3] Plaintiffs contend that the Service should have included several studies in the Administrative
Record (at 25, n.7), but they waived any such argument when they failed to file a motion to
complete or supplement the Administrative Record on September 1, 2021, per the Court's
scheduling order.

## I.   PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE UNRIPE.

Every plaintiff in federal court bears the burden of establishing the three elements that make up the "irreducible constitutional minimum" of Article III standing: injury-in-fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish an injury-in-fact, a plaintiff must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotation marks omitted).

Where, as here, Plaintiffs rely on claims of possible, future injury, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient.'" *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis in original). A plaintiff must provide "details" that render a "prediction of future injury" certain to occur. *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015). Uncertain and unspecific prediction of future harm is inadequate to establish Article III standing. *Ctr. for Biol. Div. v. Tenn. Valley Auth.,* 491 F. Supp. 3d 1180, 1186-90 (N.D. Ala. 2020). "[W]hen [as here,] the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citations omitted).

Here, Plaintiffs' conclusory standing allegations are not sufficient to demonstrate an injury-in-fact, causation, or redressability. Plaintiffs assert that the Designation will likely cause a reduction in property values as a result of negative perceptions of land designated critical habitat. Dkt. 48 at ¶ 13; Dkt. 49 at ¶ 20; Dkt. 50 at ¶¶ 11-12. However, their argument is unsupported by competent evidence. For example, nowhere does their first declarant, Mr. Skipper, allege that he has plans to list his property for sale or that he has been approached by prospective buyers at discounted rates (or any

rates for that matter). Instead, he claims that "investors in southwestern Alabama are *generally* reluctant to purchase timberland property subject to *potential* regulatory limitations on land use conversion or development . . . ." Dkt. 48 ¶ 15 (emphasis added); *see also* Dkt. 49 at ¶ 18 (offering similar speculation); Dkt. 50 at ¶¶ 13, 15 (same). "This is, . . . the kind of uncertain and unspecific prediction of future harm that is inadequate to establish Article III standing." *Swanson*, 790 F.3d at 242; *cf.* AR627 ("Forestry Operations have occurred on units 7 & 8 for over a century.").[4]

The declarants also assert, in conclusory language, that the Designation will increase the costs, in both time and money, of managing their private timber lands. Plaintiffs' view that a critical habitat designation directly imposes regulatory burdens is flawed for several reasons. First, Section 7(a)(2) does not apply to private land unless the private landowner requires a federal permit for a proposed activity on that land. Second, even if a federal permit were required, formal Section 7(a)(2) consultation may not be triggered if the federal agency issuing the permit concludes that issuance of the permit has no effect on or is not likely to adversely affect listed species or critical habitat. 50 C.F.R. § 402.14. Only formal consultation has the potential to indirectly impose regulatory burdens, and formal consultation is required only where the action agency determines that the proposed action is "likely to adversely affect" a listed species or the designated critical habitat of a listed species. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b); *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1138, 1143 (11th Cir. 2008); *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regul., & Enf't*, 871 F. Supp. 2d 1312, 1323, 1327 (S.D. Ala. 2012). Third, the Service has interpreted Section 7 to prohibit an activity only to the extent that it appreciably diminishes the value of critical habitat a whole for the conservation of a listed

---

[4] None of the Plaintiffs' declarants has provided any evidence or even asserted that their property has actually lost value. This is insufficient to meet their burden. *Humane Soc'y of the U.S. v. Perdue,* 290 F. Supp. 3d 5, 17 (D.D.C. 2018).

species. 50 C.F.R. § 402.02. If the Service issues a biological opinion concluding that the proposed action will result in destruction or adverse modification of critical habitat, the agency is required to identify any "reasonable and prudent alternatives" that the action agency can adopt to avoid violating Section 7. *See* 50 C.F.R. § 402.14(g), (h). Thus, even if formal consultation is required and it results in a finding of destruction or adverse modification of critical habitat, the proposed action will likely still proceed subject to certain modifications.

Moreover, to the extent that Plaintiffs claim they have suffered harm due to their voluntary actions–as opposed to requirements imposed by the Service–those costs do not constitute injury-in-fact. Dkt. 48 ¶¶ 18 (voluntary modification taken not because of critical habitat rule, but rather due to "take" liability and presumption of occupancy flowing from pine snake listing rule), 23; Dkt. 50 ¶ 16 (activity foregone because declarant "not comfortable" doing); *see also Clapper*, 568 U.S. at 416 (party cannot manufacture standing merely by inflicting harm on itself); *Food & Water Watch v. Vilsack*, 79 F. Supp. 3d 174, 196 (D.D.C. 2015) (plaintiff cannot transform remote risk into concrete injury merely by taking steps to avoid that risk), *aff'd*, 808 F.3d 905 (D.C. Cir. 2015).

Similarly, because Plaintiffs have not established that they suffered any injury, there is no concrete dispute and their claims are not ripe for review. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1284 (11th Cir. 2015) (plaintiff's injury not ripe until further site-specific actions required to implement scheme have been proposed). Plaintiffs may raise their claims in a new lawsuit if modifications are required in order to ensure that critical habitat is not destroyed. *See Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003). For these reasons, the Court lacks jurisdiction and should enter summary judgment for Federal Defendants.

## II. THE SERVICE REASONABLY CONCLUDED THAT UNITS 7 AND 8 OF THE DESIGNATION WERE OCCUPIED AT THE TIME OF LISTING.

Even if Plaintiffs had standing and their claims were ripe, the Service correctly concluded that Units 7 and 8 were "occupied" under the ESA.

### A. The Service's Interpretation that All Units in the Designation are "Occupied" is Entitled to Deference.

The ESA defines a species' critical habitat as:

(i) the specific areas within the geographical area occupied by the species, at the time it is listed …, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

(ii) specific areas outside the geographical area occupied by the species at the time it is listed …, upon a determination by [the Service] that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

Here, the Service has concluded that the black pinesnake's critical habitat is occupied. The Service is entitled to deference in making this determination in two respects: first, on the Service's legal interpretation of the meaning of the word "occupied," and second, on the Service's exercise of its technical expertise of whether the habitat is, in fact, "occupied."

Plaintiffs admit that the ESA regulations "reserve to the [Service] the unlimited discretion to define occupation on an ad hoc basis." Dkt. 47 at 15 n.4. But Plaintiffs nevertheless suggest that "occupied" should be given its "ordinary meaning" and rely on a dictionary definition meaning to "dwell in" or to "take up or fill up (space, time, etc.)." *Id.* at 15. This definition, however, is not grounded in biological reality. Nor does it reasonably apply to a species like the pine snake, which spends the vast majority of its time underground. AR13, 38. Nor does Plaintiffs' definition resolve the issue of whether an area is to be treated as "occupied" if the best scientific data available indicates it is likely that the black pine snake is present. As such, whenever habitat is likely to be occupied by a

listed species, the habitat should be considered "occupied."

Moreover, Plaintiffs' novel interpretation, unlike the Service's interpretation of "occupied," is at odds with the ESA's requirement that the habitat be designated on the basis of the "best *available* scientific data" in that Plaintiffs' definition demands a precision and certainty that the ESA rejects. The Service must rely on the available data, even if it is inconclusive and does not allow the agency to precisely determine the location of the species. *Sw. Ctr. for Biol. Div. v. Babbitt*, 215 F.3d 58, 60-61 (D.C. Cir. 2000) (emphasis added). As the Service explained, its designation constitutes its "current best assessment of the areas that meet the definition of critical habitat for the black pinesnake." AR397. In practice, the best available science does not always permit the Service to state with certainty whether a particular area is occupied. Plaintiffs' "dwell in" interpretation makes little sense as applied to mobile or migratory animals—including the pine snake—for which it may be impossible to delineate a definitive area in which the animal "dwells." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1165-66 (9th Cir. 2010). Plaintiffs' interpretation would, moreover, be unworkable for many species, such as "periodical cicadas that live underground for years before emerging as adults, migratory birds, or other animals that require a diverse array of habitats." *Id.* at 1166, n.3.

The Service's determination of this factual issue, which requires the exercise of considerable technical expertise, must be accorded substantial deference. Congress has delegated to the Service the responsibility to make such technical decisions. Where an agency resolves technical issues within its area of expertise, the Supreme Court has held that courts "must defer to 'the informed discretion of the responsible federal agencies.'"[5] For these reasons, the Service's interpretation of the term

---

[5] *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential"); *Fisher*, 656 F. Supp. 2d at 1365-66 (when agency is compelled to exercise judgment in face of scientific uncertainty,

"occupied" as including "likely to be occupied" is reasonable and entitled to deference. The Court should accordingly reject Plaintiffs' cramped interpretation of the term "occupied."

###### B.      The Service's Analysis is Fully Supported by the Administrative Record.

In this case, the Service based its determination on the best available scientific information—relying on a combination of recorded sightings and habitat suitability analysis. "Determining whether a species uses an area with sufficient regularity that it is 'occupied' is a highly contextual and fact-dependent inquiry." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164. Plaintiffs disagree with the Service's approach, claiming that the Service cannot simply "infer occupation from isolated sightings. Dkt. 47 at 16. In *New Mexico Farm & Livestock Bureau v. United States Department of the Interior,* 952 F.3d 1216 (10th Cir. 2020), the Tenth Circuit found that the Service's reliance on jaguar sightings in the late 1990s was insufficient to support the agency's conclusion that the species occupied the designated critical habitat in the 1970s. 952 F.3d at 1226-27. There had been no concerted efforts to detect jaguars before 1997, making the case unique. *Id.* at 1226.

Plaintiffs err by relying on *New Mexico Farm & Livestock Bureau* as it is distinguishable from the case at bar. That case turned on the fact that the sightings fell outside the timeframe that would have likely meant the area was occupied at the time of listing. The court specifically rejected the Service's reliance on jaguar life history to conclude that they were present between 1962 and 1982—ten years before and after the date of listing, which is the average jaguar lifespan. *Id*. at 1227.

In contrast, the Service here did not simply rely on speculative expert opinion and the

---

"unless that uncertainty is so profound that it precludes any reasoned judgment," "even probative preliminary data not yet certifiable as 'fact' may provide an appropriate basis for promulgation of regulations.") (alterations omitted) (citing *Miami-Dade Cnty. v. U.S. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (*per curiam*)).

average pine snake lifespan. The Service relied on habitat suitability and site occupancy.[6] The Service explained that, although there are more recent studies, the earlier dataset constitutes the *best available* scientific data because the more recent work did not include a corresponding habitat suitability analysis. AR398. In addition to the earlier recorded sightings, which are the primary indicator that the area supports pine snakes, the Service also relied on a thorough analysis of the designated units using updated Geographic Information Systems habitat information. *Id*. If sufficient forested habitat was still present and available in the vicinity of where the snake had been documented, the Service determined in its expert judgment that there was a reasonable likelihood that populations still occurred in those areas. *Id*. Plaintiffs fail to account for the Service's expertise in assessing the value of habitat and the logical inferences that it drew concerning occupancy. Plaintiffs also gloss over the recorded sighting of a pine snake in July 2015 in Unit 7, AR398, 413, or the fact that the pine snake spends the majority of its life underground and it is not possible to pinpoint exactly where such reclusive species exist.

Finally, Plaintiffs mischaracterize the feedback the Service received from peer reviewers. Although it is true that at least one reviewer queried whether the recorded sightings were sufficient to support the Service's occupied determination, that same reviewer concluded that he "support[s] the listing, [and] the designation of critical habitat *as written*." AR442-43 (emphasis added). He stated that he felt the Service did "a good job of delineating the areas that are critical." *Id.* Thus, Plaintiffs do not provide the full context of the peer reviews before the Service. Plaintiffs fail to acknowledge statements from other peer reviewers that the absence of recorded sightings in a given area, even over a number of years, is not a sufficient basis to conclude that black pine snakes have been eliminated

---

[6] Recorded sightings include: eight pine snakes within Unit 1, AR411; five within Unit 2, *id*.; over 100 within Unit 3, AR412; two within Subunit 4A, *id*.; four within Subunit 4B, *id*.; seven within Unit 5, AR413; two within Unit 6, *id*.; five within Unit 7, *id*.; and two within Unit 8, *id*.

provided that suitable habitat still exists in the area. AR398; *see, e.g.*, AR444 ("just because [pine snakes] have not been documented in a particular county or parish for 'X' number of years does not necessarily mean the animal is no longer there."). In sum, the Administrative Record fully supports the Service's conclusion.[7]

At bottom, Plaintiffs simply disagree with the Service's decision. Such disagreements are insufficient to pass muster under the APA's arbitrary and capricious standard.

## III.   THE SERVICE CORRECTLY ASSESSED THE ECONOMIC COSTS OF THE DESIGNATION.

Plaintiffs' contention that the Service did not take economic effects of the designation into account is also not supported by the Administrative Record. Dkt. 47 at 19-26. The Service thoroughly analyzed potential costs to landowners and federal agencies due to the designation. That is all that is required by the Act and the Supreme Court's decision in *Weyerhauser v. FWS*, 139 S. Ct. 361 (2018), and the Service is owed deference in making that analysis.

### A.   The Service Appropriately Utilized the Incremental Approach to Calculating the Costs of the Designation.

The ESA requires the Service to designate critical habitat based on the best available scientific information, taking into consideration the economic impact (and other relevant impacts not at issue here) of specifying any particular area as critical habitat. 16 U.S.C. § 1533(b)(2). The ESA leaves to the Service's discretion the particular methodology for considering the economic impacts of designation. Here, the Service used an incremental approach to assess the economic costs of the Designation. In 2001, the Tenth Circuit rejected the Service's "baseline approach" to calculating

---

[7] Where data are inconclusive or where habitat is used on a sporadic basis, allowing the Service to designate as "occupied" habitat where the species is likely to be found comports with the ESA's policy of "institutionalized caution." *TVA*, 437 U.S. 153, 194 (1978); *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1166-67; *cf. Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) ("Congress clearly intended that [federal agencies] give the highest of priorities and the benefit of the doubt to preserving endangered species.").

economic impacts when designating critical habitat for a bird species. *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277 (10th Cir. 2001). Plaintiffs' argument hinges entirely on the flawed premise that *New Mexico Cattle Growers* invalidated the approach the Service followed here when considering the economic impacts of designating critical habitat for the pine snake. Dkt. 47 at 20-23; *cf. Fisher*, 656 F. Supp. 2d at 1368-73  (describing history).

There are significant differences between the baseline approach to economic analysis found invalid in *New Mexico Cattle Growers* and the incremental approach applied here. The pre-2001 baseline approach had two basic premises. First, that the Service should only consider costs attributable to the critical habitat designation itself, and not the separate decision to list the species, because the listing was part of the "baseline," *i.e.*, the status quo that would be in place regardless of whether the Service had designated critical habitat. Second, the presumption that the impact of designating critical habitat would be functionally equivalent to the impact of the listing. This second premise, known as the "functional equivalence" theory, as a practical matter meant that the Service would attribute all or almost all costs to the listing and not the critical habitat designation. The "functional equivalence" theory was based on the regulatory definitions in place at that time, which defined "destruction or adverse modification of critical habitat" as occurring only when an action appreciably diminished the value of the habitat for both survival *and* recovery. 50 C.F.R. § 402.02 (2000). This definition overlapped with the regulatory definition of "jeopardize the continued existence of" a listed species ("jeopardy"), under which jeopardy occurs when an action reduces "the likelihood of both the survival and recovery of a listed species in the wild." *Id.* Therefore, on occupied critical habitat, any action likely to cause adverse modification of critical habitat would also be likely to jeopardize the species. This, in turn, meant that the costs of Section 7 consultations and project modifications could be attributed to the listing of the species, instead of the critical habitat

designation.

*New Mexico Cattle Growers* rejected the Service's use of the pre-2001 baseline approach to determine that there would be *zero* costs associated with designating critical habitat. 248 F.3d at 1280, 1285. Contrary to Plaintiffs' view, the Court explained that the "root of the problem" was the Service's position that critical habitat did not add any significant protections beyond those associated with the listing—the functional equivalence theory. *Id.* at 1283; *contra* Dkt. 47 at 22.

In 2004, the Ninth Circuit invalidated the Service's definition of "destruction or adverse modification" in 50 C.F.R. § 402.02 in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1069 (9th Cir. 2004), *amended on other grounds*, 387 F.3d 968 (2004); *see also Sierra Club v. Fish and Wildlife Service*, 245 F.3d 434 (5th Cir. 2001). The Service responded by abandoning the functional equivalence theory and amending the regulatory definition of "destruction or adverse modification." Based on the updated definitions, the Service now assesses the incremental effects of designating critical habitat that go beyond the listing itself.

That incremental effects assessment, moreover, differs substantially from the method employed in *New Mexico Cattle Growers*. Here, the Service calculated roughly $190,000 in administrative costs associated with the designation would accrue in the first year and lesser amounts in subsequent years, AR23, 29, 403. This is a far cry from the assertion in *New Mexico Cattle Growers* that the designation at issue would have no costs. 248 F.3d at 1285. Without the functional equivalence theory—a fundamental premise of the Service's pre-2001 baseline approach—conducting an incremental effects analysis where the listing is considered part of the "baseline" does not render the economic analysis requirement "meaningless." *Id.* This eliminates the only rationale supporting the *New Mexico Cattle Growers*' holding. *Id.*; *see also N. New Mexico Stockman's Assoc. v. FWS*, 494 F.Supp.3d 850 (D.N.M. 2020); *Colo. by & through Colo. Dep't of*

*Nat. Res. v. FWS*, 362 F. Supp. 3d 951, 988 (D. Colo. 2018) (*N. Mexico Cattle Growers* is outdated).

Further, since *New Mexico Cattle Growers*, the Service has undertaken formal rulemaking codifying the incremental effects approach it uses today. The regulation, which is legally binding on the Service, now provides that "[t]he Secretary will consider impacts at a scale that the Secretary determines to be appropriate, and will compare the impacts with and without the designation." 50 C.F.R. § 424.19(b); *Revisions to the Regulations for Impact Analyses of Critical Habitat*, 78 Fed. Reg. 53,058, 53,076 (Aug. 28, 2013) (Service noting new definition of "destruction or adverse modification" had eliminated the predicate for Tenth Circuit's analysis in *New Mexico Cattle Growers*). In *New Mexico Cattle Growers*, the Tenth Circuit explicitly did not apply *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984) deference to the Service's then "informal interpretation" of the ESA. 248 F.3d at 1281. Because Congress has not spoken directly to whether the Service should use the incremental or co-extensive effects approach, the Court must defer to the Service's interpretation as long as it is a permissible construction of the statute.

The Service's incremental effects approach is not only a permissible construction of the ESA, but the best construction of the statute given that the functional equivalence theory has been jettisoned. *Cf. Fisher*, 656 F. Supp. 2d at 1371 (crediting baseline approach to critical habitat cost calculation as reasonable). The ESA requires the agency to consider "the economic impact . . . *of specifying any particular area as critical habitat*." 16 U.S.C. § 1533(b)(2) (emphasis added). The Service reasonably focuses this inquiry on the impact of the designation itself, and not impacts that will occur regardless of whether critical habitat is designated. This is particularly appropriate when the Service is evaluating whether to exclude an area from a critical habitat designation. The Service assesses the "benefits of such exclusion" in determining whether to exercise its discretion to exclude a particular area. *Id.* By definition, costs that are completely "co-extensive," such that they will occur

19

even if the area is not designated, will not be avoided if the area at issue is excluded. In other words, there would be no economic "benefit" to excluding an area if the costs associated with designating that area would still occur.

Further, the incremental impacts approach comports with the Office of Management and Budget's ("OMB") guidance, which advises agencies to define benefits and costs "in comparison with a clearly stated alternative" which will "normally will be a 'no action' baseline: [*i.e.*,] what the world will be like if the proposed rule is not adopted." Circular A-4 (Sept. 17, 2003), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf; *see also* 78 Fed. Reg. at 53,062 (noting consistency of Service's approach with OMB guidance) (last visited Oct. 29, 2021). After *Gifford Pinchot*, numerous courts have upheld, and no court has called into question, the Service's discretion to utilize the incremental effects approach.[8]

In sum, Plaintiffs misapply the Tenth Circuit's reasoning to the Service's new approach. The incremental effects approach codified in the new regulations is a logical and permissible interpretation of the ESA. *Fisher*, 656 F. Supp. 2d at 1371.

### B.    The Service Fully Accounted for, and Analyzed, the Costs of the Designation.

The Administrative Record belies Plaintiffs' argument that the Service declined to analyze costs associated with market value of private property within designated pine snake critical habitat.

---

[8] *Ariz. Cattle Growers Ass'n v. Salazar*, 606 F.3d at 1173 (rejecting reasoning in *New Mex. Cattle Growers*, given *Gifford Pinchot*'s invalidation of regulatory definition of "adverse modification," and noting impact of designating critical habitat could be negligible); *North. New Mex. Stockman's Ass'n v. FWS*, 484 F. Supp. 3d 850, 971, 994-95 (D.N.M. 2020) (upholding Service's use of incremental economic analysis approach as consistent with ESA section 4(b)(2) because revised adverse modification definition addressed concerns outlined in *New Mex. Cattle Growers*), *appeal filed*, Case No. 21-2019 (10th Cir. Mar. 2, 2021); *Otay Mesa Prop., LP v. U.S. Dep't of the Interior*, 144 F. Supp. 3d 35, 68 (D.D.C. 2015); *Maddalena v. FWS*, No. 08-CV-02292-H (AJB), 2010 WL 9915002, at *8-12 (S.D. Cal. Aug. 5, 2010); *Ariz. Cattle Growers' Ass'n v. Kempthorne*, 534 F. Supp. 2d 1013, 1036 (D. Ariz. 2008); *Cape Hatteras Access Pres. All.*, 344 F. Supp. 2d at 127-31; *Fisher*, 656 F. Supp. 2d at 1371; *Colorado*, 362 F. Supp. 3d at 988.

Dkt. 47 at 24. The Service considered potential perception-related land value costs. AR44-53; AR34-35 (assessing consultation rate in Alabama, concluding no formal consultations are likely to occur in Units 7 and 8). Due to data limitations regarding the probability that such effects might occur, and the likely degree to which property values will be incrementally affected above and beyond potential effects from the aforementioned listings, the Service was unable to estimate the magnitude of perception-related costs resulting from the Designation. *Id.* at AR44, 39. However, "as public awareness grows of the regulatory burden placed on designated lands, particularly where no Federal nexus compelling section 7 consultation exists, the effect of critical habitat designation on properties may subside." AR39; *cf. Wyoming State Snowmobile Ass'n v. FWS*, 741 F. Supp. 2d 1245, 1259 (D. Wyo. 2010) (where private party's action has no federal nexus, it is not affected by critical habitat designation). Taking all of these factors into account, the Service determined that the Designation will have little to no impact on private lands.[9] This assessment was fully consistent with the ESA and Supreme Court precedent, and Plaintiffs have not identified any method or data the Service could have used to further estimate such effects, or anything the Service allegedly failed to consider. Dkt. 47 at 23-25; *cf. Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 565 (9th Cir. 2016) ("[The Service's] decision not to include [certain] costs deemed too uncertain or speculative in the total potential incremental cost of the designation was within its discretion" and "not arbitrary and capricious.").

---

[9] AR403 (Service concluding Plaintiffs' activities unlikely to trigger consultation requirement), 34 (same), 39 (proposed critical habitat located in areas where development pressure is low, and agricultural and timber uses are likely to represent the highest and best use of land); 443 (same); AR34 (noting likely lack of Federal nexus for activities occurring in proposed Units 7 and 8, and "timber management, which is the primary activity occurring in those areas, rarely has a Federal nexus for consultation on private lands."). The Service additionally tallied the administrative costs of the designation, finding they would equal roughly $190,000 in the first year (of which only $45,600 is attributable to Units 7 and 8, AR37), and lesser amounts in succeeding years.

Plaintiffs' argument that "any decrease in land values will be solely attributable to the pine snake designation" is similarly unpersuasive. Plaintiffs speculate–using non-expert testimony and without providing any actual evidence of such declines–that within Units 7 and 8 land values have declined because of the Designation. But they do not show that, even if such a decline has taken place, it is not due to other factors, such as regional development or demographic trends. Plaintiffs' attempt to link the Designation to hypothetically lower property values misses the mark. The Court should accordingly uphold the Service's assessment of the economic costs of the Designation.

## IV.    THE SERVICE REASONABLY OPTED NOT TO EXCLUDE UNITS 7 AND 8.

The Service's decision not to exclude Units 7 and 8 in the designation was a reasonable exercise of the agency's discretion. Section 4(b)(2) provides that the Service "may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits" of inclusion, and exclusion will not cause the species' extinction. 16 U.S.C. § 1533(b)(2). The Supreme Court recently recognized that "[t]he use of the word 'may'" in the second sentence of Section 4(b)(2) "certainly confers discretion on the Secretary." *Weyerhaeuser*, 139 S. Ct. 361, 371. Until *Weyerhaeuser*, several courts had considered the agency's discretion over whether to exclude an area of critical habitat so unfettered that it was "committed to agency discretion by law" pursuant to 5 U.S.C. § 701(a)(2) and not subject to judicial review. *Weyerhaeuser* explained that not "all matters committed to agency discretion [are] unreviewable . . . ." 139 S. Ct. at 370. Instead, the Service's decision whether or not to exclude an area from critical habitat is reviewable "for abuse of discretion." *Id.* at 371 (quoting *Bennett v. Spear*, 520 U.S. 154, 172 (1997)). Thus, although the agency has broad discretion over exclusion and is never *required* to exclude an area even if the benefits of exclusion outweigh the benefits of inclusion, courts may review whether the agency "appropriately consider[ed] all of the relevant factors that the statute sets forth to guide the agency in

the exercise of its discretion." *Id.*

The Service considered all relevant factors here. Contrary to Plaintiffs' arguments, the Service's explanation of its decision not to exclude any areas was sufficient, rational, and consistent with agency policy. The Service identified the economic costs of designation and qualitatively assessed the benefits of designation, including the promotion of public awareness of the presence of the species and the importance of habitat protection and potentially greater habitat protection for the species. AR401 (explaining benefits, including statutory protections triggered by ESA Section 7 and improvement of public awareness). The benefits of designation were assessed in the context of the species' unique biological characteristics and particular vulnerability to habitat destruction and fragmentation. AR398, 407-414. Therefore, it was reasonable for the Service to not exercise his discretion to exclude the areas when concluding that economic costs were not disproportionate to the benefits of designating critical habitat. *See TVA*, 437 U.S. at 194 ("the balance has been struck in favor of affording endangered species the highest of priorities").

Plaintiffs disagree, but they fail to mention that the Service specifically identified the factors it considered in determining not to exclude Units 7 and 8. The Service explained that, as part of its screening analysis, it considered the types of economic activities, including silvicultural activities that are likely to occur within the areas designated as critical habitat. AR416.

They also do not recognize that the Service clarified the distinction between the effects that would result from the subspecies being listed, on the one hand, and those attributable to the critical habitat designation. *Id*. It noted that the physical and biological features identified for critical habitat are the same features essential for the life requisites of the species, and any actions that would result in sufficient harm or harassment to constitute jeopardy to the species would also likely adversely affect the physical and biological features of its critical habitat. *Id.*

Because all lands in the designation are currently occupied, in these areas, any actions that may affect the species or its habitat would also affect designated critical habitat. *Id.*; *see also* AR5-20. The Service therefore explained that it is unlikely that any additional conservation efforts would be recommended to address the adverse modification standard over and above those recommended as necessary to avoid jeopardizing the species' continued existence. AR416.

The Service also investigated possible effects on the value of private lands within critical habitat from the public perception that the designation posed restrictions on the use of these lands. *Id.* Because it was unable to estimate the magnitude of any perception-related costs, after considering the relevant factors, including the benefits of critical habitat, the Service reasonably determined not to exercise his discretion to exclude Units 7 or 8. AR417

Finally, Plaintiffs' suggestion that the Service calculated potential costs at up to $180 million is not accurate. Dkt. 47 at 27 (citing AR51). The Service has never asserted that economic costs of the designation could be this high. The consulting firm conducting the analysis, Industrial Economics, Incorporated ("IEc"), stated the value of the affected property "cannot exceed" $180 million, but never suggested this figure was relevant to calculating costs. AR52-53. IEc included that figure to provide an outer bound value for the total acreage of land that could conceivably be impacted. *id.* IEc explained that due to existing data limitations, it was "unable to estimate the magnitude of perception-related costs resulting from this designation." *Id.* at 53.

Accordingly, the Court should find that the Service's decision not to exercise its discretion to exclude Units 7 and 8 is rational and supported by the record.

## V.   THE SERVICE REASONABLY DETERMINED THAT NO REGULATORY FLEXIBILITY ANALYSIS WAS REQUIRED.

The Court should enter summary judgment as to Count 6 of the Complaint because the Service reasonably determined that a critical habitat designation does not directly impose any

requirements on non-federal entities.[10] Thus, because the RFA applies only to entities that are directly regulated by the agency's rule, the Service had a rational basis to certify that no regulatory flexibility analysis was required. The Court should uphold the Service's decision under the deferential APA standard of review.

A.      **The Service's Interpretation of the ESA is Entitled to Deference.**

The Service's determination that no small entities are directly regulated by the final rule was based on its interpretation of the legal effects of a critical habitat designation, which is consistent with the language of the ESA.[11] Deference to the Service is particularly appropriate here because the agency was interpreting a statute that it administers. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 665-69 (2007).

On its face, the statute does not impose on private parties any requirements related to critical habitat. Section 9, which lists those acts prohibited by the statute, does not include destruction or adverse modification of critical habitat. *See* 16 U.S.C. § 1538(a)(1) (prohibiting, among other things, "take" of listed wildlife species); *see also id.* § 1532(19) (defining "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect"). The only express requirement related to critical habitat–aside from those in Section 4 regarding its designation and revision–is Section 7's mandate that federal agencies consult with the Service and/or NMFS to avoid adverse modification. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

If the Court finds that the statutory text is ambiguous, it should consider whether the Service's "interpretation is based on a permissible construction of the statute." *Chevron v. Nat.*

---

[10] *Weyerhauser*, 139 S. Ct. 361, 365; *see id.* at 367 (noting "the critical habitat designation has no direct effect on the timber operations.").

[11] *See* AR 400 (designation of critical habitat on private land has no impact on individual landowner activities; landowners not be required to convert land to longleaf pine forests or conduct pine snake monitoring), 404 (same), 405 (even if adverse modification conclusion reached, action agency and landowner would not be required to abandon proposed activity).

*Res. Def. Council*, 467 U.S. 837, 843 (1984). The interpretation adopted by the Service in this

case is consistent with that of the U.S. Department of the Interior's Office of the Solicitor.[12] The

Service's interpretation is also in line with *Weyerhauser*, 139 S. Ct. 361, and other court

decisions interpreting the legal effects of critical habitat designations.[13]

The agency's construction of the statute is reasonable and thus should be upheld,

"whether or not it is the only possible interpretation or even the one a court might think best."

*Holder v. Martinez Gutierrez*, 566 U.S. 583, 591 (2012).

**B.      The Service Had a Rational Basis to Invoke RFA Section 605(b).**

Having determined that no small entities are directly regulated by the designation, the

Service reasonably concluded that the RFA's procedural requirements do not apply.[14] The

agency's decision is supported by relevant court precedent.[15] Indeed, in the only case within the

---

[12] *See* Dep't of the Interior, Off. of the Solic., *The Secretary's Authority to Exclude Areas from a Critical Habitat Designation under Section 4(b)(2) of the Endangered Species Act*, at 2 (Oct. 3, 2008), *available at* https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37016.pdf (last visited Oct. 29, 2021) (regulatory impact of designated critical habitat under ESA derives solely from section 7); *see also* H.R. Rep. No. 94-887, at 3 (1976) (once critical habitat designated, ESA requires that proposed Federal actions not adversely affect habitat).

[13] *See, e.g.*, *Markle Interests, LLC v. FWS*, 827 F.3d 452, 461 (5th Cir. 2016) (only federal agencies–not private parties–must engage in Section 7 consultation process); *Nat. Res. Def. Council v. U.S. Dep't of Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997) (same); *Conserv. Council for Haw. v. Babbitt*, 2 F. Supp. 2d 1280, 1288 (D. Haw. 1998) (discussing protections from designation, including those derived from increased education).

[14] *See* AR419 (Service, concluding that no small entities are directly regulated, and certifying that Designation will not have significant economic impact on substantial number of small entities); *see also* 5 U.S.C. § 605(b).

[15] *See, e.g.*, *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 467 n.18 (D.C. Cir. 1998) (noting RFA distinguishes between small entities subject to agency rule, to which requirements apply, and those not subject to rule, to which requirements do not apply); *Mid-Tex Elec. Coop. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985) (noting remedy Congress fashioned—careful consideration of those costs in regulatory flexibility analyses—is accordingly limited to small entities subject to proposed regulation); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (noting that RFA applies to small businesses indirectly affected by regulation of other entities repeatedly rejected) (per curiam); *Am. Trucking Ass'ns v. U.S. EPA*, 175 F.3d 1027, 1044 (D.C. Cir. 1999) (per curiam) (EPA air quality standards regulating small entities indirectly through

Eleventh Circuit to squarely address the "direct effects vs. indirect effects" issue, the court in *Fla. Wildlife Federation, Inc. v. Jackson*, 853 F. Supp. 2d 1138, 1175-76 (N.D. Fla. 2007), found in a case involving an EPA regulation that where "rule's only effect on small entities will be indirect, an agency may properly make a no-impact certification." *Id.* (citing *Michigan v. EPA*, 213 F.3d 663, 688-89 (D.C. Cir.) (*per curiam*)). The court noted that, as here, the "*direct* effect is on [a third party,] the State of Florida" because it "will fall to the state to implement the [numeric pollution] criteria." *Id.*

Plaintiffs' argument that the Service's interpretation is somehow inconsistent with the Small Business Administration's ("SBA") guide for government agencies on how to comply with the RFA is belied by the Administrative Record. *See* AR 183-184. There, the SBA noted that "courts have held that the RFA requires an agency to perform a regulatory flexibility analysis of small entity impacts only when a rule directly regulates small entities." AR183 (reviewing cases); *see also* AR184 (SBA stating agencies are "not required" by the RFA to perform "regulatory flexibility analysis when the impacts of [their] regulation are indirect").

At bottom, Plaintiffs fundamentally misunderstand how critical habitat designations operate. Plaintiffs are not directly regulated by the critical habitat designation. Rather, the only directly regulated entities are federal agencies taking actions that may adversely affect critical habitat. The critical habitat rule may affect the future planning decisions of action agencies like the Corps of Engineers, but that is not a direct effect on timberland owners.[16]

---

state implementation plans do not directly impact them), *vacated in part on other grounds, Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (D.C. Cir. 2001).

[16] *Michigan v. EPA*, 213 F.3d at 689 (upholding RFA Section 605(b) certification where challenged rule regulated small entities only indirectly); *Nat'l Women, Infants, & Child. Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 108-10 (D.D.C. 2006) (same); *Idaho Cty. v. Evans*, 2003 U.S. Dist. LEXIS 23459, at *18-19 (D. Idaho Sept. 30, 2003) (same).

Federal Defendants do not dispute that the private lands owned by Plaintiffs could, theoretically be included in an ESA Section 7 consultation. However, any economic effects that a third party may experience as a result of future consultations are not the type of effects that Congress intended to address through the RFA.

Against this backdrop, the Service clearly did not adopt an erroneous definition of "small entities," or otherwise err in its interpretation of the RFA. The agency's certification that there would not be a significant economic impact was based not on the statutory definition of "small entity," but on its determination that no small entities were directly regulated. This decision hinges on the Service's legal interpretation of the ESA, a statute it administers, rather than the RFA.

Nor does judicial authority help Plaintiffs. In *North Carolina Fisheries Association v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997) ("*N.C. Fisheries Ass'n I*"), cited by Plaintiffs (at 29), the plaintiffs challenged NMFS' rule setting the quota for summer flounder issued for commercial fishermen under a completely different statute, the Magnuson-Stevens Fishery Conservation and Management Act. *Id.* at 650. In *N.C. Fisheries Ass'n I*, there was evidence of significant direct economic impacts on fishermen arising from the rule. *Id.* at 653 ("It is evident to this Court from the some 100 North Carolina fisherman [*sic*] who appeared to testify that their businesses were significantly affected that there was a significant economic impact. . . ."). Unlike a fishing quota, which directly regulated the number of fish that fishermen may remove from the ocean, the critical habitat rule does not directly impose economic impacts on Plaintiffs.

Similarly, in *N.C. Fisheries Association, Inc. v. Daley*, 27 F. Supp. 2d 650 (E.D. N.C. 1998) ("*N.C. Fisheries Ass'n II*"), cited by Plaintiffs (at 7 and 30), the court was not considering the potential direct or indirect effects of a critical habitat designation, but rather NMFS's 1997

summer flounder fishery quota, again under the Magnuson-Stevens Fishery Conservation and Management Act. 27 F. Supp. 2d at 651-58. Unsurprisingly, the court found that the quota directly, not indirectly, impacted fishermen, because the rule substantially reduced the flounder quota that fishermen were permitted to remove from the ocean. *Id.* at 654. *N.C. Fisheries I* and *N.C. Fisheries II* have nothing to do with critical habitat designations under the ESA.

Plaintiffs are not aided by *California Cattlemen's Association v. FWS*, 315 F. Supp. 3d 282 (D.D.C. 2018), upon which they heavily rely, either. Dkt. 47 at 28-29. There, the court initially found that Plaintiffs' allegations and declarations were adequate to demonstrate standing and ripeness at the motion to dismiss stage, *id.* at 286-87. However, the court explicitly noted that its decision was based on the "forgiving standards" that apply to review of a motion to dismiss. *Id.* at 288. At the summary judgment stage, the court found that plaintiffs lacked standing and therefore did not reach the issue of whether they were directly affected by the critical habitat designation. *California Cattlemen's Ass'n.*, 369 F. Supp. 3d 141, 145-46 (D.D.C. 2019). *California Cattlemen's Association* therefore does not support Plaintiffs.

Plaintiffs' reference to NMFS' practice, in context, also bolsters Federal Defendants' position. Dkt. 47 at 22. In its final regulatory flexibility analysis for the designation of critical habitat for the Atlantic sturgeon, NMFS adopted the same legal interpretation of the ESA that the Service relies upon here. *See* NMFS, *Final Regulatory Flexibility Economic Analysis* (Exh. 1), at 153 ("The critical habitat rule does not directly apply to any particular entity, small or large."). However, NMFS made the decision to analyze the costs of future Section 7 consultations as part of a regulatory flexibility analysis despite the absence of direct effects on small entities. *See id.* NMFS concluded that, for "most if not all of the federal activities predicted to occur in the next 10 years," the costs to small businesses would not be significant because Section 7 consultation

would have occurred anyway as a result of the listing. *See id.* at 154. Nothing precludes an agency from electing to do *more* than is required if it finds such a course of action informative and it has the capacity to do so.

The Service made a different policy choice here, following federal court precedent holding that an RFA analysis is only required where small entities are directly affected. Yet the Service did not ignore the costs of future consultations, factoring them into the economic analysis. In the context of timberland ownership, the Service estimated those costs but determined that those costs could not be estimated due to a lack of data. The final rule for the pine snake must be reviewed based on its own administrative record and not by comparison to a different agency's rule. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (agency's action must be upheld, if at all, on basis articulated by agency itself).

The Court should uphold the Service's certification under Section 605(b) because the administrative record sets forth a rational basis for the agency's decision and demonstrates that it made a good faith effort to comply with the RFA. *See Council for Urological Interests*, 790 F.3d 212, 227 (D.C. Cir. 2015).[17]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary

//

//

//

---

[17] If the Court determines that the Service erred in concluding that the RFA's procedural requirements did not apply, it should decline to remand the rule because any such error was harmless. 5 U.S.C. § 706. The Service analyzed the economic effects on landowners as part of the rulemaking process. *Cf. Fla. Wildlife Federation, Inc. v. Jackson*, 853 F. Supp. 2d 1138, 1175-76 (N.D. Fla. 2007).

judgment and grand Federal Defendants' cross-motion for summary judgment.

Dated: October 29, 2021.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY

KEITH A. JONES
Assistant United States Attorney
63 S. Royal St., Suite 600
Mobile, Alabama  36602
Tel: (251) 415-7206
Email: keith.jones2@usdoj.gov

TODD KIM
Assistant Attorney General Environment &
  Natural Resources Division
SETH M. BARSKY, Chief
U.S. Department of Justice
Wildlife and Marine Resources Section

*/s/ J. Brett Grosko*
J. BRETT GROSKO
*Senior Trial Attorney* (MD Bar No. 0106180001)
DAVIS A. BACKER
*Trial Attorney* (CO Bar No. 53502)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0342 (o) / (202) 353-5282 (c)
Fax: (202) 305-0275
Email: brett.grosko@usdoj.gov / davis.backer@usdoj.gov

*Attorneys for Federal Defendants*

*Of Counsel*

Helen Speights
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ J. BRETT GROSKO*

_____
J. BRETT GROSKO
*Attorney for Federal Defendants*