# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

THOMAS GRAY SKIPPER, et al.,

                Plaintiffs,

      v.

UNITED STATES FISH AND WILDLIFE
SERVICE; et al.,

                Defendants,

CENTER FOR BIOLOGICAL DIVERSITY,

                Defendant-Intervenor.

Case No. 1:21-CV-00094-JB-B

## PLAINTIFFS' COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND BRIEF IN OPPOSITION TO FEDERAL DEFENDANTS' AND DEFENDANT INTERVENOR'S CROSS-MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I. The Landowners Have Standing and Their Claims are Ripe ................................. 2

   A. The Landowners have standing ..................................................................... 2

      1. The Final Rule has reduced the market value of the Landowners' property causing them an immediate and ongoing economic injury .................................................... 3

      2. The Final Rule has increased regulatory burdens on the Landowners use of their properties causing them present and future injuries ................................................. 6

   B. The Landowners' claims are ripe ................................................................... 8

II. The Service's Conclusion That Units 7 and 8 Were Occupied Was Unlawful and Is Unsupported By the Record ................................................................... 8

   A. The Service's interpretation that Units 7 and 8 were "occupied" is not entitled to deference and fails as a matter of law .......................................................... 9

      1. The Service and Intervenor cannot disguise improper statutory definitions as agency scientific expertise ...................................................................... 9

      2. Ad hoc agency interpretations do not warrant heightened deference ................... 10

      3. Under the plain meaning of the ESA Units 7 and 8 were not occupied ................. 11

      4. Deference does not salvage the Service's unreasonable, unsupported conclusion that Units 7 and 8 were occupied .......................................................... 14

   B. The Service's conclusion that Units 7 and 8 were occupied is not supported by the best available science ........................................................................ 16

      1. The ESA's best available science requirement does not authorize the Service to reach unfounded or speculative conclusions ........................................... 16

      2. The best available science demonstrates that the Service's occupancy determination was unlawfully speculative ......................................... 17

III. The Service Was Required to Analyze All the Costs—Including the Coextensive Costs—of the Critical Habitat Designation .................................................. 18

A. The Service's interpretation of Section 4(b)(2) of the ESA is not entitled
to deference .......................................................................................... 18

1. Section 4(b)(2) of the ESA requires the consideration of coextensive costs and
New Mexico Cattle Growers remains persuasive .................................................. 19

2. Deference does not salvage the Service's unreasonable exclusion of coextensive
costs from the economic analysis ........................................................................ 23

B. Even if the baseline method were proper the Service failed to properly analyze the
full impact of the designation ................................................................................... 24

IV. The Service Does Not Have Unbridled Discretion in Its Exclusion Decisions and It
Failed to Provide a Reasoned Explanation for Not Excluding Units 7 and 8 .................. 26

V. The Service Erroneously Failed to Prepare Regulatory Flexibility Analyses
for the Critical Habitat Designation. ................................................................................ 28

A. The Service is not entitled to deference ..................................................... 28

B. Deference does not salvage the Service's invocation of RFA Section
605(b) ................................................................................................................... 31

C. The Service's failure to prepare regulatory flexibility analyses
was not "harmless" ........................................................................................... 31

VI. The Court Should Vacate the Designation ....................................................... 32

A. Under the ESA and APA vacatur is the presumptive remedy ..................... 32

B. The equities favor vacating the critical habitat designation ...................... 34

C. This Court should vacate the Final Rule in its entirety ............................. 35

CONCLUSION ........................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

Am. Trucking Ass'ns, Inc. v. EPA,
175 F.3d 1027 (D.C. Cir.) *vacated in part on other grounds Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ....................................................................................29

Aposhian v. Barr,
958 F.3d 969 (10th Cir. 2020) ...............................................................................10, 18

Ariz. Cattle Growers' Ass'n v. Salazar,
606 F.3d 1160 (9th Cir. 2010) ...............................................................................14, 15

Bischoff v. Osceola Cty,
222 F.3d 874 (11th Cir. 2000) .......................................................................................6

Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs,
781 F.3d 1271 (11th Cir. 2015) ................................................................................33, 34

Bryan v. United States,
524 U.S. 184 (1998) ..................................................................................................7, 26

Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.,
315 F. Supp. 3d 282 (D.D.C. 2018) .......................................................................30, 31

Care v. Nielsen,
461 F. Supp. 3d 1289 (N.D. Ga. 2020) .......................................................................27

Carpenters Indus. Council v. Zinke,
854 F.3d 1 (D.C. Cir. 2017) ...........................................................................................4

Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
467 U.S. 837 (1984) .............................................................................................. *passim*

Conley v. Nw. Fla. State Coll.,
145 F. Supp. 3d 1073 (N.D. Fla. 2015) ..................................................................14, 23

Corley v. United States,
556 U.S. 303 (2009) ................................................................................................13, 22

Ctr. for Biological Diversity v. Norton,
240 F. Supp. 2d 1090 (D. Ariz. 2003) .........................................................................35

Czyzewski v. Jevic Holding Corp.,
137 S. Ct. 973 (2017) .....................................................................................................4

*Defs. of Wildlife v. EPA*,
  420 F.3d 946 (9th Cir. 2005), *rev'd on other grounds*, *sub nom. Nat'l Ass'n of*
  *Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).......................................33

*Elend v. Basham*,
  471 F.3d 1199 (11th Cir. 2006) ....................................................................8

*Good Samaritan Hosp. v. Shalala*,
  508 U.S. 412 (1993)....................................................................................10

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ..................................................................30

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
  613 F.3d 1112 (D.C. Cir. 2010)....................................................................32

*Judulang v. Holder*,
  565 U.S. 42 (2011).......................................................................................26

*Koch Foods, Inc. v. U.S. Dep't of Lab.*,
  712 F.3d 476 (11th Cir. 2013) ....................................................................12

*Legal Env't Assistance Found., Inc. v. EPA*,
  118 F.3d 1467 (11th Cir. 1997) ....................................................11, 12, 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................5

*Markle Ints., LLC v. U.S. Fish & Wildlife Serv.*,
  40 F. Supp. 3d 744 (E.D. La. 2014)...............................................................4

*Markle Ints., LLC v. U.S. Fish & Wildlife Serv.*,
  827 F.3d 452 (5th Cir. 2016) .........................................................................5

*Marsh v. Oregon Nat. Res. Council*,
  490 U.S. 360 (1989)...................................................................................9, 10

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) .......................................................................7

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*,
  248 F.3d 1277, 1285 (10th Cir. 2001).........................................19, 20, 21, 22, 34

*N.C. Fisheries Ass'n, Inc. v. Daley*,
  27 F. Supp. 2d 650 (E.D. Va. 1998) ............................................................33

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*,
  952 F.3d 1216 (10th Cir. 2020) ..............................................................16, 18

*N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*,
No. CV 15-428 KG/CG, 2021 WL 275535 (D.N.M. Jan. 27, 2021)......................................34

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008) .....................................................................................34, 35

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
344 F. Supp. 3d 355 (D.D.C. 2018) .......................................................................14

*Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*,
646 F.3d 914 (D.C. Cir. 2011) ...........................................................................16, 17, 24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .........................................................................................21

*Regions Bank v. Legal Outsource PA*,
936 F.3d 1184 (11th Cir. 2019) ........................................................................12

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018)...............................................................................11, 19

*Scheerer v. U.S. Atty. Gen.*,
513 F.3d 1244 (11th Cir. 2008) ....................................................................14, 23, 31

*Scheidler v. Nat'l Org. for Women, Inc.*,
547 U.S. 9 (2006)...........................................................................................23

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944).................................................................................11, 18

*Sundance Associates, Inc. v. Reno*,
139 F.3d 804 (10th Cir. 1998) .......................................................................19

*Tenn. Valley Auth. (TVA) v. Hill*,
437 U.S. 153 (1978).............................................................................13, 22, 33

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) .................................................................11, 19

*United States v. Atlantic Research Corp.*,
551 U.S. 128 (2007)........................................................................................13

*United States v. Mead Corp.*,
533 U.S. 218 (2001)...............................................................................11, 18

*Village of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926)........................................................................................3

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) ........................................................................ *passim*

*Wildearth Guardians v. U.S. Dep't of the Interior*,
    205 F. Supp. 3d 1176 (D. Mont. 2016)........................................35

**Statutes**

5 U.S.C. § 603................................................................................32

5 U.S.C. § 603(c)............................................................................32

5 U.S.C. § 604................................................................................32

5 U.S.C. § 604(a)(6)........................................................................32

5 U.S.C. § 605(b)......................................................................28, 29

5 U.S.C. § 611(a)(4)........................................................................33

5 U.S.C. § 706(2)(A).......................................................................32

16 U.S.C. § 1532(5)(A)...................................................................12

16 U.S.C. § 1532(5)(A)(i)................................................................13

16 U.S.C. § 1532(5)(A)(ii)...............................................................13

16 U.S.C. § 1532(32).......................................................................13

16 U.S.C § 1533(b)(2)........................................................19, 21, 32

16 U.S.C. § 1536(a)(4).....................................................................34

16 U.S.C. § 1540(a)–(b)......................................................7, 25, 26

28 U.S.C. § 1746...............................................................................5

Pub. L. No. 97-304, 96 Stat. 1411 (1982)......................................22

**Regulations**

50 C.F.R. § 17.42...............................................................................7

50 C.F.R. § 424.02...........................................................................10

**Other Authorities**

57 Fed. Reg. 1796-01 (Jan. 15, 1992)..............................................20

78 Fed. Reg. 53,058 (Aug. 28, 2013) ..................................................................18, 22

80 Fed. Reg. 37,404 (June 30, 2015) .........................................................................23

80 Fed. Reg. 60,467 (Oct. 6, 2015) ...........................................................................34

81 Fed. Reg. 3866 (Jan. 22, 2016) ............................................................................23

81 Fed. Reg. 7226 (February 11, 2016) .....................................................................27

81 Fed. Reg. 7414 (Feb. 11, 2016) ...........................................................................10

84 Fed. Reg. 45,020 (Aug. 27, 2019) ........................................................................22

85 Fed. Reg. 11,238 (Feb. 26, 2020) ..........................................................................1

85 Fed. Reg. 11,458 (Feb. 27, 2020) ........................................................................23

86 Fed. Reg. 20,798 (Apr. 21, 2021) ........................................................................23

86 Fed. Reg. 30,888 (June 10, 2021) ........................................................................23

Brian S. Prestes, *Remanding Without Vacating Agency Action*, 32 Seton Hall L. Rev. 108 (2001) .........................................................................................................32

H.R. Rep. No. 97-567, 1982 U.S.C.C.A.N. 2807 .....................................................22

House Agreement to Conference Report on S. 2899 (Oct. 14, 1978) *in* A Legislative History of the ESA, 1220-21 (U.S. GPO 1982). ...................................14

Intervenor-Respondents Br., *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, No. 17-71 (U.S. Jun. 29, 2018) *available at* https://www.supremecourt.gov/DocketPDF/17/17-71/51820/20180629122317034_17-71bs.pdf . .........................................................5

*Occupy*, Webster's New Twentieth Century Dictionary of the English Language Unabridged (2d ed. 1977) ......................................................................................12

# INTRODUCTION

Plaintiffs (collectively the "Landowners"), offer the following combined reply in support of their Motion for Summary Judgment, ECF No. 47, and brief in opposition to the Federal Defendants' (collectively the "Service"), and the Defendant-Intervenor's (the "Intervenor"), Cross-Motions for Summary Judgment, ECF Nos. 57, 59.[1]

The Landowners argue that the Service failed to follow the requirements of the Endangered Species Act (ESA), the Administrative Procedure Act (APA), and the Regulatory Flexibility Act (RFA), when it finalized a February 26, 2020, rule designating critical habitat for the black pinesnake, 85 Fed. Reg. 11,238 ("Final Rule" or "designation). The Service first responds by baselessly asserting that the Landowners have not alleged an injury-in-fact sufficient to prove Article III standing. This attempt to avoid judicial review should be rejected given the immediate and ongoing economic injuries—in the form of reduced property values, increased regulatory burdens, and diminished revenues—the designation has imposed on the Landowners.

On the merits, the Service and Intervenor ask this Court to simply rubberstamp the designation and ignore its numerous substantive defects. But this case—which challenges the Service's failures to comply with the unambiguous requirements of the ESA, RFA, and APA—is an especially poor candidate for judicial deference. First, the Service's interpretation of the unambiguous statutory term "occupied" is not entitled to deference, and the contention that the ESA's "best available science requirement" excuses reliance upon pure speculation where a species is purportedly "elusive," cannot save the Service's arbitrary conclusion that Units 7 and 8

---

[1] The Landowners will hereafter refer to their Brief in Support of Summary Judgment, ECF No. 47, as the "Opening Brief" (Op. Br.); the Federal Defendants' Memorandum, ECF Nos. 57-1 and 58, as the "Service's Brief" (Serv. Br.); and the Defendant-Intervenor's Memorandum, ECF Nos. 59-1, 60, as the "Intervenor's Brief" (Int. Br.).

were occupied. Second, the Service's illegal adoption of the "baseline" method, and subsequent failure to comply with the ESA's categorical requirement that it consider economic impacts of designating critical habitat, does not warrant deference. Third, the mere fact that the Service maintains discretion when making exclusion decisions pursuant to the ESA, does not excuse its complete failure to offer a rationale that weighed the costs and benefits of excluding Units 7 and 8. Fourth, the Service and Intervenor strain credulity when they argue that critical habitat designations are categorically exempt from the requirements of the RFA because they do not directly regulate land so designated. Finally, the Intervenor's request for the extraordinary remedy of remand without vacatur is inappropriate given the substantive illegality of the Final Rule.

For these reasons, which are discussed further below, and for the reasons set forth in the Landowners' Motion for Summary Judgment, ECF No. 47, this Court should grant the Landowners' Motion for Summary Judgment, ECF No. 47, and deny the Service and Intervenor's Cross-Motions for Summary Judgment, ECF Nos. 57, 59, entering the ordinary remedy of vacatur.

## ARGUMENT

## I.    The Landowners Have Standing and Their Claims are Ripe

### A.    The Landowners have standing

The Landowners have standing. The Landowners principally argue that they are injured by the designation having immediately reduced the market value and impacted the salability of their private property. Op. Br. 11–14. They also demonstrate that the designation has imposed significant regulatory burdens on their timber operations. *Id*. The Landowners support their arguments with the Service's own documents, *see* Op. Br. 12, and with detailed declaration evidence, *see* ECF No. 48 (Declaration of Thomas Gray Skipper (Skipper Decl.)); ECF No. 49 (Declaration of Scott Jones (Jones Decl.)); ECF No. 50 (Declaration of John R. Goodloe III

(Goodloe Decl.)). Notwithstanding this record and declaration evidence, the Service asserts that the Landowners' "standing allegations are not sufficient to demonstrate an injury-in-fact, causation, or redressability"—although, its brief only appears to contest the first factor: injury-in-fact. Serv. Br. 9–11. The Landowners have demonstrated injury-in-fact sufficient to establish Article III standing.

### 1. The Final Rule has reduced the market value of the Landowners' property causing them an immediate and ongoing economic injury

The Service attempts to cast the Landowners' standing arguments as relying upon "possible, future injury." Serv. Br. 9. But the Landowners do not rely upon claims of future injury to establish standing. Instead, they principally argue that the designation of their property as Units 7 and 8 has caused an *immediate* reduction in the market value of their properties due to stigma that attaches to private land designated as critical habitat. Op. Br. 12–13. This stigma—which stems from public perceptions about the impacts of critical habitat on land use and is therefore traceable to the Final Rule—has caused the Landowners an immediate and ongoing economic injury that will only be redressed by this Court setting aside the Final Rule. *Id.*

Ignoring the immediacy of this loss in market value, the Service goes so far as to suggest that a loss in value is insufficient to establish standing in the absence of evidence that steps are being taken to sell the property at a discounted rate. *See* Serv. Br. 9. But Article III does not require the Landowners to compound their injury in this fashion—the reduction in market value is itself a financial injury sufficient to establish standing. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 n.1 (2018) (holding that a "decrease in the market value of . . . land" resulting from a critical habitat designation was "sufficiently concrete injury for Article III purposes); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386, (1926) (holding that a zoning ordinance that "of its own force . . . greatly . . . reduce[d] the value of appellee's lands" constituted

a "present invasion of appellee's property rights"). *Cf. Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact. And the amount is irrelevant. A dollar of economic harm is still an injury-in-fact for standing purposes.").

Perhaps most fatal to the Service's objection, is that the United States Supreme Court—considering substantially similar evidence and arguments—has concluded that a loss in the market value of private property is sufficient to establish standing to challenge a critical habitat designation. *Weyerhaeuser*, 139 S. Ct. at 368 n.1. In *Weyerhaeuser* a group of forest landowners and lessees challenged the Service's designation of critical habitat for the dusky gopher frog on privately owned and leased timber property in Louisiana. *Id.* at 367–68. To establish standing they submitted declaration evidence asserting that the critical habitat designation had reduced the market value of their land due to public perceptions. *See Markle Ints., LLC v. U.S. Fish & Wildlife Serv.*, 40 F. Supp. 3d 744, 757 & n.22 (E.D. La. 2014) (describing the declarations).[2] The landowners did not assert they had definite plans to list the property for sale or otherwise attempt to quantify that loss in value. *See id. See also infra* note 3. Instead, in similar fashion to the declarants in this case, the landowners in *Markle* asserted that the critical habitat designation had diminished the market value of their property, due to public perceptions about land designated as critical habitat. *See Markle Ints.*, 40 F. Supp. 3d at 757 & n.22. *See also infra* note 3. These arguments satisfied the Eastern District of Louisiana, the Fifth Circuit, and the United States Supreme Court. *See Markle Ints.*, 40 F. Supp. 3d at 757 ("The defendants downplay these

---

[2] *Markle Interests* was the lead case in the consolidated district court case that gave rise to the Supreme Court's decision in *Weyerhaeuser*.

economic harms and regulatory burdens as speculative, but the Court finds that the plaintiffs have demonstrated actual, concrete injuries"); *Markle Ints., LLC v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 463 (5th Cir. 2016) ("The Landowners' assertion of lost property value . . . is a concrete and particularized injury that supports standing[]"). Indeed, the Supreme Court had occasion to consider and reject virtually identical standing and ripeness arguments to those now made by the Service.[3] *See Weyerhaeuser*, 139 S. Ct. at 368 n.1. This Court should similarly reject the Service's arguments here.

The Service also attacks the competence of the Landowners' declarations as evidence for proving present injury-in-fact. *See* Serv. Br. 9–10. The Service argues (in a footnote) that "[n]one of the Plaintiffs' declarants ha[ve] provided any evidence or even asserted that their property has actually lost value." *Id.* at 10 n.4. But the Landowners' declarations *are evidence. See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (holding that affidavits are the primary form of evidence to establish standing at summary judgment); 28 U.S.C. § 1746 (unsworn declarations an acceptable substitute for affidavit); *Weyerhaeuser*, 139 S. Ct. at 368 n.1 (affirming lower courts' reliance on declaration evidence to prove standing). And contrary to the Service's suggestion, the Landowners' declarations do in fact contain explicit assertions of lost market value attributable to

---

[3] *Compare* Intervenor-Respondents Br. 21, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, No. 17-71 (U.S. Jun. 29, 2018), *available at* https://www.supremecourt.gov/DocketPDF/17/17-71/51820/20180629122317034_17-71bs.pdf ("But Article III limitations do not permit plaintiffs to transform conjectural future harms into actionable, concrete injuries simply by positing that a hypothetical purchaser would pay more for a property were there no risk of future regulation.") *with* Serv. Br. 9 (characterizing the Landowners' similar assertions of perception-related decreases in market value as "uncertain and unspecific prediction[s] of future harm"). *Also compare* Intervenor-Respondents Br. 22, *Weyerhaeuser*, No. 17-71 ("petitioner has never claimed any concrete intention to sell its 152 acres or that it would have done so absent the challenged designation.") *with* Serv. Br. 9 ("nowhere does their first declarant, Mr. Skipper, allege that he has plans to list his property for sale or that he has been approached by prospective buyers at discounted rates . . . .").

the designation.[4] Moreover, the Service's unexplained suggestion that the declarants' assertions are "conclusory," is simply not borne out. *See* Serv. Br. 9–10. Each declarant's assertion of lost value is supported by multiple paragraphs laying out the basis for that assertion. This includes education, decades of professional experience, knowledge of the Final Rule, examination of pertinent documents in the administrative record, knowledge of the lands designated as Units 7 and 8, and extensive knowledge of local market conditions for timberland real estate. *See* Skipper Decl. ¶¶ 2, 9–16, 20, 25; Goodloe Decl. ¶¶ 2, 4–15; Jones Decl. ¶¶ 2–3, 9–23, 28.

For purposes of the Landowners' motion for summary judgment, these assertions of lost value must be accepted as true. *Bischoff v. Osceola Cty*, 222 F.3d 874, 883 (11th Cir. 2000). The Service is entitled to present evidence contravening the truth of the declarants' assertions. *See id* at 878. But it has not done so. Moreover, even if the Service had presented contravening evidence, cross-motions for summary judgment are not the appropriate place to resolve any such dispute. *See id.* at 880 (making clear that in the Eleventh Circuit, "disputed factual issues material to standing must be determined not on the record but with an evidentiary hearing." (collecting cases)).

## 2. The Final Rule has increased regulatory burdens on the Landowners' use of their properties causing them present and future injuries

The Service also attacks the Landowners' alternative standing theory—that the designation has imposed direct regulatory burdens on their timber operations.

The Service argues that any regulatory burdens stemming from the Section 7 consultation

---

[4] *See, e.g.*, Skipper Decl. ¶ 13 ("[t]he designation of our property as Unit 7 has negatively impacted its salability and *reduced its market value*, due to negative perceptions of land designated as critical habitat."); Jones Decl. ¶ 20 ("the designation of critical habitat on private timber property will significantly affect the marketability of land so designated and *immediately reduce its value*."); Goodloe Declaration ¶ 11 ("the U.S. Fish and Wildlife Service's critical habitat designation for the black pinesnake *has reduced the value* and marketability of Phalyn, LLC's land within Unit 8 . . .) (emphases added).

process are insufficient to prove injury-in-fact, because the precise extent of such burdens will depend, in part, on additional agency action. *See* Serv. Br. 10–11. Even if this were true, the costs stemming from the Section 7 consultation process (while not insignificant) are not the only burdens imposed on the Landowners by the designation. *See* Op. Br. 13. Instead, the Landowners chiefly assert that necessary actions taken in response to the designation (by them and entities they contract with), have resulted in costs and lost revenue. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. The designation significantly increases the Landowners' potential liability for any incidental take that may occur during their ordinary timber management activities. *See* 50 C.F.R. § 17.42 (Section 4(d) Rule) (prohibiting incidental take of the pinesnake resulting from "conversion of long-leaf-pine dominated forests" and "significant subsurface disturbance"). The designation of Units 7 and 8 as "occupied" demonstrates that the agency tasked with enforcing the ESA's prohibition on take—the Service—presumes the pinesnake's presence. As such, liability for incidental take within those areas would likely be that of a "knowing" violation. *Bryan v. United States*, 524 U.S. 184, 193 (1998) (explaining that to "knowingly" violate a statute means to act with "knowledge of the facts that constitute the offense."). The ESA imposes penalties that are orders of magnitude higher for "knowing" violations. *See* 16 U.S.C. § 1540(a)–(b). As such, the Landowners' have had no choice but to alter their harvesting and management practices to avoid habitat modification. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. This has cost them in both time and money. *See id.*

Reference to this economic injury is not an attempt by the Landowners to "manufacture standing" by taking steps to avoid a "remote" risk. *See* Serv. Br. 11. Any prudent landowner would have taken these actions in direct response to the designation. These costs—incurred to avoid the non-trivial risk of dramatically increased civil liability—constitute an injury-in-fact. *See Mountain*

*States Legal Found. v. Glickman*, 92 F.3d 1228, 1234–35 (D.C. Cir. 1996) (holding that "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing" and suggesting that, if the threatened injury is severe, "relatively modest increments in risk should qualify for standing"). Moreover, in Phalyn's case, the revenue loss is in part due to the attitudes of third-party loggers with which it contracts (and are thus not entirely attributable to Phalyn's own prudent actions). *See* Goodloe Decl. ¶ 16.

### B. The Landowners' claims are ripe

The Service also contends that the Landowners' claims are unripe. Serv. Br. 11. Again, the Service posits that the Landowners must wait, suffer additional or compounded injuries caused by the Final Rule, and then belatedly litigate its legality. *Id.* The Service's ripeness arguments fail for the same reason its standing arguments fail—the Landowners have suffered an immediate and ongoing injury-in-fact. *See Elend v. Basham*, 471 F.3d 1199, 1204–05 (11th Cir. 2006) (noting the frequent convergence between the inquiries for injury-in-fact and ripeness); *Weyerhaeuser*, 139 S. Ct. at 368 n.1 (rejecting both ripeness and standing objections on the same grounds: a diminution in market value constitutes a present injury-in-fact).

## II. The Service's Conclusion That Units 7 and 8 Were Occupied Was Unlawful and Is Unsupported By the Record

The Service's conclusion that the pinesnake "occupied" Units 7[5] and 8—based on outdated and isolated sightings combined with the mere presence of "suitable forested habitat" AR000398—adopted an illegal interpretation of the ESA and was arbitrary and capricious. The Service and Intervenor raise two defenses. First, they argue that the Service's interpretation of the term "occupied" is entitled to deference. Serv. Br. 12–14; Int. Br. 11–13. Second, considering the

---

[5] The Service misstates the size of Unit 7. *See* Serv. Br. 8 (asserting that Unit 7 includes 5,940 acres, thirty-six percent of which is privately owned). Unit 7 actually includes 33,395 acres, *100 percent* of which is privately owned. AR000411.

pinesnake's purportedly "elusive" nature, they argue that the Service relied on the best available science when it speculatively concluded that Units 7 and 8 were "occupied." Serv. Br. 14–16; Int. Br. 13–17. Both arguments fail.

### A.     The Service's interpretation that Units 7 and 8 were "occupied" is not entitled to deference and fails as a matter of law

The Service and Intervenor claim this Court should defer to the Service's conclusion that Units 7 and 8 were occupied by the pinesnake, in "two respects." *See* Serv. Br. 12. First, they argue for heightened deference to the Service's factual determinations involving scientific or technical expertise. *See* Serv. Br. 12–13 (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)); Int. Br. at 10, 14, 17 (same). Second, although they do not invoke it explicitly, they argue this Court should defer to the Service's legal interpretation of the statutory term "occupied" under the framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). *See* Serv. Br. 12–14 (arguing that the term "occupied" is ambiguous and that the designation warrants deference as a "reasonable" interpretation of the ESA); Int. Br. 11–13 (same). The Service is not entitled to either form of deference.

### 1.     The Service and Intervenor cannot disguise improper statutory definitions as agency scientific expertise

The designation is not entitled to heightened deference under *Baltimore Gas and Electric* merely because agency scientific expertise was used. While it is true that courts defer to agency scientific determinations about *facts*, *see Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376–77 (1989), the Service's factual determinations are not at issue in this case. Courts distinguish between factual disputes involving agency technical determinations on the one hand. *Marsh*, 490 U.S. at 376–77, and disputes "turn[ing] on the meaning of" of a disputed statutory term "or on an application of" a statutory standard "to settled facts," on the other. *Id.* While in the former the government receives heightened deference under *Baltimore Gas and Electric*, in the latter it does

not. *Cf. id.* Here, the Landowners do not dispute the Service's *factual* determinations—i.e., that there has only been one sighting of the pinesnake in Unit 7 since 1995, that there were two sightings in Unit 8 prior to 1997, and that the pinesnake relies upon certain habitat features. AR000413, AR000408–09. Instead, the Landowners contend that the designation fails as a matter of law, because the Service relies upon an illegal interpretation of the term "occupied," to conclude (based on its factual findings) that Units 7 and 8 were occupied. *See* Op. Br. 15–19. This case therefore presents a dispute of the latter variety—whether the Service's legal interpretation of the term "occupied" is entitled to deference.

### 2. Ad hoc agency interpretations do not warrant heightened deference

The Service's legal interpretation of the term "occupied" is not entitled to deference under *Chevron*. No heightened deference is afforded ad hoc agency interpretations varying according to decision. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 412, 417 (1993). In requesting deference, the Service asks this Court to accept its practice of determining the meaning of "occupied" on a case-by-case basis. Serv. Br. 12–13 (arguing that use of the plain meaning of "occupied" would constrain the Service's ability to apply different definitions to different species). But this is itself grounds to reject the Service's request. *Cf. Good Samaritan Hosp.*, 508 U.S. at 417. The Intervenor places a heavy emphasis on a 2016 interpretive rule defining the phrase "geographical area occupied by the species." Int. Br. 3, 11–12. But that interpretive rule should not alter the Court's conclusion that deference is not warranted. That 2016 interpretive rule merely codifies the Service's preexisting belief in its unlimited discretion to define occupation on an ad hoc basis. *See* 50 C.F.R. § 424.02; 81 Fed. Reg. 7414, 7416 (Feb. 11, 2016) ("the amended regulations do not substantially change the manner in which critical habitat is designated."). *Cf. Aposhian v. Barr*, 958 F.3d 969, 979–80 (10th Cir. 2020) (distinguishing a "legislative rule" which "changes existing

law, policy, or practice" from an "interpretive rule" which "simply advise[s] the public of the agency's construction of the statute and rules which it administers[,]" and determining the former generally receives *Chevron* deference, whereas the latter does not (internal citations omitted)); *see also United States v. Mead Corp.*, 533 U.S. 218, 232 (2001).

Where, as here, no deference is warranted under *Chevron*, an agency's interpretation may still merit some deference "proportional to its 'power to persuade.'" *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944)). However, as the arguments below demonstrate, the Service's interpretation of "occupied" plainly violates the unambiguous language of the ESA. *See infra* 11–14. And the Service's patently unreasonable designation of Units 7 and 8 as "occupied" would warrant no deference even under the deferential *Chevron* step two. *See infra* 14–15. As such, the Final Rule's "power to persuade" is approximately nil.

### 3. Under the plain meaning of the ESA Units 7 and 8 were not occupied

Even were it to apply *Chevron*, this Court should not defer to the Service. Under the *Chevron* framework, a reviewing court owes the agency's "interpretation of the law no deference unless, after employing traditional tools of statutory construction," it finds itself "unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (quotations omitted). This is because the "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Legal Env't Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1473 (11th Cir. 1997) (quoting *Chevron*, 467 U.S. at 842). As such, before deferring to an agency, a court must look to the "text, structure, purpose, and legislative history to determine if the Congress has expressed its intent unambiguously." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016) (citations omitted). Most importantly, a reviewing court does "not start from the premise that [the statutory] language is imprecise." *Legal Env't Assistance Found.*, 118 F.3d at 1474

(quoting *United States v. LaBonte,* 520 U.S. 751, 757 (1997)). Instead, the reviewing court will "assume that in drafting legislation, Congress said what it meant." *Id.*

The term "occupied" is not ambiguous. The Landowners explain that since "occupied" is not defined in the ESA, it should be given its ordinary meaning. *See* Op. Br. 15; *see also Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1190 (11th Cir. 2019) (determining at *Chevron* step one that "unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." (quoting *Barton v. U.S. Att'y Gen.*, 904 F.3d 1294, 1298 (11th Cir. 2018))). The ordinary meaning of "occupy" is to "dwell in" or to "take up or fill up (space, time, etc.)." *See Occupy*, Webster's New Twentieth Century Dictionary of the English Language Unabridged (2d ed. 1977). *Cf. Koch Foods, Inc. v. U.S. Dep't of Lab.*, 712 F.3d 476, 480–81 (11th Cir. 2013) (endorsing the use of dictionaries to ascertain the ordinary meaning of a statutory term at *Chevron* step one); *Legal Env't Assistance Found.*, 118 F.3d at 1474 (same). This Court should therefore apply the ordinary meaning of "occupy" and hold unlawful the designation. A small number of outdated, isolated, and anecdotal sightings, does not constitute evidence of the pinesnake "dwell[ing]" in Units 7 and 8 and does not support a conclusion that the area is "occupied." *See* Op. Br. 18.

Reliance upon the ordinary meaning of "occupied" is consistent with the ESA's structure and purpose. The ESA authorizes the Service to designate "occupied" areas containing "the physical or biological features . . . essential to the conservation of the species" and "unoccupied" areas that are "essential for the conservation of the species." *See* 16 U.S.C. § 1532(5)(A). The ordinary meaning of "occupied," which requires a conclusive showing of an area's regular use, is consistent with the congressional decision to distinguish "occupied" from "unoccupied" areas. The Service's conclusion that "occupation" can be inferred on the basis of habitat "suitability,"

AR000398, however, short circuits that distinction. The Service stunningly suggests that its determinations should be upheld even where the evidence of occupation is "inconclusive," because this "comports with the ESA's policy of 'institutionalized caution.'" Serv. Br. 16 n.7 (citing *Tenn. Valley Auth. (TVA) v. Hill*, 437 U.S. 153, 194 (1978)). While a policy of "institutionalized caution" might explain Congress's decision to permit the designation of "unoccupied" areas that are "essential for the conservation of the species," 16 U.S.C. § 1532(5)(A)(ii), it does not justify the Service's outright disregard for that distinction. *Cf. United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (rejecting an interpretation that would render a statutory provision "dead letter"). It is not necessary to ignore the plain meaning of "occupied" to ensure habitat is protected. The Service can, and often does, conclude that "unoccupied" areas are "essential," therefore protecting them. But it did not make that finding here. *See* Op. Br. 19.

The Service and Intervenor also protest that to apply the ordinary meaning of "occupied" would result in a definition that is unduly "narrow" and therefore "inconsistent" with the ESA's intent. Serv. Br. 13–14; Int. Br. 11–13. The argument that Congress intended "occupied" be read broadly, amounts to an assertion that "occupied" as it is used in the ESA, really means "likely to be occupied." *See* Serv. Br. 13–14, 16 n.7; Int. Br. 11–13. This argument is unpersuasive. Other provisions of the ESA authorize regulation based on mere *likelihood*. *See* 16 U.S.C. § 1532(32) (defining a "threatened species" as "any species which is *likely* to become an endangered species within the foreseeable future." (emphasis added)). That Congress chose not to apply comparably relaxed terminology in defining critical habitat, *see* 16 U.S.C. § 1532(5)(A)(i), is strong indication that it intended occupation to be determined conclusively, in accordance with the term's ordinary meaning, *cf. Corley v. United States*, 556 U.S. 303, 314, (2009) (presuming that Congress uses "distinct terms . . . deliberately" (internal quotations omitted)). The Service and Intervenor's

objection is also unpersuasive given Congress's intent to pass "[a]n extremely narrow definition of critical habitat." *See* House Agreement to Conference Report on S. 2899 (Oct. 14, 1978) *in* A Legislative History of the ESA, 1220–21 (U.S. GPO 1982).

### 4. Deference does not salvage the Service's unreasonable, unsupported conclusion that Units 7 and 8 were occupied

Even if this Court were to find the term "occupied" ambiguous, it should not defer to the Service. At *Chevron* step two, a court must determine whether the agency's interpretation is impermissible, arbitrary, or capricious. *Scheerer v. U.S. Atty. Gen.*, 513 F.3d 1244, 1250 (11th Cir. 2008). Factors to be considered include the text and structure of the statute, the legislative purpose of that text, and any arbitrariness resulting from the agency's construction. *See Conley v. Nw. Fla. State Coll.*, 145 F. Supp. 3d 1073, 1081 (N.D. Fla. 2015). These factors demonstrate the flaws of the Service's conclusion that Units 7 and 8 were occupied.

First, the ESA's text and structure militates against deference to the Service's interpretation. Even courts which have given the Service the benefit of *Chevron* on the question of whether critical habitat was "occupied," have endorsed use of the term's ordinary meaning. For example, in *Otay Mesa Property*, the District of the District of Columbia cited Merriam-Webster's Dictionary for the proposition that "to occupy" means "to take up residence in," and concluded that according to the "text and structure" of the ESA, "consistent use" of an area by the species should be the hallmark of any occupancy determination. *See Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 344 F. Supp. 3d 355, 369 (D.D.C. 2018). One or two sightings in twenty years does not constitute sufficient evidence of the pinesnake "dwelling" in Units 7 and 8, or otherwise "consistent[ly] us[ing]" the area. Op. Br. 16.

The Service and Intervenor's reliance on *Arizona Cattle Growers* is misplaced. Serv. Br. 13 (citing *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1165–66 (9th Cir. 2010)); Int.

Br. 12–13 (same). In that case, the Ninth Circuit held that the Service has "authority to designate as 'occupied' areas that [a species] uses with *sufficient regularity* that it is likely to be present during any *reasonable* span of time." *Ariz. Cattle Growers*, 606 F.3d at 1165, 1167 (emphasis added). The areas which the Ninth Circuit agreed were "occupied" were directly adjacent to occupied nesting sites, into which—based on extensive data—the Service concluded Mexican spotted owls would regularly move to forage. *Id.* at 1162–63, 68. It was this evidence of regular foraging use of land directly adjacent to nesting sites that the Ninth Circuit distinguished from "areas . . . merely suitable for future occupancy" which cannot be considered "occupied." *Id*. at 1167. By contrast, there is no evidence that the pinesnake uses Units 7 and 8 "with sufficient regularity that it is likely to be present during any reasonable span of time." *See id.* at 1165. Instead, by inferring occupation from minimal evidence of historic presence and the continued existence of "*suitable* forested habitat," AR000398 (emphasis added), the Service does precisely what *Arizona Cattle Growers* said it could not. *Cf. Ariz. Cattle Growers' Ass'n*, 606 F.3d 1167.

*Arizona Cattle Growers* also emphasizes that the ESA's structure militates against deference to the Service's interpretation. The Ninth Circuit's warning against reliance upon mere suitability for future occupancy was grounded in the ESA's "distinction between occupied and unoccupied" critical habitat*. Id*. As discussed, the Final Rule disregards that distinction. *See* Op. Br. 18–19; *supra* 12–13.

Second, and again, the Service's expansive interpretation plainly conflicts with Congress's intention that "critical habitat" have "an extremely narrow definition." *See supra* 13–14.

Finally, as discussed further in the next section, the Service's interpretation of "occupied" contained in the Final Rule was patently arbitrary, being unsupported by the best available science contained in the administrative record. *See infra* 16–18. No deference is warranted.

**The Service's conclusion that Units 7 and 8 were occupied is not supported by the best available science**

      1.    **The ESA's best available science requirement does not authorize the Service to reach unfounded or speculative conclusions**

Both the Service and Intervenor make pains to clarify that the ESA's "best available science" standard does not require that conclusions be supported by the best data *possible. See* Serv. Br. 13; Int. Br. 14. The Service and Intervenor therefore argue that the pinesnake's supposedly "elusive" nature excuses speculative inferences about its occupation of Units 7 and 8. Serv. Br. 2, 15; Int. Br. 15–16. Although true that the best *available* data is not necessarily the best *possible* data, courts have repeatedly explained that this does not provide the Service with blanket authorization to reach unsupported or speculative conclusions. *See Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 918 (D.C. Cir. 2011) ("the absence of a requirement for the Service to collect more data on its own is not the same as an authorization to act without data to support its conclusions."). *See also N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1226–27 (10th Cir. 2020); *Ariz. Cattle Growers*, 606 F.3d at 1164.

The Tenth Circuit's decision in *New Mexico Farm and Livestock Bureau* is especially instructive. In that case, the court rejected the Service's argument that the purportedly "elusive" nature of the jaguar excused reliance on isolated sightings and mere habitat suitability to infer occupation. *See N.M. Farm & Livestock Bureau*, 952 F.3d at 1226–27. The similarities between that argument and the arguments now made by the Service and Intervenor are not lost on the Landowners. *See* Serv. Br. 2, 15 (referring to the "elusive" nature of the pinesnake); Int. Br. 15–16 (same). The Service attempts to draw minor factual distinctions. *See* Serv. Br. 14–15. But these minor distinctions do not negate the applicability of the rule of law the Tenth Circuit announced: that a species' supposedly "elusive" nature does not excuse reliance upon inferences or other speculative conclusions when determining occupancy. *See N.M. Farm & Livestock Bureau*, 952

F.3d at 1226–27. Moreover, the designation here is analogous to the designation at issue in *New Mexico Farm and Livestock Bureau*. In *New Mexico Farm and Livestock Bureau*, the Service relied upon sightings in the 1990s to infer occupation in the 1970s. *See id.* Here, the Service's designation of Units 7 and 8 rely upon sightings in the 1990s to infer occupation in 2015.

The Intervenor also requests this Court consider that the private ownership of lands within Units 7 and 8 has hindered data collection. *See* Int. Br. 15–16. However, most of Unit 8 is publicly owned. *See* AR 000413 (Final Rule). And until 2016 most of the area now comprising Unit 7 was leased to the State of Alabama and accessible to the public. AR000089; AR000391. Moreover, both areas have been regularly surveyed and an extensive survey conducted in 2008–09 failed to locate any pinesnakes. AR001967–68 (Barbour 2009).

### 2. The best available science demonstrates that the Service's occupancy determination was unlawfully speculative

The Service claims significant license in the "best available science" requirement. But no matter how one reads that requirement, the best available scientific data demonstrates the speculative—therefore arbitrary and capricious—nature of Service's conclusions. The Landowners identify three primary reasons for this conclusion. Op. Br. 17–18. First, a 2008–09 survey failed to locate any individual pinesnakes within Units 7 and 8. *See* Op. Br. 18 (citing AR001967–68). *Cf. Otay Mesa Prop.*, 646 F.3d at 917 (determining an occupied designation was unsupported where later surveys failed to locate any specimens). Second, the sightings, which the Service describes as "the primary indicator" that Units 7 and 8 "support[] pine snakes," Serv. Br. 15, are outdated (in the case of the 1990s sightings in both units), isolated and limited to one unit (in the case of the 2015 sighting in Unit 7), and "anecdotal,"[6] *see* Op. Br. 17–18. Third, several

---

[6] The Intervenor objects to the use of the term "anecdotal," to describe the 1990s sightings. *See* Int. Br. 15. However, the Landowners quote directly from the administrative record which descriptively refers to these sightings as "anecdotal." *See* AR001967–68 (Barbour 2009).

peer review comments cast doubt on the Service's methodology for inferring occupancy. *See* Op. Br. 17. While the Service attempts to downplay this expert peer review criticism, Serv. Br. 15, its citations to other portions of the record do not assail the Landowners' core contention in citing these experts: the Service's methodology was based on a large degree of speculation, making it arbitrary and illegal. *Cf. N.M. Farm & Livestock Bureau*, 952 F.3d at 1226.

## III. The Service Was Required to Analyze All the Costs—Including the Coextensive Costs—of the Critical Habitat Designation

By adopting the "baseline" approach and excluding numerous costs from its economic analysis, the Service violated the ESA's "categorical requirement" that it consider economic and other impacts before designating critical habitat. *Weyerhaeuser*, 139 S. Ct. at 371 (quoting *Bennett*, 520 U.S. at 172). The Service and Intervenor's arguments to the contrary are unavailing.

### A. The Service's interpretation of Section 4(b)(2) of the ESA is not entitled to deference

The Service and Intervenor again assert that this Court should defer to the Service's interpretation of the ESA under *Chevron*. *See* Serv. Br. 19–20; Int. Br. at 19–21. Again, *Chevron* deference is not warranted. As an initial matter, in invoking *Chevron*, both the Service and Intervenor place heavy emphasis on the fact that the Service has promulgated regulations codifying the "baseline approach." *See* Serv. Br. 19; Int. Br. 18–19. But that interpretive rule, which served merely to "codify the current practices" of the Service, 78 Fed. Reg. 53,058, 53,076 (Aug. 28, 2013), is not entitled to *Chevron* deference. *Cf. Aposhian*, 958 F.3d at 979–80; *Mead*, 533 U.S. at 232.[7] But even if this Court were to apply the *Chevron* framework to the Service's interpretation

---

[7] Perhaps in anticipation, the Intervenor very briefly asserts (in a footnote) that the Service's use of the baseline method warrants *Skidmore* deference. *See* Int. Br. 21 n.1. However, as the arguments below demonstrate, use of the baseline method is contrary to the unambiguous requirements of the ESA and patently impermissible. *See infra* 18–24. The Final Rule therefore lacks the "power to persuade." *See Skidmore*, 323 U.S. at 139–40.

of Section 4(b)(2), it should not defer to the agency. First, the plain text of the ESA unambiguously forecloses use of the baseline method. Second, even were this Court to conclude that the ESA is ambiguous, the Service's interpretation is patently impermissible.

1.    **Section 4(b)(2) of the ESA requires the consideration of coextensive costs and *New Mexico Cattle Growers* remains persuasive**

Under the *Chevron* framework, a court owes an agency's "interpretation of the law no deference unless, after employing traditional tools of statutory construction," it finds itself "unable to discern Congress's meaning." *SAS Inst.*, 138 S. Ct. at 1358 (quotations omitted). *See also Legal Env'tl Assistance Found.*, 118 F.3d at 1473. Moreover, even if the Service's codification of the baseline approach *were* a legislative rule, its mere existence does not displace the Court's duty to apply traditional tools of statutory construction to ascertain the plain meaning of the ESA. *See Sundance Associates, Inc. v. Reno*, 139 F.3d 804, 808 (10th Cir. 1998) ("An agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." (quotations omitted)).

As discussed in the Landowners' opening brief, the ESA unambiguously requires the Service to "conduct a full analysis of all of the economic impacts of a critical habitat designation, regardless of whether those impacts are attributable co-extensively to other causes." *See* Op. Br. 20 (quoting *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277,1285 (10th Cir. 2001)). Consistent with *Chevron*, the Landowners base their argument on the "text, structure, purpose, and legislative history." *U.S. Sugar Corp.*, 830 F.3d at 605, of the ESA. *See* Op. Br. 20–21.

First, as the Tenth Circuit has held, the baseline approach is contrary to the ESA's requirement that the Service take "into consideration the economic impact . . . of specifying any particular area as critical habitat," 16 U.S.C § 1533(b)(2), because it does not study "all of the

economic impacts of a critical habitat designation . . . ." *N.M. Cattle Growers*, 248 F.3d at 1285. Instead, it ignores entire categories of costs—namely coextensive costs. *See id.*

The Service and Intervenor's chief response is to argue that *New Mexico Cattle Growers* is no longer persuasive because the Service has since modified its definition of what constitutes "adverse modification" of critical habitat. Serv. Br. 19; Int. Br. 22–25. Because there is no longer a precise "functional equivalence" between the effects of listing a species and the effects of designating critical habitat, the Service argues, the baseline method will now generally yield some *de minimis* costs. Serv. Br. 19; Int. Br. 24. The Service believes this addresses the Tenth Circuit's concern that the baseline approach renders the ESA's language "virtually meaningless." *Id*. This reading misapprehends *New Mexico Cattle Growers*. The Tenth Circuit did not draw the line between an approach that found *zero* impacts and an approach that found any impacts, no matter how minor. *N.M. Cattle Growers*, 248 F.3d at 1285. After all, the baseline approach found significant impacts in some designations prior to *New Mexico Cattle Growers*. *See, e.g.*, 57 Fed. Reg. 1796-01, 1811, 1816 (Jan. 15, 1992) (applying baseline approach and concluding that the critical habitat for the northern spotted owl would result in $113 million in impacts)*.* Instead, the Tenth Circuit meant that the Service cannot render the economic analysis requirement "essentially without meaning" by interpreting it in a way that systematically ignores coextensive costs. *N.M. Cattle Growers*, 248 F.3d at 1285. Moreover—notwithstanding the updated regulatory definition of "adverse modification"—in designating habitat for the pinesnake, the Service still assumed that all actions that would constitute adverse modification of its occupied critical habitat would also result in jeopardy. AR000417. It therefore limited cost considerations to minor administrative costs. AR000023 (Screening Memo). As in *New Mexico Cattle Growers*, application of the

baseline approach to the pinesnake's "occupied" critical habitat "render[ed] any purported economic analysis . . . virtually meaningless." *N.M. Cattle Growers Ass'n*, 248 F.3d at 1285.

For its part, the Intervenor maintains that the ESA *prohibits* the consideration of coextensive costs. *See* Int. Br. 18. Not so. *See N.M. Cattle Growers*, 248 F.3d at 1285 (rejecting that argument). Coextensive costs are one category of economic impacts associated with a critical habitat designation—subsumed within the ESA's broad directive to consider the "economic impact" of a designation. *Cf. id*. As such, it was not necessary for Congress to specifically direct their consideration (or the consideration of any other single category of costs, for that matter). The Intervenor's argument to the contrary, that only non-coextensive costs are "associated with the critical habitat designation itself," Int. Br. 18, improperly relies upon a "but for" approach that categorically ignores certain economic costs attributable to the designation, merely because they may have multiple contributing causes. *Cf. N.M. Cattle Growers*, 248 F.3d at 1283 (describing the baseline approach as a "but for" method, in contrast to the coextensive method).

Second, the structure of the ESA reinforces that the baseline approach is improper. The ESA makes broad pronouncements of what costs the Service must study under the ESA. 16 U.S.C § 1533(b)(2); *see also Weyerhaeuser*, 139 S. Ct. at 371 (2018). It also separately provides when the Service must ignore costs. *N.M. Cattle Growers*, 248 F.3d at 1284 ("[T]he ESA clearly bars economic considerations from having a seat at the table when the listing determination is being made."). It "is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotations omitted). By listing when the Service must ignore costs, "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (quotations omitted). The 1982 amendments targeted a specific problem by stating that the Service could not

refuse to list a species because of economic impacts. Pub. L. No. 97-304, 96 Stat. 1411 (1982). This amendment was not superfluous. *Corley*, 556 U.S. at 314 (a statute should be construed so that effect is given to all its provisions). Congress passed this prohibition because while critical habitat is "an integral part of the listing process" Congress wished "to prevent its designation from influencing the decision on the listing of the species." H.R. Rep. No. 97-567, at 12, 1982 U.S.C.C.A.N. 2807, 2812. In other words, Congress did not want the required economic analysis to affect the listing of a species. But that does not mean that Congress wanted the Service to ignore the economic analysis. *N.M. Cattle Growers*, 248 F.3d at 1285. Instead, Congress required the Service to study "all of the economic impacts of a critical habitat designation," *id*, and directed that "[t]he balancing between science and economics should occur . . . through the exemption process." H.R. Rep. No. 97-567, at 12, 1982 U.S.C.C.A.N. 2807, 2812.

Third, the purpose of the economic analysis requirement further demonstrates why the baseline approach is improper. Section 4(b)(2) has two purposes: to assess impact *and* to determine whether an exclusion would be appropriate. *See* 78 Fed. Reg. at 53,060 ("An economic analysis is a tool that informs both the required impact analysis and the discretionary 4(b)(2) exclusion analysis."). But the baseline approach deliberately excludes impacts, thus depriving the Service of all the relevant information of its decision.

Finally, the legislative history confirms the meaning of the economic analysis requirement. The 1978 amendments were passed in response to *TVA*, 437 U.S. 153. 84 Fed. Reg. 45,020, 45,022 (Aug. 27, 2019). The critical habitat at issue in *TVA* was what the 1978 amendments would define as "occupied." *See TVA*, 437 U.S. at 170. But, as demonstrated above, the baseline approach renders Section 4(b)(2) idle for occupied critical habitat. Hence, use of the baseline approach in *TVA* would likely have resulted in a near-zero economic impact. The baseline method therefore

undercuts the very purpose of the 1978 amendments—it would have provided no relief in the controversy that gave rise to them. One cannot accept that Congress responded to *TVA* by passing a statute that did not address the problems it raised. *Cf. Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 23 (2006) (courts should not interpret statutes contrary to congressional intent).

### 2. Deference does not salvage the Service's unreasonable exclusion of coextensive costs from the economic analysis

Even if this Court were to decide application of *Chevron* is merited and find Section 4(b)(2) ambiguous, it should not defer to the Service. Again, factors to be considered at *Chevron* step two include the text and structure, the legislative purpose, and any arbitrariness resulting from the agency's construction. *Scheerer*, 513 F.3d at 1250; *Conley*, 145 F. Supp. 3d at 1081.

As the discussion above demonstrates, the baseline approach is inconsistent with the statute's text and legislative purpose. These factors therefore demonstrate that the Service's approach is impermissible at *Chevron* step two. However, there are additional reasons why this Court should not defer to the Service. Chiefly, the Service's interpretation of the ESA results in frequently arbitrary outcomes. Where any "occupied" critical habitat is at issue the baseline approach results in the same, perfunctory economic analysis. Rather than look at each designation on a case-by-case basis, the Service simply concludes that "the probable incremental economic impacts of the . . . critical habitat designation are expected to be limited to additional administrative efforts as well as minor costs of conservation efforts resulting from a small number of future section 7 consultations." AR000416 (Final Rule).[8] This one-size-fits-all analysis for nearly every occupied critical habitat designation is arbitrary.

Moreover, the fact that the Service believes the "baseline" method is consistent with the

---

[8] *See also* 86 Fed. Reg. 30,888, 30,898 (June 10, 2021) (same); 86 Fed. Reg. 20,798, 20,873 (Apr. 21, 2021) (same); 85 Fed. Reg. 11,458, 11,514 (Feb. 27, 2020) (same); 81 Fed. Reg. 3866, 3883 (Jan. 22, 2016) (same); 80 Fed. Reg. 37,404, 37,425 (June 30, 2015) (same).

Office of Management and Budget's guidance for conducting regulatory analysis in accordance with Executive Order 12866, does not render it a permissible interpretation of the ESA. *See* Serv. Br. 20 (citing OMB Circular A-4 (Sept. 17, 2003)). It goes without saying that the requirements of the ESA differ from other cost-benefit analyses. As discussed above Congress developed the ESA's economic analysis requirement in response to unique concerns related to the ESA's explicit exclusion of cost-considerations from the first part of the process (listing). *See supra* 21–22. Congress required a coextensive approach to make sure that all relevant costs are considered at some point. *See id*. Thus, the ESA's 1978 amendments—which predate Executive Order 12866 by more than a decade—impose requirements that differ from the requirements anticipated in Circular A-4. *See* Circular A-4 at 42 (reminding agencies that other statutes and executive orders may impose "specialized analysis" requirements in addition to the requirements of Executive Order 12866).

B.     **Even if the baseline method were proper the Service failed to properly analyze the full impact of the designation**

Even accepting the Service's reliance upon the baseline method, its analysis failed to properly assess numerous costs. *See* Op. Br. 24–26.

First, the Service failed to properly consider the effects of public perceptions about critical habitat on land values. *See* Op. Br. 21. The Service and Intervenor cite purported "data limitations" to excuses this failure. Serv. Br. 21; Int. Br. 26. Again, "the absence of a requirement for the Service to collect more data on its own" does not equate to blanket authorization to reach arbitrary conclusions. *See Otay Mesa Prop.*, 646 F.3d at 918. The Service's conclusions were arbitrary. The Service acknowledged the probability that these costs would occur. AR000044 (Suppl. Info. on Land Values). But it failed to analyze them (beyond a rudimentary bounding analysis); improperly discounted their effects due to the mistaken belief that the presence of other protected species

*which do not occur in Units 7 and 8* would reduce such costs; and declined to consider the body of economic literature on perceptional effects. *See* Op. Br. 24–25.

Neither the Service nor the Intervenor dispute that the Final Rule's conclusion that protections for the gopher tortoise, red-cockaded woodpecker, and dusky gopher frog will reduce the effects attributable to the black pinesnake designation, is *mistaken as to Units 7 and 8*. *See* Op. Br. 25 (no protected populations in Units 7 and 8). The Service does, however, argue that the Landowners waived the argument that the Service arbitrarily declined to apply the body of literature on perceptional effects, *see* Op. Br. 25 n.7. The Service bases this argument on the fact the Landowners did not move for the administrative record to be supplemented with that literature. *See* Serv. Br. 8 n.3. The Service misses the point. This Court need not look beyond the record, nor have the Landowners asked it to. *See* ECF No. 62 (Opp. to Motion to Strike). Instead, the administrative record itself demonstrates that the Service was aware of this body of literature but declined to apply it. *Compare* AR 00045–46 (Suppl. Info. on Land Values) (informing the Service of and summarizing several studies on perceptional effects) *with* AR000417 (Final Rule) (discussing the perceptional effects phenomenon but omitting any reference to these studies).

Second, the Landowners argue that the Service failed to consider the costs imposed on timber projects by the designation of Units 7 and 8 as "occupied." Op. Br. 25. This argument is based on the reality that in issuing the Final Rule, the Service publicly stated its belief that Units 7 and 8 are occupied. *See* AR000413. This public statement on the part of the agency tasked with enforcing the prohibitions on taking the pinesnake substantially increases the likelihood that a landowner would be liable for more severe penalties for "knowing[ly]" violating the ESA. *See* 16 U.S.C. § 1540(a)–(b); *Bryan*, 524 U.S. at 193. The Intervenor responds that, as a matter of law, the designation does not extend the take prohibition to areas where pinesnakes are not present. Int.

Br. 26. But this argument is nonresponsive to the Landowners' critique: that the Service failed to consider the foreseeably chilling effect of its public pronouncement about occupation, on liability-wary project proponents. *See* 16 U.S.C. § 1540(a)–(b).

Finally, the Service failed to account for costs associated with disincentivizing voluntary conservation. *See* Op. Br. 25–26. The Intervenor argues that these costs need not be considered, because conservation-minded property owners responding to the perverse incentives created by critical habitat make their own choices. Int. Br. 26–27. This argument fails to address the foreseeability of those choices. The Service was aware of the foreseeability of these conservation costs, given the documents in the record discussing them. *See* Op. Br. 25–26. Moreover, the Service claims it properly considered the qualitative conservation *benefits* of the designation— such as a foreseeable "improvement of public awareness," Serv. Br. 23—but the Intervenor now claims the Service should not have considered qualitative conservation *costs* such as the foreseeable disincentive for private landowners to continue conserving the pinesnake's habitat.

## IV. The Service Does Not Have Unbridled Discretion in Its Exclusion Decisions and It Failed to Provide a Reasoned Explanation for Not Excluding Units 7 and 8

The Service and Intervenor make three arguments in defense of the Service's decision not to exclude Units 7 and 8: (i) the Service possesses discretion; (ii) the inclusion of Units 7 and 8 will lead to various qualitative conservation benefits; and (iii) the Service concluded that costs would not be disproportionate. *See* Serv. Br. 22–24; Int. Br. 27–30. These arguments fail.

First, although the Service maintains discretion when making exclusion decisions, *see Weyerhaeuser*, 139 S. Ct. at 361, 371, this discretion is not "unfettered," *compare Judulang v. Holder*, 565 U.S. 42, 52–53 (2011) (noting that although review under the APA's arbitrary and capricious standard is "narrow" a reviewing court nevertheless "retain[s] a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking" (internal citations

omitted)) *with* Serv. Br. 22 (implying that Service possesses "unfettered" discretion). As such, when making exclusion decisions, the Service must offer a rationale that weighs the costs and benefits of excluding a particular area. *See* 81 Fed. Reg. 7226, 7248 (February 11, 2016) (Service's Section 4(b)(2) policy). The Service failed to offer any such rationale in the Final Rule.

Second, the fact that the inclusion of Units 7 and 8 within the designation might result in various "qualitative[]" benefits to the species' survival and recovery, does not resolve the pertinent question. *See* Serv. Br. 23; Int. Br. 28–30. The ESA requires the Service to weigh the benefits of inclusion as against the benefits of exclusion. Thus, simply because there are things to account for on one side of the ledger does not end the analysis—it just begins it.

Third, the Service's conclusion that economic costs would not be "disproportionate" to the qualitative benefits of designating Units 7 and 8, was unreasoned. *See* AR000417 (Final Rule). That single-sentence statement of non-disproportionality contains no weighing of costs and benefits. *See Care v. Nielsen*, 461 F. Supp. 3d 1289, 1308 (N.D. Ga. 2020) ("reasoned decision-making under the Administrative Procedure Act calls for an explanation for agency action"). The Service attempts to excuse its failure on the grounds that "data limitations" prevented it from quantifying the precise "magnitude of any perception-related costs" to private property. Serv. Br. 24. However, there is an inherent contradiction in the Service's claim that although it was *able* to properly attribute value to "qualitative" conservation benefits, data limitations left it *unable* to assign proper weight to perception-related costs. Serv. Br. 23. The Service appears to be enforcing a requirement of rigid quantification when it assesses costs but relaxing that requirement when it assesses benefits. This willingness to consider benefits, notwithstanding obvious data limitations, but refusal to consider costs that might be partially qualitative, is itself arbitrary.

In defending its conclusory "non-disproportionality" finding, the Service also minimizes the clear *quantitative* implications of its conclusions regarding perceptional effects. *See* Serv. Br. 24. Its "data limitations" claim is therefore overstated. The document titled "Supplemental Information on Land Values" asserts the probability that the designation will result in perception-related costs. AR00044–47. It then performs a "bounding analysis" by estimating the total market value of the private property effected by the designation. AR 000047–000052. This total value of $180 million ($37.1 million within Units 7 and 8 alone) represents the "upper bound" of any perception-related costs. *Id*. The quantitative conclusion, therefore, is that a loss of some fraction of that figure will be attributable to the designation. AR 000047–48. Even if the loss attributable to the designation constitutes but a small fraction, this would still represent a significant cost. The Service cannot escape this conclusion, and its failure to weigh these costs against the benefits of the designation was arbitrary, capricious, and an abuse of discretion. *See Weyerhaeuser*, 139 S. Ct. at 372 (remanding to determine whether the Service's exclusion decision was "arbitrary, capricious, or an abuse of discretion").

## V.   The Service Erroneously Failed to Prepare Regulatory Flexibility Analyses for the Critical Habitat Designation

The Service and Intervenor offer the credulity-straining argument that certification pursuant to 5 U.S.C. § 605(b) was proper because critical habitat designations do not directly regulate land so designated. Serv. Br. 26–27; Int. Br. 30–31. This argument should be rejected.

### A.   The Service is not entitled to deference

The Service's conclusion that the Final Rule would not have a "significant economic impact on a substantial number of small entities" (a "SEISNOSE"), is not entitled to *Chevron* deference. The Service does not administer the RFA, and its interpretations of the RFA are not entitled to deference. *See Am. Trucking Ass'ns, Inc. v. EPA*, 175 F.3d 1027, 1044 (D.C. Cir.)

*vacated in part on other grounds Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) (declining to apply *Chevron* deference in a challenge to a Section 605(b) certification). The Service does not contend that its interpretations of the RFA are entitled to deference. Instead, it suggests that its certification that the Final Rule would not have a SEISNOSE was not based on an interpretation of the RFA, but rather on an interpretation of the ESA. Serv. Br. 25–26, 30. This misstates the issue. At issue is whether the Service correctly asserted that the Final Rule will not have a SEISNOSE *for purposes of the RFA's certification provision*, 5 U.S.C. § 605(b). Irrespective of the Service's interpretation of the ESA, making that assessment necessarily requires an interpretation of the RFA's phrase "significant economic on a substantial number of small entities." *See* 5 U.S.C. § 605(b). The impropriety of the Service's request for deference is demonstrated by the cases it cites. In *American Trucking*, the District of Columbia Circuit expressly declined to apply *Chevron* deference in a challenge to an agency Section 605(b) certification. *See Am. Trucking Associations*, 175 F.3d at 1044. Instead, it treated the question of the challenged rule's SEISNOSE as a matter of the agency's interpretation *of the RFA*, not the organic statute pursuant to which the challenged rule was promulgated. *Id.*

This Court should not be persuaded by the Service's erroneous interpretation of the RFA. The Final Rule unquestionably places direct regulations upon numerous parcels of small entity-owned property. *See* AR000411 (identifying 93,208 acres of privately owned property); AR000401–04 (responding to comments from effected small entities). The Service and Intervenor's chief response is to cite authorities discussing the primary mechanism by which the Final Rule will operate to restrict small entities' use of their private property—the Section 7 consultation process. *See* Serv. Br. 26 (citations omitted); Int. Br. 30–31. They argue that because the precise contours of any restrictions stemming from the Section 7 process will rely in part on

future actions taken by federal agencies, the critical habitat designation itself does not directly burden the lands within its boundaries, and therefore does not have a SEISNOSE. *Id*. This argument fails. A critical habitat designation is undeniably directed at the specific lands it designates. AR000422–29 (mapping those areas of land to be contained within the designation). Section 7 consultations pertaining to that designated land (and any restrictions on land use imposed via that process), do not operate independently of the Final Rule. They operate to implement the Final Rule as to the lands designated.

The Service's suffocatingly narrow interpretation of the RFA has already been rejected once. In *California Cattlemen's*, the court concluded that critical habitat designations impose direct effects on burdened land because the only function of the Section 7 process is for "federal agencies to determine what the critical habitat designation requires in specific cases." *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282, 287–88 (D.D.C. 2018). In reaching this conclusion, the court observed that "[t]he D.C. Circuit has never held that the involvement of multiple federal agencies breaks the chain of RFA causation." *Id.* at 288.

The Service overstates matters greatly when it suggests that *California Cattlemen's* "does not support" the Landowners. Serv. Br. 29. While the Service is correct that the opinion involved a motion to dismiss and therefore a different standard of review, that distinction is primarily relevant to the court's treatment of *factual* allegations. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (noting that on a motion to dismiss the court will assume the truth of a plaintiff's factual allegations, but not its legal conclusions (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009))). The standard of review therefore does not negate the persuasive nature of the *California Cattlemen's* court's independent *legal conclusions*. The holding in *California Cattlemen's*—that claims against a critical habitat designation could proceed under the RFA,

because as a matter of law, critical habitat directly regulates small entities—obviously has significant persuasive utility. *See Cal. Cattlemen's*, 315 F. Supp. 3d at 287–88.

The Landowners also identify several direct effects to private property which are independent of the Section 7 process, such as lost market value and the need to alter management practices in response to the Service's public presumption of occupancy. *See* Op. Br. 29.

Considering these *direct* impacts of the Final Rule, this Court must reject the Service and Intervenor's attempts to frame the Landowners' argument as a request for this Court to rule that the RFA encompasses indirect effects. Serv. Br. 26–30; Int. Br. at 30–32.[9]

### B. Deference does not salvage the Service's invocation of RFA Section 605(b)

Even were this Court to treat the RFA's application to critical habitat as solely a question of interpreting the ESA, it should not defer to the Service under *Chevron*. As discussed above, the Service's assertion that critical habitat designations do not directly affect small entities strains credulity and is patently unreasonable, arbitrary, and capricious. No deference is warranted, even at *Chevron* step two. *See Scheerer*, 513 F.3d at 1250.

### C. The Service's failure to prepare regulatory flexibility analyses was not "harmless"

The Service also includes a brief footnote requesting that this Court decline to remand the Final Rule even were it to find the RFA certification illegal. *See* Serv. Br. 30 n.17. The Service argues that because it has conducted an economic analysis pursuant to Section 4(b)(2) of the ESA, its failure to consider the impacts to small entities pursuant to the RFA, was "harmless." *Id*. This argument is unavailing. While true that the ESA requires the consideration of economic impacts,

---

[9] The Landowners argue in the alternative that the RFA does not distinguish between direct and indirect effects, and therefore the Service's reliance upon that distinction is improper. Op. Br. 30. However, as stated in the Landowners' opening brief, their principal contention is that even accepting that distinction, critical habitat does impose *direct effects* on small entity landowners, and the Service's Section 605(b) certification was therefore improper. *Id*. 28–30.

*see* 16 U.S.C. § 1533(b)(2), the separate analysis required by the RFA is not merely duplicative of that process. Instead, the RFA requires a specific analysis of the impacts of agency action on small entities. *See* 5 U.S.C. §§ 603, 604. This requires the Service to collect and analyze specific data pertaining to small entity impacts which are not anticipated in the ESA's 4(b)(2) process. *See id.* The failure to collect or analyze this information prevented the Service from taking "steps . . . to minimize the significant economic impact on small entities," consistent with the requirements of the RFA. *See* 5 U.S.C. §§ 603(c), 604(a)(6). This was plainly prejudicial to the small-entity Landowners now subject to the designation. *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (holding that the requirement to show prejudice and avoid "harmless error" is not "particularly onerous"). Indeed, to apply the harmless error rule in response to the Service's argument would render the RFA a nullity as to every statute requiring consideration of costs. Surely, when Congress passed the RFA, it did not intend such an outcome.

## VI. This Court Should Vacate the Designation

This Court should decline the Intervenor's request for the extraordinary remedy of remand without vacatur. *See* Int. Br. 32–35.

### A. Under the ESA and APA vacatur is the presumptive remedy

Agency decisions made pursuant to the ESA are reviewed according to the standards set forth in the APA. *See Weyerhaeuser*, 139 S. Ct. at 371. The APA commands that a "reviewing court *shall* . . . hold unlawful and *set aside*" unlawful and arbitrary agency action. 5 U.S.C. § 706(2)(A) (emphasis added).[10] Thus, "[t]ypically, when an agency violates the Administrative

---

[10] With this language, Congress sought to override any equitable discretion that a court may otherwise have when fashioning a remedy for unlawful agency action. Brian S. Prestes, *Remanding Without Vacating Agency Action*, 32 Seton Hall L. Rev. 108, 145–46 (2001) ("Defenders of remanding without vacating . . . side-step the separation of powers by favoring remedies

Procedure Act and the Endangered Species Act," a court will "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defs. of Wildlife v. EPA*, 420 F.3d 946, 978 (9th Cir. 2005), *rev'd on other grounds*, *sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).[11]

Despite the language of the APA, the Eleventh Circuit has held that under certain circumstances, a reviewing court may exercise its equitable discretion to deviate from the presumptive remedy and remand unlawful agency action "without vacatur." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289–90 (11th Cir. 2015). However, in adopting that exception, the Eleventh Circuit limited it to circumstances where the agency's failure was a lack of explanation or reasoned decision making. *Id.* It expressly declined to decide whether the exception should extend to circumstances "where the agency has erred to such an extent as to indicate that its ultimate decision was unlawful." *Id.*

The Landowners allege that the Final Rule is substantively illegal because the Service erred as a matter of law in designating Units 7 and 8 as occupied, *see supra* 8–18, violated the ESA's "categorical requirement" to consider the economic impacts of designating critical habitat, *see supra* 18–24, and erroneously certified that critical habitat designations are categorically exempt from the RFA, *see supra* 28–31. These constitute fundamental substantive defects, as opposed to the reasoned decision making failures at issue in *Black Warrior Riverkeeper*. *See* 781 F.3d at 1289–90. This Court should not grant remand without vacatur in circumstances where the Eleventh Circuit has declined to state that remedy is available. *See id.*

---

unanchored in the statutory text of the APA."). Congress can override a court's traditional equitable powers through statute. *See TVA*, 437 U.S. at 194. That is what Congress did with the APA, expressly defining the consequences of unlawful and arbitrary agency action.

[11] Vacatur is also an appropriate remedy for violations of the RFA. *See N.C. Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 666 (E.D. Va. 1998). *See also* 5 U.S.C. § 611(a)(4).

## B.    The equities favor vacating the critical habitat designation

Even were this Court to consider the Intervenor's request for remand without vacatur, the equities, in this case, do not support deviation from the default rule. In deciding whether agency action should be remanded without vacatur, a court will consider the seriousness of the deficiencies in the rulemaking and the consequences of vacating the rule before remand. *See Black Warrior Riverkeeper*, 781 F.3d at 1290 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

First, as discussed, the Service committed serious substantive errors in promulgating the Final Rule. The fundamental nature of these legal defect supports the vacatur of the designation. *See N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, No. CV 15-428 KG/CG, 2021 WL 275535, at *8 (D.N.M. Jan. 27, 2021) (vacating critical habitat designation that incorrectly designated areas as "occupied."); *N.M. Cattle Growers Ass'n*, 248 F.3d at 1285 (vacating a designation that adopted the illegal "baseline" method and underestimated costs).

Second, as to the consequences of vacatur, the effects of leaving the designation in place weigh in favor of setting it aside. *But see North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008), *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) (quotations omitted) (consequences of vacatur are irrelevant if the agency will have to apply different standards on remand). As discussed, the designation continues to impose significant economic hardships on the Landowners, primarily in the form of decreased property values and increased regulatory burdens. *See supra* 2–8.

These economic burdens, as balanced against vacatur's minimal consequences to the pinesnake's conservation, counsel in favor of vacatur. Pinesnakes are unlikely to be present throughout Units 7 and 8. *See supra* 8–18. And substantial protections for the pinesnake remain in effect because of its listing as a threatened species. *See* 80 Fed. Reg. 60,467 (Oct. 6, 2015). In any area where the pinesnake *is present* those protections will apply. 16 U.S.C. § 1536(a)(4).

The Intervenor cites two cases for the proposition that the ESA's purported "conservation purpose" renders remand without vacatur appropriate. *See* Int. Br. 33. These cases are inapposite. The defining feature of each was that they involved challenges to *insufficiently* protective critical habitat designations. *See Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1109 (D. Ariz. 2003); *Wildearth Guardians v. U.S. Dep't of the Interior*, 205 F. Supp. 3d 1176, 1190 (D. Mont. 2016). As a result, the remand anticipated in each case was for the Service to consider *expansion* of the areas designated, making vacatur in the interim inappropriate. *See Ctr. for Biological Diversity*, 240 F. Supp. 2d at 1109; *Wildearth Guardians*, 205 F. Supp. 3d at 1190. That differs fundamentally from the present case where due to substantive errors, the Service has promulgated a critical habitat designation that will likely need to be *reduced* on remand.

### C.     This Court should vacate the Final Rule in its entirety

The Intervenor also requests that this Court limit any vacatur to Units 7 and 8. Int. Br. 35. However, if a rule is "one, integral action," all of its components "must stand or fall together." *North Carolina*, 531 F.3d at 929. The Intervenor argues the Final Rule is severable. Int. Br. 35. That is not so easily stated. If the Court rules in the Landowners' favor, the more extensive economic analysis conducted on remand will inform subsequent exclusion decisions. *Weyerhaeuser*, 139 S. Ct. at 371. As such, it is possible there will be significant changes to the boundaries of all eight units. Those boundaries should not be enforced while the Service revises them.

## CONCLUSION

For the foregoing reasons, this Court should grant the Landowners' Motion for Summary Judgment and deny the Service and Intervenor's Cross-Motions for Summary Judgment. In doing so, it should vacate the Final Rule in its entirety, consistent with the default rule for unlawful agency action.

DATED: December 8, 2021.

Respectfully submitted,

/s/ Charles T. Yates
CHARLES T. YATES*
Cal. Bar No. 327704
JEFFREY W. McCOY*
Cal. Bar No. 317377
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: JMccoy@pacificlegal.org
Email: CYates@pacificlegal.org

*Pro Hac Vice

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

/s/ Charles T. Yates
CHARLES T. YATES*

*Pro Hac Vice*
