# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| THOMAS GRAY SKIPPER, et al., | Case No. 1:21-CV-00094-JB-B |
| Plaintiffs, | |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Defendants, | |
| CENTER FOR BIOLOGICAL DIVERSITY, | |
| Defendant-Intervenor. | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF ON ARTICLE III STANDING

## TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... iv

GLOSSARY ................................................................................................................... vii

INTRODUCTION ............................................................................................................ 1

LEGAL BACKGROUND ................................................................................................ 2

I.      Article III Standing ............................................................................................... 2

        A.      The test for Article III standing ................................................................ 2

                1.      Injury in fact.................................................................................... 3

                2.      Economic injury: the quintessential injury in fact ........................ 4

                3.      Causation......................................................................................... 5

                4.      Redressability.................................................................................. 5

        B.      Standing for organizations and "associational standing"......................... 6

II.     Ripeness ................................................................................................................ 6

III.    The Endangered Species Act ................................................................................ 6

        A.      Listing of threatened or endangered species and the prohibition on "take" ........... 6

        B.      Critical habitat and the Section 7 consultation process ........................... 7

        C.      The perceptional effects phenomenon ...................................................... 7

IV.     Article III standing and the ESA: *Weyerhaeuser Co. v. U.S. Fish and Wildlife Service* .... 8

        A.      Proceedings in the Eastern District of Louisiana ..................................... 8

        B.      Proceedings at the Fifth Circuit ............................................................. 10

        C.      The Supreme Court's decision................................................................ 11

SUPPLEMENTAL STATEMENT OF FACTS ............................................................. 12

I.      The Final Rule..................................................................................................... 12

II.    The Service's Economic Impact Analysis ........................................................ 13

III.   Description of the Landowners ....................................................................... 14

    A.    The Skipper family entities ................................................................... 14

    B.    Phalyn, LLC ......................................................................................... 15

    C.    Forest Landowners Association ............................................................. 16

IV.    The Landowners' Declarations ........................................................................ 16

    A.    The declarants ...................................................................................... 17

    B.    The declarants' assertions regarding lost market value and salability ................ 18

    C.    The declarants' assertions regarding additional regulatory costs ........................ 19

STANDARD OF REVIEW ........................................................................................ 19

ARGUMENT ............................................................................................................. 21

I.    The Final Rule Has Reduced the Market Value of the Skippers' and Phalyn's Property Causing Them an Immediate and Ongoing Economic Injury That Will Only Be Redressed By a Favorable Decision From This Court ...................................................... 22

    A.    This lost market value and salability is a constitutionally sufficient injury in fact ..................................................................................................... 22

        1.    The Skippers and Phalyn have established a loss in market value and salability of their property with uncontroverted evidence ........................ 22

        2.    This injury meets the subsidiary elements for an injury in fact ............... 24

    B.    The reduction in the market value of the Skippers' and Phalyn's property is caused by the Final Rule and will be redressed by a favorable decision from this Court ....................................................................................................... 26

    C.    The Supreme Court's decision in *Weyerhaeuser* leaves no doubt that the loss in market value of the Skippers' and Phalyn's property is sufficient for Article III standing purposes ...................................................................................... 27

        1.    The circumstances, evidence, and arguments before the Supreme Court in *Weyerhaeuser* were virtually identical to those before this Court ............ 27

2.    This Court should reject the Service's attempts to distinguish the operative facts in *Weyerhaeuser* ............................................................... 29

II.    The Final Rule Has Increased Regulatory Burdens on the Skippers' and Phalyn's Use of Their Properties Causing Them Ongoing Economic Injuries ............................................ 32

    A.    These increased regulatory burdens on the Skippers' and Phalyn's timber operations are an injury in fact ................................................................. 32

        1.    The Skippers and Phalyn have demonstrated costs resulting from increased regulatory burdens ............................................................... 32

        2.    These costs constitute an injury in fact .................................... 33

    B.    These increased regulatory burdens are caused by the Final Rule and would be redressed by a favorable decision from this Court ................................................. 35

III.    Forest Landowners Association has Associational Standing ............................................ 36

IV.    The Landowners' Claims are Ripe ............................................................. 38

CONCLUSION ................................................................................................. 39

CERTIFICATE OF SERVICE ................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Adinolfe v. United Techs. Corp.*, 768 F.3d 1161 (11th Cir. 2014)..............................................5, 24

*Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165 (D.D.C. 2008)...........................................34

*Bischoff v. Osceola Cty.*, 222 F.3d 874 (11th Cir. 2000)................................................20, 23, 36

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
    781 F.3d 1271 (11th Cir. 2015) ...............................................................................27

*Bryan v. United States*, 524 U.S. 184 (1998)................................................................33

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017)......................................4, 24, 33

*Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339 (1892) ...........................................2

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) ...........................................4, 24

*Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586 (11th Cir. 1997)..........................6, 38

*Elend v. Basham*, 471 F.3d 1199 (11th Cir. 2006) ......................................................38

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008)...............6, 25, 36-37

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*,
    641 F.3d 1259 (11th Cir. 2011) ...........................................................................5, 26, 35

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013) .............................3, 26, 34

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ...............................6, 37

*Licari Fam. Chiropractic Inc. v. Eclinical Works, LLC*,
    No. 8:16-CV-3461-MSS-JSS, 2021 WL 4506405 (M.D. Fla. Jan. 11, 2021)....................4, 24

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .................................................. *passim*

*Made in the USA Found. v. United States*, 242 F.3d 1300 (11th Cir. 2001) ................................6

*Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*,
    40 F. Supp. 3d 744 (E.D. La. 2014)................................................................ *passim*

*Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452 (5th Cir. 2016) ............. *passim*

iv

*Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 848 F.3d 635 (5th Cir. 2017) ....................11

*McGowan v. Maryland*, 366 U.S. 420 (1961)................................................................................4

*Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996)................................35

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312 (11th Cir. 2019) .......................4, 24, 33

*Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335 (11th Cir. 2005)............................................38

*Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 714 F. Supp. 2d 73 (D.D.C. 2010)............ *passim*

*People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020) .................................3

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*,
     87 F.3d 1242 (11th Cir. 1996) .............................................................................................20

*Schalamar Creek Mobile Homeowner's Ass'n, Inc. v. Adler*,
     855 F. App'x 546 (11th Cir. 2021) .......................................................................................37

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ....................................................................20

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................................2

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) .................................................4

*Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990 (11th Cir. 2020)............................... *passim*

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in
     State of Ala.*, 941 F.2d 1428 (11th Cir. 1991)...............................................................20, 36

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) ..................................................5, 24

*Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014)..............................................4, 24

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................2

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 138 S. Ct. 924 (2018)......................................11

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018) ............................. *passim*

*Wilding v. DNC Services Corp.*, 941 F.3d 1116 (11th Cir. 2019) ...................................................5

## Statutes

5 U.S.C. § 704...................................................................................................................38

5 U.S.C. § 706(2) .............................................................................................................27

16 U.S.C. § 1540(a)–(b) ............................................................................7, 33

28 U.S.C. § 1746 ....................................................................................20

**Constutional Provisions**

U.S. Const., art. III §§ 1–2 ........................................................................2

**Regulations**

13 C.F.R. § 121.201 ................................................................................15

50 C.F.R. § 17.3 .................................................................................7, 33

50 C.F.R. § 17.42 ...................................................................................33

**Court Rules**

Civ. L.R. 56(d) ............................................................................. 20, 22-23

Fed. R. Civ. P. 56(a) ................................................................................19

**Miscellaneous**

86 Fed. Reg. 15,427 (Mar. 23, 2021) ...............................................................7

Declaration of L. Richard LeBlanc, *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.* (E.D. La. May 2, 2014), ECF No. 106-3 .................................................10, 28

Declaration of Edward B. Poitevent, *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.* (E.D. La. Dec. 13, 2013), ECF No. 80-2....................................................9-10, 28

Declaration of Robin M. Rockwell, *Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, No. 13-cv-00234 (E.D. La. Dec. 9, 2013), ECF No. 69-3 ...................................9-10, 28

Intervenor-Respondents Br., *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, No. 17-71 (June 29, 2018) ......................................................................... 12, 28-29

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | The stipulated Administrative Record, ECF No. 44 |
| Designation | The United States Fish and Wildlife Service's February 26, 2020, final rule designating critical habitat for the black pinesnake, 85 Fed. Reg. 11,238 |
| ESA | Endangered Species Act |
| Final Rule | The United States Fish and Wildlife Service's February 26, 2020, final rule designating critical habitat for the black pinesnake, 85 Fed. Reg. 11,238 |
| FLA | Forest Landowners Association |
| Goodloe Decl. | August 17, 2021, Declaration of John R. Goodloe III, ECF No. 50 |
| Jones Decl. | August 25, 2021, Declaration of Scott Jones, ECF No. 49 |
| Land Values Memorandum | The document entitled Supplemental Information on Land Values—Critical Habitat Designation for the Black Pinesnake which can be found in the Administrative Record at AR000044–AR000053. |
| Landowners | Plaintiffs Thomas Gray Skipper, HOS Timberlands, LLC, Phalyn, LLC, and Forest Landowners Association |
| Plaintiffs' Opening Brief (Pl. Op. Br.) | Plaintiffs' Motion for Summary Judgment and Brief in Support, ECF No. 47 |
| Plaintiffs' Reply (Pl. Reply) | Plaintiffs' Combined Reply in Support of Motion for Summary Judgment and Brief in Opposition to Federal Defendants' and Defendant Intervenor's Cross-Motions for Summary Judgment, ECF No. 63 |
| RFA | Regulatory Flexibility Act |
| Service | Federal Defendants United States Fish and Wildlife Service, United States Department of the Interior, Debra Haaland, and Martha Williams |

| | |
|---|---|
| Service's Opening Brief (Serv. Op. Br.) | Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, ECF Nos. 57-1, 58 |
| Service's Reply (Serv. Reply) | Federal Defendants' Reply in Support of Cross-Motion for Summary Judgment, ECF No. 71 |
| Skippers or Skipper family entities | HOS Timberlands, LLC, the Helen O. Skipper Trust of 1967, and the Skipper Family Trusts of 1989 |
| Skipper Decl. | August 25, 2021, Declaration of Thomas Gray Skipper, ECF No. 48 |
| Skipper Suppl. Decl. | February 24, 2022, Supplemental Declaration of Thomas Gray Skipper, submitted with this supplemental brief |
| *Weyerhaeuser* Landowners | The landowner plaintiffs in the consolidated action in the Eastern District of Louisiana that led to the Supreme Court's unanimous decision in *Weyerhaeuser Company v. United States Fish & Wildlife Service*, 139 S. Ct. 361 (2018). |
| Yates Decl. | February 28, 2022, Declaration of Charles T. Yates, submitted with this supplemental brief |

## INTRODUCTION

Plaintiffs Thomas Gray Skipper, HOS Timberlands, LLC, Phalyn, LLC, and Forest Landowners Association, respectfully submit the following supplemental brief addressing their standing to bring the above captioned lawsuit.

The Landowners have met their burden to establish Article III standing and they are entitled to summary judgment on that question. Private land designated as critical habitat is the object of government regulation and there is "ordinarily little question" that the owners of such land have standing. *See Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 463–64 (5th Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992)), *rev'd sub nom. on other grounds Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361 (2018). *See also Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 714 F. Supp. 2d 73, 80 (D.D.C. 2010) (quoting *Lujan*, 504 U.S. at 560–62), *rev'd on other grounds*, 646 F.3d 914 (D.C. Cir. 2011). As the owners of land located within the designation of critical habitat for the black pinesnake the Landowners are the objects of the regulation and, thus, they have standing to challenge the Final Rule. *Cf. Markle*, 827 F.3d at 463–64.

The record demonstrates that the Landowners have met their burden to demonstrate standing to bring this suit. In 2018 a unanimous Supreme Court recognized that a decrease in the market value of land resulting from the designation of critical habitat is sufficient to establish standing. *Weyerhaeuser*, 139 S. Ct. at 368 n.1. The Service's own documents demonstrate that the designation has reduced the market value of the Landowners' property and harmed its salability. *See* AR000044–53 (Land Values Memorandum). This reduced market value is confirmed by the Landowners' declaration evidence. In addition to demonstrating the reduced market value, the

Landowners have shown that the designation has injured them by imposing costs and regulatory burdens on their day-to-day timber operations.

This brief will begin with a discussion of general legal principles related to standing, focusing especially on the rule of law announced by the Supreme Court in *Weyerhaeuser*, and the record of that case. Second, it will provide a supplemental statement of facts identifying the facts in the record pertinent to the question of the Landowners' standing. Third, it will address the Skipper family entities and Phalyn's standing to bring this lawsuit. Fourth, it will address FLA's standing to bring this lawsuit. Finally, it will briefly address the related question of ripeness.

## LEGAL BACKGROUND

### I.    Article III Standing

Article III of the United States Constitution grants to federal courts the "judicial Power" to resolve only "Cases" or "Controversies." U.S. Const. art. III §§ 1–2. As such federal courts may exercise their power for "the determination of real, earnest, and vital controversy between individuals." *Chi. & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). This principle is embodied in the doctrine of Article III standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To demonstrate standing, a plaintiff must have "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

### A.    The test for Article III standing

Under settled precedent, the "irreducible constitutional minimum" of Article III standing consists of three elements: (1) "the plaintiff must have suffered an injury in fact;" (2) "the defendant must have caused that injury;" and (3) "a favorable decision must be likely to redress

it." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996–97 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560–61). The party invoking the jurisdiction of a federal court "bears the burden of establishing these elements." *Id.* at 996 (quoting *Lujan*, 504 U.S. at 560–61). Where "the legality of government action or inaction" is being challenged "there is ordinarily little question" of standing for a plaintiff who is the "object of the action (or forgone action)." *Lujan*, 504 U.S. at 561–62. In a case with multiple plaintiffs raising the same claims the court need only determine that one of the plaintiffs has met the requirements for standing. *See People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179, 1197 (N.D. Ala. 2020) (holding that if there is one plaintiff "who has demonstrated standing to assert these rights as his own," the court "need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit." (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977))).

### 1. Injury in fact

The "foremost" of the three standing elements is the requirement that a plaintiff demonstrate an "injury in fact." *Trichell*, 964 F.3d at 996–97 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). An injury in fact consists of (1) "an invasion of a legally protected interest" that is (2) "concrete," (3) "particularized," and (4) "actual or imminent, not conjectural or hypothetical." *Id.* at 996–97 (quoting *Lujan*, 504 U.S. at 560). The injury in fact element also requires "an additional showing" when prospective relief is sought. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328–29 (11th Cir. 2013). Namely, a plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Id.* (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1284 (11th Cir. 2001)).

### 2. Economic injury: the quintessential injury in fact

Where a plaintiff demonstrates an economic injury there is ordinarily little question that a constitutionally sufficient injury in fact has been established. *See MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019) (explaining that an economic injury is the "epitome" of a concrete injury). *See also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("Economic harm to a business clearly constitutes an injury-in-fact."); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("economic injury is a quintessential injury upon which to base standing"). Moreover, where economic injury is at issue "the amount is irrelevant," and "a dollar of economic harm" is still an injury in fact. *Carpenters Indus. Council*, 854 F.3d at 5. *See also. Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961) (finding that appellants fined five dollars plus costs had standing); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("The consumers' alleged economic harm—even if only a few pennies each—is a concrete, non-speculative injury."); *Licari Fam. Chiropractic Inc. v. Eclinical Works, LLC*, No. 8:16-CV-3461-MSS-JSS, 2021 WL 4506405, at *3–4 (M.D. Fla. Jan. 11, 2021) (explaining that "[t]here is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be[]" and finding that a plaintiff had "suffered a concrete monetary injury because it paid $0.08 in overage fees" (quoting *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019))).

This principle—that economic injury of any amount is constitutionally sufficient—is well recognized where the market value or salability of property has been impacted. *See Weyerhaeuser*, 139 S. Ct. at 368 n.1 (2018) (holding that a "decrease in the market value of . . . land" resulting

from a critical habitat designation under the ESA was "sufficiently concrete injury for Article III purposes"); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926) (holding that a zoning ordinance that "of its own force . . . greatly . . . reduce[d] the value of appellee's lands" constituted a "present invasion of appellee's property rights"); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014) (characterizing "diminution in the value of . . . land" as an "[e]conomic harm" and therefore a "well-established" injury).

### 3.    Causation

The second element requires that the alleged injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)). The hallmark of the causation element is *fair traceability* and "[p]roximate causation is not a requirement of Article III standing." *Wilding v. DNC Services Corp.*, 941 F.3d 1116, 1125–26 (11th Cir. 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)). To establish a fairly traceable causal connection, a plaintiff need not show that "the defendant's actions are the very last step in the chain of causation." *Id.* at 1125–26 (quoting *Bennett*, 520 U.S. at 168–69).

### 4.    Redressability

"Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011) (quoting *Mulhall v. UNITE HERE Local 355,* 618 F.3d 1279, 1290 (11th Cir. 2010)). The key to redressability is that the court have the "authority" to rectify or prevent the injury asserted. *See Made in the USA Found. v. United States*, 242 F.3d 1300, 1308 (11th Cir. 2001).

### B.    Standing for organizations and "associational standing"

An organization can assert standing on its own behalf, on behalf of its members, or both. *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159–1166 (11th Cir. 2008). Where an organization wishes to assert standing on its own behalf, it must demonstrate that it meets the ordinary test for Article III standing. *Id*. An organization has standing to sue on behalf of its members—so called "associational standing"—where (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted or the relief requested requires the participation of individual members in the lawsuit." *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1160 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). *See also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

## II.    Ripeness

The ripeness doctrine involves the addition of "prudential considerations" to Article III's limitation of federal court jurisdiction to actual "cases or controversies." *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (citing *Johnson v. Sikes*, 730 F.2d 644, 648 (11th Cir. 1984)). The ripeness inquiry requires a determination of "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *See id.* (citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)).

## III.    The Endangered Species Act

### A.    Listing of threatened or endangered species and the prohibition on "take"

For a complete discussion of the process for listing species and the ESA's prohibition on take, the Landowners direct the Court's attention to their opening brief. *See* Pl. Op. Br. 3–4. However, it bears emphasizing that a take can include habitat modification, *see* 50 C.F.R. § 17.3,

and that the ESA imposes criminal and civil penalties that are orders of magnitude higher for "knowing" violations of its take prohibition, *see* 16 U.S.C. § 1540(a)–(b) (setting civil penalties of $25,000 and criminal penalties of $50,000 and/or one year in prison for "knowing" violations of the ESA's prohibition on take; but setting civil penalties of $500 for "other" violations).[1]

### B.    Critical habitat and the Section 7 consultation process

For a complete discussion of the process for designating critical habitat and the burdens associated with the Section 7 consultation process the Landowners direct the Court's attention to their opening brief. *See* Pl. Op. Br. 4–5. However, it bears emphasizing that other courts have held that land designated as critical habitat is "the object" of the critical habitat regulation, and as a result there is ordinarily little question of Article III standing for the owners of that land. *See Markle*, 827 F.3d at 463–64 (citing *Lujan*, 504 U.S. at 561–62), *rev'd sub nom. on other grounds Weyerhaeuser*, 139 S. Ct. 361. *Cf. Otay Mesa*, 714 F. Supp. 2d at 80 (quoting *Lujan*, 504 U.S. at 561–62), *rev'd on other grounds*, 646 F.3d 914 (D.C. Cir. 2011).

### C.    The perceptional effects phenomenon

The imposition of land use restrictions through the Section 7 consultation process—while significant—is not the only cost imposed on private landowners by the designation of critical habitat. It is well recognized that a critical habitat designation will immediately reduce the value and damage the salability of any private property within its boundaries due to public recognition of the potential burdens that flow from the designation of critical habitat. *See* AR000044 (Supplemental Memorandum on Land Values) ("This lower value results from the perception that

---

[1] Due to annual inflation adjustments these civil penalties are now more than twice that figure. *See* 86 Fed. Reg. 15,427, 15,428 (Mar. 23, 2021) (setting civil penalties of $54,157 per offense for knowing violations of the ESA prohibition on take).

critical habitat will preclude, limit, or slow development, or somehow alter the highest and best use of the property."); *id.* ("Public attitudes about the limits and costs that the Act may impose can cause real economic effects to the owners of property, regardless of whether such limits are actually imposed."). There is now a growing body of economic literature analyzing the stigmatic effect of critical habitat on public perceptions and the salability of designated land. *See* AR000045–46 ("several published studies provide evidence that public perception can result in material effects, even absent participation in a section 7 consultation.").

## IV.    Article III standing and the ESA: *Weyerhaeuser Co. v. U.S. Fish and Wildlife Service*

In *Weyerhaeuser* the Supreme Court held unanimously that a group of landowners had established standing to challenge the designation of their timber property as critical habitat by asserting that the designation had reduced the market value of their property and damaged its salability. *See Weyerhaeuser*, 139 S. Ct. at 368 n.1. To illuminate the rule of law announced in *Weyerhaeuser* this section will provide a summary of the record and posture of the Supreme Court's determination of the *Weyerhaeuser* Landowners' Article III standing.

### A.    Proceedings in the Eastern District of Louisiana

The dispute in *Weyerhaeuser* originated in 2013 when a group of landowners filed three separate challenges to the designation of critical habitat for the dusky gopher frog. *See Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 40 F. Supp. 3d 744, 752–53 (E.D. La. 2014). These three challenges were filed by Markle Interests, LLC; P & F Lumber Company (2000), LLC, St. Tammany Land Co., LLC, and PF Monroe Properties, LLC; and Weyerhaeuser Company. *Id.* The named family entities owned an undivided interest in ninety-five percent of the land comprising Unit 1 of the frog's critical habitat. *Id.* The remaining five percent (approximately 152 acres) was owned by Weyerhaeuser, which also held a long-term timber lease—set to expire in the

year 2043—on the balance of Unit 1. *Id.* The lawsuits were consolidated in May of 2013. *Id.* at 753 & n.13. On June 25, 2013, the Center for Biological Diversity and Gulf Restoration Network were granted leave to intervene as defendants. *See id.* at 753. The decision that was ultimately reviewed by the Supreme Court was the district court's resolution of cross-motions for summary judgment. *See id.* The *Weyerhaeuser* Landowners asserted two distinct injuries to support their standing.

First, the *Weyerhaeuser* Landowners asserted that the designation had injured them by impacting their future business decisions. *See Markle*, 40 F. Supp. 3d at 757 & n.22. They argued that the designation burdened their land due to the possibility that future plans could be disrupted by the need to consult pursuant to Section 7. *Id.* This argument—the "Lost Future Development" argument—was supported by declarations submitted by representatives or employees of each company.[2] These declarations did not describe any concrete plans to develop the designated areas.

Second, the *Weyerhaeuser* Landowners asserted that the frog's designation had reduced the market value and salability of their property due to negative perceptions of land designated as critical habitat. *See Markle*, 40 F. Supp. 3d at 757 & n.22. This argument—the "Perceptional

---

[2] *See* Declaration of Robin M. Rockwell ¶ 4 (Rockwell Decl.), *Markle Interests v. U.S. Fish & Wildlife Serv.*, No. 13-cv-00234 (E.D. La. Dec. 9, 2013), ECF No. 69-3 (attached as Exhibit A to Yates Decl.) ("the designation imposes significant regulatory burdens on the property such that federal approval may be required for any activity that may affect the species, including adverse habitat modification."); Declaration of Edward B. Poitevent ¶ 4 (Poitevent Decl.), *Markle*, No. 13-cv-00234, ECF No. 80-2 (attached as Exhibit B to Yates Decl.) (same).

Effects" argument—was likewise supported by declarations submitted by representatives of each landowner.[3] The declarations did not attempt to quantify the claimed losses in market value.[4]

The Service argued that both the Lost Future Development and the Perceptional Effects theories were "speculative" and therefore insufficient to establish standing. *See Markle*, 40 F. Supp. 3d at 757 & n.23. Nevertheless, the district court concluded that the declaration evidence presented by the *Weyerhaeuser* Landowners was "sufficient to establish constitutional standing" under both theories. *See Markle*, 40 F. Supp. 3d at 757. The district court went as far suggesting that the "Defendants' attack on standing grounds seem[ed] utterly frivolous." *Id.* at 757.

### B.    Proceedings at the Fifth Circuit

Although the district court granted summary judgment to the *Weyerhaeuser* Landowners on standing, it ruled against them on the merits. *Id.* at 769. The *Weyerhaeuser* Landowners appealed the district court's decision to the Fifth Circuit. *See Markle*, 827 F.3d at 459. In addressing Article III standing the Fifth Circuit evaluated each of the *Weyerhaeuser* Landowners' "two alleged injuries." *Id.* at 462.

The Fifth Circuit rejected the Lost Future Development argument, concluding it was too speculative to demonstrate standing. *See id.* The Fifth Circuit concluded that the *Weyerhaeuser* Landowners had not provided evidence of any concrete development plans, that any development

---

[3] *See* Rockwell Decl. ¶ 5 ("In addition to a drastic reduction in value, the designation also limits the useability and saleability of the property to the detriment of Markle Interests, LLC"); Poitevent Decl. ¶ 7 (same); Declaration of L. Richard LeBlanc ¶ 7 (LeBlanc Decl.)), *Markle*, No. 13-cv-00234, ECF No. 106-3 (attached as Exhibit C to Yates Decl.) ("The price that would likely be offered by a knowledgeable buyer would be less than would be expected in the absence of the critical habitat designation. . . .").

[4] *See* LeBlanc Decl. ¶ 7 ("a professional appraiser would be required to address these additional regulatory risks and reflect them in an any opinion of value offered."). *See also* Rockwell Decl. ¶ 5 (declining to quantify the asserted loss in market value); Poitevent Decl. ¶ 7 (same).

plans that had existed were indefinitely delayed "because of the recession and the mortgage crisis," that the long-term timber lease on the property—not set to expire until 2043—suggested a low likelihood of sale or development in the foreseeable future, and that the record was uncertain as to the likelihood and magnitude of costs associated with the Section 7 process. *Id.* at 462–463 & n.10.

In contrast, the Fifth Circuit accepted the Perceptional Effects argument and held that "[t]he Landowners' assertion of lost property value . . . [wa]s a concrete and particularized injury that support[ed] standing." *Id.* at 463. The Fifth Circuit relied upon the *Weyerhaeuser* Landowners' declarations asserting that their property had already lost value. *Id.* It also noted that the Service's economic analysis for the designation acknowledged the possibility of perceptional effects. *Id.* The Fifth Circuit then concluded that "[c]ausation and redressability flow naturally from this injury." *Id.* The Fifth Circuit also held that since the *Weyerhaeuser* Landowners' property was "the object" of the designation, there was "little question that the action . . . ha[d] caused [them] injury, and that a judgment preventing . . . the action [would] redress it." *Id.* at 463–64 (citing *Lujan*, 504 U.S. at 561–62).

The Fifth Circuit then ruled against the *Weyerhaeuser* Landowners on the merits. *Markle*, 827 F.3d at 480. Following denial of their petition for rehearing en banc, *see Markle Interests, LLC v. U.S. Fish & Wildlife Serv.*, 848 F.3d 635, 636 (5th Cir. 2017), the *Weyerhaeuser* Landowners filed petitions for writ of certiorari to the Supreme Court.

### C.    The Supreme Court's decision

On January 22, 2018, the Supreme Court granted Weyerhaeuser's petition. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 138 S. Ct. 924 (2018). At the Supreme Court the Service declined to press its standing objections. Intervenor-respondents, the Center for Biological Diversity, however, did. *See* Intervenor-Respondents Br. 18–23, *Weyerhaeuser Co. v. U.S. Fish &*

11

*Wildlife Serv.*, No. 17-71 (June 29, 2018) (attached as Exhibit D to Yates Decl.). The Supreme Court held unanimously that Weyerhaeuser had standing. *Weyerhaeuser*, 139 S. Ct. at 368 n.1. Expressly rejecting the Center for Biological Diversity's arguments to the contrary, the Supreme Court held that "[w]e agree with the lower courts that the decrease in the market value of Weyerhaeuser's land as a result of the designation is a sufficiently concrete injury for Article III purposes." *Weyerhaeuser*, 139 S. Ct. at 368 n.1.

Importantly, the Supreme Court's discussion of standing was limited to the *Weyerhaeuser* Landowners' second standing theory—Perceptional Effects. *Id.* It affirmed the district court and Fifth Circuit on that point. *Id.* It did not however address the Fifth Circuit's conclusion that the Lost Future Development argument was too speculative to establish standing. *See id.*

## SUPPLEMENTAL STATEMENT OF FACTS

The Landowners offer the following supplemental statement of facts to identify the evidence in the record pertinent to the Court's standing analysis.

## I.    The Final Rule

On February 26, 2020, the Service published its Final Rule designating critical habitat for the black pinesnake. AR000397 (Final Rule). In designating critical habitat for the black pinesnake, the Service deemed each unit to have been "occupied" at the time of listing, and no area was determined to meet the stricter requirements for unoccupied critical habitat. AR000409. Unit 7, located in Clarke County, Alabama, consists of 33,395 acres of privately owned timberland. AR000413. 11,489 acres of Unit 7 is owned by the Skipper family entities. Skipper Decl. ¶ 12. Unit 8, also located in Clarke County, Alabama, consists of 5,943 acres of forested land, of which 2,100 acres is privately owned. AR000413. 270 acres of Unit 8 is owned by Phalyn, LLC. Goodloe

Decl. ¶ 8. Both units were designated as "occupied" based on either decades-old, anecdotal, or isolated sightings of the black pinesnake. *See* Pl. Op. Br. 8–9.

## II.    The Service's Economic Impact Analysis

Prior to finalizing the designation, the Service produced an analysis of its expected economic impacts. AR000415–18 (Final Rule). The Service's economic impact analysis consists of three documents: (1) an "Incremental Effects Memorandum," *see* AR000005–20; (2) a "Screening Analysis" which purports to analyze the designation's anticipated economic impacts, *see* AR000021–43; and (3) a Land Values Memorandum, which identifies and analyzes the impacts of the designation to private land values within the designated area, *see* AR000044–53.

Despite excluding so-called "baseline" costs of regulation[5] these documents still identified significant incremental costs expected to result from the designation. For example, the Land Values Memorandum contains a discussion of the perceptional effects phenomenon and acknowledges the likelihood of a significant decrease in land values resulting from the designation. *See* AR000044–53 (Land Values Memorandum). The Land Values Memorandum can be summarized in four parts.

First, it explains the perceptional effects phenomenon stating that "[p]ublic attitudes about the limits and costs that the Act may impose can cause real economic effects to the owners of property, regardless of whether such limits are actually imposed." AR000044. It explains further that "[t]his lower value results from the perception that critical habitat will preclude, limit, or slow development, or somehow alter the highest and best use of the property." *Id.*

---

[5] For further discussion of the "baseline method" and its legality under the ESA. *See* Pl. Op. Br. 20–24; Pl. Reply 18–24.

Second, the Land Values Memorandum surveys a sample of the existing literature on perceptional effects and describes purported limitations on the Service's own ability to conduct original research. AR000045–46. It concludes that the existing literature is likely underappreciative of the magnitude and extent of perception-related costs. *See* AR000046 (the "limited number of studies is unlikely to encompass the full range of possible perception-related effects.").

Third, it describes the characteristics that could influence the magnitude of perception-related costs of a critical habitat designation. AR000046. Notably, it concludes that "in areas with large amounts of alternative land suitable for forestry and other agricultural uses, the effect on designated property may be more significant and longer lasting." *Id.* The Service's rationale for this conclusion is that in such circumstances "it may be relatively easy for investors to select a parcel outside of critical habitat, rather than inside, thus reducing the presumed value of the critical habitat lands for forestry and agricultural activities." AR00046.

Fourth, the Land Values Memorandum evaluates the magnitude of perception related costs resulting from the black pinesnake designation by conducting a "bounding analysis." AR000047–53. The Service estimates a total value of $31 million within Unit 7 and $6.1 million within Unit 8. AR000051. This is the so-called "upper bound" of likely perceptional effects to private landowners within Units 7 and 8. The Service concludes that a loss in value of some fraction of that figure will be attributable to the Final Rule. *See* AR000047–48, 000053.

## III.    Description of the Landowners

### A.    The Skipper family entities

The Skipper family owns 11,489 acres of working timberland currently designated as Unit 7 of the black pinesnake's critical habitat. *See* Skipper Decl. ¶ 12. At the time of the filing of

this lawsuit the Skippers' Unit 7 property was held in trust for the benefit of various members of the Skipper family—represented in this lawsuit by plaintiff Thomas Gray Skipper as trustee and attorney-in-fact for the trustee. *Id.* ¶ 3–4. On December 30, 2021—as part of the planned process for winding up the late Helen O'Melia Skipper's estate—title to the Skippers' Unit 7 property passed to plaintiff HOS Timberlands, LLC, a family holding company. Skipper Decl. ¶ 28; Skipper Supp. Decl. ¶¶ 7–8. HOS Timberlands is a small entity for purposes of the RFA. 13 C.F.R. § 121.201; Skipper Decl. ¶ 29. During the rulemaking process, representatives of the Skipper family entities submitted comments to the Service identifying their ownership of lands within Unit 7.[6] Those comments also described the designation's anticipated negative impacts to the use, salability, and market value of their property.

## B.    Phalyn, LLC

Phalyn owns approximately 270 acres of working timberland within Unit 8 of the designation. Goodloe Decl. ¶ 8. J. Russell Goodloe, Jr., is the manager and sole member of Phalyn. *Id.* ¶ 3. His son John R. Goodloe, III, manages Phalyn's day-to-day timber and real estate operations. *Id.* The current use for Phalyn's Unit 8 tract is forestry. *Id.* ¶ 8. However, due to its proximity to the town of Jackson, its paved road frontage, and its access to utility lines, its highest and best use is subdivision for large acreage homesites. *Id.* ¶ 10. Phalyn is prepared to convert the property to this alternative use, should the right circumstances arise. *Id.* Phalyn is a small entity for purposes of the RFA. *See* 13 C.F.R. § 121.201; Goodloe Decl. ¶ 17. During the rulemaking

---

[6] *See* AR000601–24 (David O'Melia Skipper Trust of 1989); AR000710–33 (George W. Skipper IV Trust of 1989); AR000774–97 (Helen O'Melia Skipper Trust of 1967); AR000947–70 (Richard Carmichael Skipper Trust of 1989); AR001014–15 (Helen O'Melia Skipper); AR 001065–66, AR001067–71 (Thomas Gray Skipper); AR001072–95 (Thomas Gray Skipper Trust of 1989).

process, representatives of Phalyn filed public comments opposing the designation. *See* AR000735–36 (J. Russell Goodloe, Jr); AR000814 (John R. Goodloe, III).

### C.    Forest Landowners Association

Forest Landowners Association serves as an advocate for America's family forest landowners in legislative, regulatory, and judicial matters. Jones Decl. ¶ 5. FLA is a conventional membership organization governed by a volunteer Board of Directors elected by its dues-paying members. *Id.* ¶ 8. FLA's mission is defined by its commitment to preserving America's tradition of private forest ownership. *Id.* ¶ 4. To this end, FLA seeks to protect private forest landowners from a variety of threats, including arbitrary and overreaching regulation. *Id.* ¶ 5. FLA has a particular interest in ensuring the fair treatment of small businesses in regulatory matters. *Id.* ¶ 7. Many of FLA's members are burdened by regulations imposed under the ESA and FLA devotes substantial resources to advocacy on ESA issues. *Id.* ¶ 6.

FLA's membership includes landowners and businesses who own land or operate within the area known as Unit 7 of the designation. *Id.* ¶ 14. This includes Scotch Land Management, LLC, a company associated with the Skipper family which manages timber property within Unit 7. *Id.* ¶ 17; Skipper Decl. ¶ 26. Scotch maintains membership in FLA on the Skippers' behalf, paying all annual dues, and prorating those dues back to the Skipper family entities on a per-acre basis. *Id.* On behalf of its effected members FLA submitted public comments to the Service during the rulemaking process. AR000700–06. These comments identified numerous harms of the designation to FLA's membership. *Id.*

## IV.    The Landowners' Declarations

The Landowners have submitted detailed declarations to provide additional evidentiary support for their standing to challenge the Final Rule.

A. **The declarants**

Declarant **Thomas Gray Skipper** is the trustee of the Helen O. Skipper Trust of 1967, attorney-in-fact for the trustee of the Skipper Family Trusts of 1989, and vice president of HOS Timberlands, LLC. Skipper Decl. ¶¶ 3, 5; Skipper Suppl. Decl. ¶¶ 3–5. Mr. Skipper has spent almost two decades employed in, or managing, his family's extensive timber and real estate operations. Skipper Decl. ¶¶ 3, 5, 9. As a result of his professional experience within the family business, Mr. Skipper has extensive experience managing, buying, and selling, timberland real estate in southwestern Alabama. *Id.* ¶¶ 9–10. Because of this experience Mr. Skipper has gained significant knowledge of the principles of forest resource management, the markets for timberland property in southwestern Alabama, and the impacts of government regulation on business decisions made by forest landowners. *Id.* ¶¶ 9–10, 15–16. Mr. Skipper has personal knowledge of the designation and the Skippers' lands designated as Unit 7. *Id.* ¶¶ 11–12.

Declarant **Scott Jones** is the CEO of Forest Landowners Association, a position he has held for over eighteen years. Jones Decl. ¶ 9. As a result of his role with FLA Mr. Jones has extensive experience with all aspects of the timber industry. *Id.* ¶¶ 11–12. Because of this experience he has substantial knowledge of the market conditions for timberland real estate in the American South. *Id.* ¶¶ 11–12. He has also gained substantial knowledge of the impacts of government policies on the timber industry, and specifically the impacts of ESA regulations on forest landowners. *Id.* ¶ 12. Mr. Jones is personally familiar with the Final Rule, its impacts on FLA's members, and the areas known as Units 7 and 8. *Id.* ¶¶ 13–14, 15, 17.

Declarant **John R. Goodloe III** is responsible for the day-to-day management of Phalyn LLC's timber and real estate operations. Goodloe Decl. ¶¶ 3–4. In addition to his duties with Phalyn, Mr. Goodloe is in business as a real estate broker through his company Rural Land

Specialists, LLC. *Id.* ¶ 5. As a result of his roles with Phalyn and Rural Land Specialists Mr. Goodloe has been involved professionally in thousands of real estate transactions involving timber properties and agricultural lands over the course of twenty-five years. *Id.* ¶¶ 3–5. This includes prior experience with timber and real estate transactions involving lands affected by ESA regulations. *Id.* ¶ 6. As a result of this professional experience Mr. Goodloe has extensive knowledge of the market conditions for timberland and agricultural real estate in southwestern Alabama. *Id.* ¶¶ 5–6. He has also gained significant familiarity with the factors influencing purchase decisions for timberland real estate and the principles of land valuation. *Id.* ¶¶ 5–6, 11–13. Mr. Goodloe has personal knowledge of the Final Rule and the lands owned by Phalyn which have been designated as Unit 8. *Id.* ¶¶ 7–8.

### B.    The declarants' assertions regarding lost market value and salability

Based on their extensive knowledge and experience, each declarant asserts that the salability and market value of their properties within Units 7 and 8 of the designation (or that of their members, in FLA's case), has been diminished as a direct result of the Final Rule. Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. Each declarant asserts that this lost market value and salability is attributable to negative public perceptions of land designated as critical habitat. Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. Each declarant also asserts that this lost market value and salability will be especially severe in the case of their Unit 7 and 8 properties. Skipper Decl. ¶ 16; Jones Decl. ¶ 22; Goodloe Decl. ¶ 13. They assert that southwestern Alabama is a vibrant market for timberland real estate, and therefore it is easy for investors to acquire substantially similar alternative property that is not encumbered by the designation. Skipper Decl. ¶ 16; Jones Decl. ¶ 22; Goodloe Decl. ¶ 13. Each declarant has also examined the Land Values Memorandum and asserts that the Service's conclusions regarding

perceptional effects are consistent with their own experience. Skipper Decl. ¶¶ 14–15; Jones Decl. ¶ 23; Goodloe Decl. ¶ 15. Mr. Goodloe, however, notes that the Service's conclusions likely *underestimate* market value impacts to Phalyn, due to the highest and best use of Phalyn's land being development for homebuilding. Goodloe Decl. ¶¶ 9–10, 15.

### C.    The declarants' assertions regarding additional regulatory costs

Mr. Skipper and Mr. Goodloe also assert that the designation has imposed additional regulatory costs on their family timber businesses. These additional economic injuries are independent of the loss in value and salability of their property.

Mr. Skipper asserts that in response to the Service's determination that Unit 7 is "occupied," the Skippers have had to modify their land management activities to avoid habitat modification within the designated areas. Skipper Decl. ¶ 18. The Skippers have done so in response to the designation because it functions as a public announcement on the part of the Service that the black pinesnake is present on the Skippers' property and therefore increases their liability for incidental take of the species. *Id*. ¶ 18. This has resulted in the loss of present and future revenues, as well as the necessity for additional expenditures in both time and money to ensure that their property is managed appropriately. *Id*. ¶¶ 19–21.

Similarly, Mr. Goodloe asserts that the designation has affected Phalyn's day-to-day business decisions, and its ability to derive revenue from the property. Goodloe Decl. ¶ 16. He cites a specific example of the designation resulting in a failed deal with a third-party to harvest timber from the property during a period of elevated timber prices. *Id*. ¶ 16.

### STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991). Drawing of inferences, weighing evidence, and assessing credibility "are jury functions, not those of a judge," and all reasonable doubts about the facts must therefore be resolved in the non-movants' favor. *Four Parcels of Real Prop.*, 941 F.2d at 1437. As a result, if any material fact is controverted, summary judgment may not be appropriate, and the matter should proceed to trial or an evidentiary hearing. *Id.* Where material facts are uncontroverted, they will be taken as true for purposes of resolving the summary judgment motion. *See Lujan*, 504 U.S. at 561. *See also* Civ. L.R. 56(d) ("The Court will deem uncontroverted material facts to be admitted . . ."). These principles apply equally to threshold disputes over standing. *See Bischoff v. Osceola Cty.*, 222 F.3d 874, 880 (11th Cir. 2000).

When summary judgment is sought in an action brought pursuant to the APA, review is ordinarily limited to the facts contained within the administrative record. *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) ("[t]he focal point for judicial review of an administrative agency's action should be the administrative record" (citing *Camp v. Pitts,* 411 U.S. 138, 142 (1973))). However, a plaintiff must still establish Article III standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. As such, on summary judgment a party in an APA case may rely upon evidence outside the administrative record to establishing standing. *See id. See also Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002).

At the summary judgment stage affidavits or declarations are the primary means by which a party may establish standing. *See Lujan*, 504 U.S. at 561 (holding that affidavits are the primary form of evidence to establish standing at summary judgment); *Bischoff*, 222 F.3d at 880 (same). *See also* 28 U.S.C. § 1746 (unsworn declarations an acceptable substitute for affidavit);

*Weyerhaeuser*, 139 S. Ct. at 368 n.1 (affirming lower courts' reliance on declaration evidence to prove standing at the summary judgment stage).

## ARGUMENT

The Landowners are entitled to summary judgment on the question of standing. Uncontroverted facts contained within the administrative record establish that the designation has reduced the market value of the Landowners' property and harmed its salability. *See* AR000047–48, 000053 (Land Values Memorandum). The Landowners have also established via the submission of uncontroverted declaration evidence that the salability and market value of their property has been reduced by the designation. *See* Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. *Weyerhaeuser* recognized that a decrease in the market value of land resulting from the designation of critical habitat is sufficient to establish standing under Article III. *Weyerhaeuser*, 139 S. Ct. at 368 n.1. There is no genuine dispute as to any material fact, and the Landowners are entitled to judgment as a matter of law.

This section will begin by addressing the Skippers' and Phalyn's principal standing assertion—that the Final Rule has reduced the market value of their private property. Second, it will address the Skippers' and Phalyn's secondary standing assertion—that increased regulatory burdens stemming from the Final Rule have impacted their day-to-day timber operations. Third, it will address FLA's associational standing to participate in this lawsuit. Finally, it will briefly discuss the related jurisdictional question of the ripeness of the Landowners' claims.

I.      **The Final Rule Has Reduced the Market Value of the Skippers' and Phalyn's Property Causing Them an Immediate and Ongoing Economic Injury That Will Only Be Redressed By a Favorable Decision From This Court**

      A.      **This lost market value and salability is a constitutionally sufficient injury in fact**

The Skipper family entities and Phalyn, LLC, have each established that the market value of their properties has been reduced as result of the designation of their land as critical habitat for the black pinesnake. *See* AR000047–48, 000053 (Land Values Memorandum); Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. This injury is supported by uncontroverted evidence and meets the constitutional requirements for an injury in fact.

      1.      **The Skippers and Phalyn have established a loss in market value and salability of their property with uncontroverted evidence**

The Skipper family entities and Phalyn support their arguments with evidence from the administrative record and with detailed declaration evidence. First, the administrative record establishes that the Skipper family entities' and Phalyn's property have been diminished in value because of the designation. During the rulemaking process the Skippers established their ownership of lands within Unit 7. *See supra* note 6. Similarly, representatives of Phalyn—which owns property within Unit 8—filed public comments opposing the designation. *See* AR000735–36; AR000814. In finalizing the rule, the Service expressly acknowledged the likelihood of an imminent decrease in land values within Units 7 and 8 resulting from the designation. *See* AR000044 (Land Values Memorandum). The Service evaluated the magnitude of perception related costs resulting from the black pinesnake designation by conducting a "bounding analysis." It reached the conclusion that a loss in value of some fraction of the total value of private land within Units 7 and 8 (not exceeding 100% of the total value) will be attributable to the Final Rule. *See* AR000047–48, 000053. These material facts contained within the administrative record are

uncontroverted and are to be taken as true for purposes of summary judgment. *See* ECF Nos. 57–58, 59–60 (declining to submit evidence controverting the truth of the material facts contained within the administrative record). *See also* Civ. L.R. 56(d).

Second, although this evidence contained within the administrative record is sufficient to establish Article III standing, the Skippers and Phalyn also support their standing with detailed declaration evidence. Representatives of both the Skipper family entities and Phalyn assert that their Units 7 and 8 properties have lost market value and salability due to the black pinesnake designation. *See* Skipper Decl. ¶ 13; Jones Decl. ¶ 20; Goodloe Decl. ¶ 11. These assertions are based on the declarants' extensive professional experience in their respective roles, their substantial knowledge of local market conditions for timberland real estate in southwestern Alabama, their knowledge of the Final Rule, and their personal knowledge of the lands designated as Unit 7 and 8. *See* Skipper Decl. ¶¶ 2, 9–16, 20, 25; Goodloe Decl. ¶¶ 2, 4–15; Jones Decl. ¶¶ 2–3, 9–23, 28. These declarations are also consistent with the Service's own conclusion that the effect of the designation "may be more significant and longer lasting" in "areas with large amounts of alternative land suitable for forestry and other agricultural uses." AR000046 (Land Values Memorandum) *accord* Skipper Decl. ¶ 16; Jones Decl. ¶ 22; Goodloe Decl. ¶ 13. The declarants explain that this factor has increased the severity of the impacts to their properties because in southwestern Alabama it is easy for investors to acquire substantially similar alternative timber property outside the designation. *See* Skipper Decl. ¶ 16; Jones Decl. ¶ 22; Goodloe Decl. ¶ 13; *accord* AR000046 (Land Values Memorandum).

In responding to the Landowners' motion for summary judgment, the Service and Intervenors did not dispute the facts asserted in these declarations. *See* ECF Nos. 57–58, 59–60 (declining to submit evidence controverting the truth of the material facts asserted in the

Landowners' standing declarations). Thus, these material facts pertaining to lost market value are to be taken as true for purposes of summary judgment. *See Lujan*, 504 U.S. at 561; *Bischoff*, 222 F.3d 874, 880. *See also* Civ. L.R. 56(d).

### 2.    This injury meets the subsidiary elements for an injury in fact

Where "the legality of government action or inaction" is being challenged "there is ordinarily little question" of standing for the "object of the action (or forgone action)." *Lujan*, 504 U.S. at 561–62. Property owned by the Skipper and Goodloe families is the object of the designation and as a result there is little question that they are injured by it. *See Markle*, 827 F.3d at 463–64 (citing *Lujan*, 504 U.S. at 561–62). *Cf. Otay Mesa*, 714 F. Supp. 2d at 80. However, *Lujan's* presumption aside, the Landowners' asserted loss in market value meets the requirements for an injury in fact. It is (1) "an invasion of a legally protected interest" that is (2) "concrete," (3) "particularized," and (4) "actual or imminent, not conjectural or hypothetical." *Trichell*, 964 F.3d at 996–97 (quoting *Lujan*, 504 U.S. at 560).

First, the economic injury asserted by the Landowners arises out of a legally protected interest. *See Trichell*, 964 F.3d at 996–97. As the Eleventh Circuit and other courts have recognized, economic injury is the "epitome" of a protected interest. *See MSPA Claims 1*, 918 F.3d at 1318. Moreover, where economic injury is at issue "the amount is irrelevant," and even a small loss is legally protected. *Carpenters Indus. Council*, 854 F.3d at 5. *See also Czyzewski*, 137 S. Ct. at 983; *Wallace*, 747 F.3d at 1029; *Licari Fam. Chiropractic*, 2021 WL 4506405, at *3–4. This principle—that economic injury of any amount is constitutionally sufficient—is well recognized where the market value of property has been impacted. *See Weyerhaeuser*, 139 S. Ct. at 368 n.1 (2018); *Village of Euclid*, 272 U.S. at 386; *Adinolfe*, 768 F.3d at 1172.

Second, the asserted losses to the market value and salability of the Skippers' and Phalyn's properties are "concrete" because they are "real, and not abstract." *Trichell*, 964 F.3d at 996–97. Economic injury is a concrete injury in fact. *See MSPA Claims 1*, 918 F.3d at 1318. And there is nothing "abstract" about the immediate diminution in value of the Skippers' and Phalyn's property that occurred upon its designation. The Supreme Court has expressly held that lost market value resulting from negative perceptional effects of critical habitat "is a sufficiently concrete injury for Article III purposes." *See Weyerhaeuser*, 139 S. Ct. at 368 n.1.

Third, these injuries are "particularized" because they affect the Skippers and Phalyn "in a personal and individual way." *Trichell*, 964 F.3d at 996–97. The Skippers, who own thirty-four percent of the private property within Unit 7, *see* Skipper Decl. ¶ 12, established their ownership interest before the Service during the rulemaking process, *supra* note 6. And the Service has concluded that the designation will result in a reduction of the value of property within Unit 7. *See* AR 000047–48, 000053. Moreover, representatives of the Skippers and Phalyn have asserted specifically that property owned by the Skipper family entities and Phalyn has lost value and salability because of the designation. *See* Skipper Decl. ¶ 13; Goodloe Declaration ¶ 11.

Fourth, the Skippers and Phalyn have demonstrated "[a]n imminent injury" because the diminution is one that is "likely to occur immediately." *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1161 (quoting *31 Foster Children v. Bush*, 329 F.3d 1255, 1264 (11th Cir. 2003)). Indeed, the injury has already occurred and is ongoing. The declarants assert that the critical habitat designation immediately reduced the market value and salability of property owned by the Skipper family entities and Phalyn due to negative public perceptions of land designated as critical habitat. Skipper Decl. ¶ 13; Goodloe Declaration ¶ 11. *See also* Jones Decl. ¶ 20 ("the designation of

critical habitat on private timber property will significantly affect the marketability of land so designated and *immediately reduce its value*.").

Finally, the Skippers and Phalyn have demonstrated standing to request prospective relief because there is "a sufficient likelihood" that they will be "affected" by the critical habitat designation in the future. *See Houston*, 733 F.3d at 1328–29. The reduction in value is caused by the designation, and if the Landowners succeed in their suit, this Court will vacate the decision.

**B.    The reduction in the market value of the Skippers' and Phalyn's property is caused by the Final Rule and will be redressed by a favorable decision from this Court**

These losses to the market value and salability of the Skippers' and Phalyn's property are caused by the Final Rule and would be redressed by an order from this Court setting it aside. As the Fifth Circuit has concluded "[c]ausation and redressability flow naturally" from the reduction in market value brought about by a critical habitat designation. *Markle*, 827 F.3d at 463–64.

The negative perceptions of the Skippers' and Phalyn's land and their lost market value are "fairly . . . trace[able] to the challenged" Final Rule. *Lujan*, 504 U.S. at 560. The Service concludes that a loss in value of some fraction of the total value of the private lands within Units 7 and 8 (not exceeding 100% of the total value) will be attributable to the Final Rule. *See* AR000047–48, 000053. *See also* AR000044 (concluding that the loss in property values "*results* from the perception that *critical habitat* will preclude, limit, or slow development . . . ." (emphases added)). The Landowners' declarations likewise attribute the negative perceptional effects and lost market value to the designation. Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14.

Similarly, the redressability of the Skippers' and Phalyn's injury is established because a favorable decision would "significantly increase . . . the likelihood" that their injuries would be redressed. *See Hollywood Mobile Estates*, 641 F.3d at 1266. The Skippers and Phalyn have

established that they are injured by the designation having reduced the market value and impacted the salability of their property. *See supra* 22–26. It follows logically that an order from this Court setting aside the designation—and therefore removing the Skippers' and Phalyn's property from its boundaries—will redress that injury. The Landowners request vacatur of the Final Rule, *see* ECF No. 8 at 32–34, and this Court has the authority to grant that request, *see* 5 U.S.C. § 706(2) (requiring a reviewing court to "hold unlawful and set aside" unlawful agency action); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) ("vacatur . . . is the ordinary APA remedy" (quotations omitted)).

### C. The Supreme Court's decision in *Weyerhaeuser* leaves no doubt that the loss in market value of the Skippers' and Phalyn's property is sufficient for Article III standing purposes

#### 1. The circumstances, evidence, and arguments before the Supreme Court in *Weyerhaeuser* were virtually identical to those before this Court

The Supreme Court's decision in *Weyerhaeuser* demonstrates that the Skippers and Phalyn have Article III standing. In *Weyerhaeuser*, three levels of the judiciary—including a unanimous Supreme Court—held that lost market value and salability of land designated as critical habitat conferred standing on a group of landowners seeking to challenge the designation. *See supra* 8–12. The outcome of *Weyerhaeuser* is significant due to its remarkably analogous nature to the present case. Three points of similarity bear emphasizing.

First, the *Weyerhaeuser* case involved a virtually identical factual scenario to the present case. In *Weyerhaeuser* a group of private landowners challenged the Service's designation of their timber property in southeastern Louisiana as critical habitat for the dusky gopher frog. *See Markle*, 40 F. Supp. 3d at 752–53. They alleged the designation was illegal under the APA and the ESA and requested an order vacating the designation. *See id*. In the present case, the Landowners

challenge the designation of their timber property in southwestern Alabama as critical habitat for the black pinesnake. *See* ECF No. 8. They likewise allege the designation is illegal under the APA and ESA and request an order of vacatur. *See id.*

Second, the *Weyerhaeuser* Landowners based their arguments for standing on the fact that negative perceptional effects of the designation had reduced the market value of their property. *See Markle*, 827 F.3d at 463; *Markle*, 40 F. Supp. 3d at 757 & n.22. They substantiated these standing arguments with declarations from company representatives or employees. *See* Rockwell Decl. ¶ 5 (Exhibit A to Yates Decl.); Poitevent Decl. ¶ 7 (Exhibit B to Yates Decl.); LeBlanc Decl. ¶ 7 (Exhibit C to Yates Decl.). The Landowners in the present case likewise argue they possess Article III standing because the black pinesnake designation has reduced the market value of their property and damaged its salability. *See* Pl. Op. Br. 11–14; Pl. Reply Br. 2–6. The Landowners substantiate their standing arguments with documents in the administrative record, AR000044–53 (Land Values Memorandum), and with detailed declarations submitted by representatives of each Landowner, *see* Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. Indeed, the declarations submitted by the Landowners in the present case are very similar to—and actually contain more thorough detail than—the declarations submitted by the *Weyerhaeuser* Landowners in the Eastern District of Louisiana. *Compare* Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14 *with* Rockwell Decl. ¶ 5 (Exhibit A to Yates Decl.); Poitevent Decl. ¶ 7 (Exhibit B to Yates Decl.); LeBlanc Decl. ¶ 7 (Exhibit C to Yates Decl.).

Third, the Service here has made virtually identical arguments to those rejected in *Weyerhaeuser*. Here, the Service argues that the Landowners' assertions of perception-related decreases in market value are "uncertain and unspecific prediction[s] of future harm" which do not meet the constitutional requirements for an injury in fact. Serv. Op. Br. 9–10; Serv. Reply 2–

3 (same). In *Weyerhaeuser*, the Center for Biological Diversity made the exact same argument. *See* Intervenor-Respondents Br. 15, *Weyerhaeuser*, No. 17-71 (Exhibit D to Yates Decl.) ("[t]he mere fact that a hypothetical buyer might take account of . . . remote contingencies does not transform constitutionally inadequate potential future harm into actionable present injury."); *id.* at 21 ("But Article III limitations do not permit plaintiffs to transform conjectural future harms into actionable, concrete injuries simply by positing that a hypothetical purchaser would pay more for a property were there no risk of future regulation.").

Similarly, here, the Service argues that the loss in market value suffered by the Skipper family entities is insufficiently concrete, because "nowhere does . . . Mr. Skipper, allege that he has plans to list his property for sale or that he has been approached by prospective buyers at discounted rates . . . ." Serv. Op. Br. 9–10; Serv. Reply 3 (same). In *Weyerhaeuser*, the Center for Biological Diversity attacked the sufficiency of the evidence on the exact same ground. *See* Intervenor-Respondents Br. 22, *Weyerhaeuser*, No. 17-71 ("petitioner has never claimed any concrete intention to sell its 152 acres or that it would have done so absent the challenged designation."). These arguments were expressly rejected by the Supreme Court, *see Weyerhaeuser*, 139 S. Ct. at 368 n.1, and this Court should also reject them here. This Court should not countenance the Service's attempts to recycle arguments which have already been rejected by three levels of the federal judiciary.

### 2.    This Court should reject the Service's attempts to distinguish the operative facts in *Weyerhaeuser*

Faced with *Weyerhaeuser* the Service conceded that "the Supreme Court has recognized that a decrease in the market value of land is a sufficiently concrete injury for purposes of Article III standing . . . ." Serv. Reply 4. Notwithstanding this concession, however, the Service

makes a last-ditch effort to argue that *Weyerhaeuser's* rule should not apply in this case. The Service argues that it is "unsurprising" the lower courts in *Weyerhaeuser* determined the *Weyerhaeuser* Landowners had standing, because the *Weyerhaeuser* Landowners had "invested in 'plans to more profitably develop the site,'" and the "Service's report on the probable economic impacts of designating the critical habitat there 'recognized that anyone developing the area may need to obtain Clean Water Act permits from the Army Corps of Engineers before filling any wetlands' on at least one of the designated units." Serv. Reply 4 (quoting *Weyerhaeuser*, 139 S. Ct. at 367). In the Service's view, these two facts rendered the designation a "concrete restriction[]" on the *Weyerhaeuser* Landowners' "use and enjoyment of their land." Serv. Reply 4. This attempt to distinguish *Weyerhaeuser* betrays a deep misunderstanding of the case and its record, for three reasons.

First, the two facts cited by the Service—potential plans to develop the site and the possibility of the need for Army Corps permits—related to the costs of the Section 7 consultation process and were provided only as part of the background discussion at the beginning of the Court's opinion. *See Weyerhaeuser*, 139 S. Ct. at 366–67. They were not referenced in the Court's analysis of standing, nor were they relevant to that question. As discussed above, the Supreme Court's standing analysis was expressly limited to the *Weyerhaeuser* Landowners' second standing theory—that is their Perceptional Effects to land values argument—and not potential injuries resulting from the outcome of Section 7 consultations. *See id.* at 368 n.1. *See also supra* 11–12.

Second, the Service's quotation from the *Weyerhaeuser* opinion omits important context. In its discussion of the two facts referenced by the Service, the Supreme Court recognized the uncertainty of the record on the question of costs resulting from the Section 7 consultation process and noted the need for further factual development. *Weyerhaeuser*, 139 S. Ct. at 367. The Supreme

Court noted that according to the record "the consultation process could result in one of three outcomes"—the first of which was no cost at all, because permits from the Army Corps might not be required in the designated areas. *Id.*

Third, even had the facts cited by the Service been pertinent to the *Weyerhaeuser* Landowners' standing, they would relate only to their first standing theory—Lost Future Development. *See supra* 9–12. But the Fifth Circuit rejected the *Weyerhaeuser* Landowners' Lost Future Development theory as too speculative. *See supra* 10–11. Addressing both facts cited by the Service—that is investment in development plans and the potential need for federal permits— the Fifth Circuit noted the uncertainty of the plans to develop the area, the unlikelihood that such plans would eventuate in the foreseeable future, and the unknowability of the outcomes of the Section 7 consultation process. *See Markle*, 827 F.3d at 462–63. *See also supra* 10–11. Again, the Supreme Court—which limited its standing analysis to the Landowners' second theory of Perceptional Effects—did not address the Fifth Circuit's conclusions on the Lost Future Development theory. *Weyerhaeuser*, 139 S. Ct. at 368 n.1.

The Service's argument is ironic. In *Weyerhaeuser* the Service argued before the district court that the future development plans of a private landowner are too speculative for standing, *see Markle*, 40 F. Supp. 3d at 757 & n.22, and that rule was subsequently adopted by the Fifth Circuit, *see Markle*, 827 F.3d at 462–63. But the Service now argues that the Landowners here can only demonstrate standing if they allege future development plans, and that injuries expressly found to be sufficiently concrete by a unanimous Supreme Court—lost market value and salability due to perceptional effects—are too speculative. *See* Serv. Reply 4. The Service's attempt to distinguish *Weyerhaeuser* is a stunning concession. Despite the Fifth Circuit's conclusion in *Markle/Weyerhaeuser*, the Service now argues that the possible outcomes of unknown future

Section 7 consultations, for unnamed and unlikely projects, were "concrete restrictions" on the *Weyerhaeuser* Landowners' "use and enjoyment of their land," such that it was "unsurprising" the Court in *Weyerhaeuser* found standing. Serv. Reply 4.

But the Service's self-contradictory analysis of the operative facts in *Weyerhaeuser* is largely beside the point. The administrative record demonstrates that the designation will diminish the market value and salability of the Landowners' properties. *See* AR000044–53 (Land Values Memorandum). The Landowners have further demonstrated this lost market value via uncontroverted facts. *See* Skipper Decl. ¶¶ 13–16; Jones Decl. ¶¶ 19–22; Goodloe Decl. ¶¶ 11–14. This is sufficient to establish standing on summary judgment. *See Weyerhaeuser*, 139 S. Ct. at 368 n.1.

## II. The Final Rule Has Increased Regulatory Burdens on the Skippers' and Phalyn's Use of Their Properties Causing Them Ongoing Economic Injuries

The Skippers and Phalyn have also demonstrated that the designation has injured them by imposing costs and regulatory burdens on their day-to-day timber operations. Specifically, they assert that necessary actions taken in response to the designation have resulted in costs and lost revenue. These injuries are independent of the lost market value discussed in the prior section and are independently sufficient to prove standing.

### A. These increased regulatory burdens on the Skippers' and Phalyn's timber operations are an injury in fact

#### 1. The Skippers and Phalyn have demonstrated costs resulting from increased regulatory burdens

In response to the Service's determination that Unit 7 is "occupied" critical habitat, the Skippers have had to modify their land management activities to avoid habitat modification. Skipper Decl. ¶ 18. This has resulted in the loss of present and future revenues, as well as the necessity for additional expenditures in both time and money to ensure that their property is

managed appropriately. *Id*. ¶¶ 19–21. The designation has also affected Phalyn's ability to derive revenue from its property. Goodloe Decl. ¶ 16. Mr. Goodloe cites a specific example of the designation resulting in a failed deal with a third-party operator to harvest timber from the property during a period of elevated timber prices. *Id*. ¶ 16.

### 2.    These costs constitute an injury in fact

These injuries meet the constitutional requirements for an injury in fact.

First, the Eleventh Circuit has recognized economic injuries—such as lost revenue or additional costs of doing business—are the "epitome" of a constitutionally protected interest, *see MSPA Claims 1*, 918 F.3d at 1318l; *Carpenters Indus. Council*, 854 F.3d at 5.

Second, the asserted injuries to the Skippers' and Phalyn's business interests are "concrete" because they are "real, and not abstract." *Trichell*, 964 F.3d at 996–97. Again, economic injury is a quintessentially concrete injury in fact. *See MSPA Claims 1*, 918 F.3d at 1318. The Landowners have incurred costs to minimize the risk of dramatically increased civil liability brought about by the designation. The designation significantly increases potential liability for any incidental take that may occur during their ordinary timber management activities. *See* 50 C.F.R. § 17.42 (Section 4(d) Rule) (prohibiting incidental take of the black pinesnake resulting from "conversion of long-leaf-pine dominated forests" and "significant subsurface disturbance"); 50 C.F.R. § 17.3 (defining "harm" and therefore "take" as including habitat modification). The designation of Units 7 and 8 as "occupied" demonstrates that the agency tasked with enforcing the ESA's prohibition on take—the Service—presumes the black pinesnake's presence. As such, liability for incidental take within those areas would likely be that of a "knowing" violation. *See Bryan v. United States*, 524 U.S. 184, 193 (1998) (explaining that to "knowingly" violate a statute means to act with "knowledge of the facts that constitute the offense."). The ESA imposes penalties that

33

are orders of magnitude higher for "knowing" violations. *See* 16 U.S.C. § 1540(a)–(b). As such, the Landowners have had no choice but to prudently alter their management practices to avoid habitat modification. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. The costs incurred to minimize the risk of dramatically increased civil liability are concrete. *See Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("Regulatory influences on a firm's business decisions may confer standing when . . . they give rise to cognizable economic injuries or even a 'sufficient likelihood' of such injuries." (quoting *Clinton v. City of New York,* 524 U.S. 417, 432–33 (1998))).

Third, these injuries are "particularized" because they have been incurred by the Skipper family entities and Phalyn individually. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. *Cf. Trichell*, 964 F.3d at 996–97 (stating that for an injury to be "particularized" it "must affect the plaintiff in a personal and individual way.").

Fourth, the Skippers and Phalyn have demonstrated an "imminent" injury because the critical habitat designation has already resulted in lost revenue and costs and will continue to do so into the future. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. Similarly, due to the ongoing nature of these injuries the Skippers and Phalyn have demonstrated they are entitled to request prospective relief. *See Houston*, 733 F.3d at 1328–29. Unlike the costs alleged in the *Weyerhaeuser* Landowners' Lost Future Development theory, the Landowners here are not speculating about future costs. The Landowners here have already incurred costs and will continue to incur these costs unless the designation is vacated.

At least one other court has held that the increased risk of liability for take of a species imposed by the designation of one's land as critical habitat demonstrates an injury in fact. In *Otay Mesa Property* the District Court for the District of Columbia observed that due to the Service's

very broad regulatory definition of "harm," modification of designated property "that would affect [a listed species'] critical habitat . . . might 'harm' that species and violate the ESA." *See Otay Mesa*, 714 F. Supp. 2d at 81, *rev'd on other grounds*, 646 F.3d 914. The court then held that this conferred a non-speculative and certain injury on the plaintiff landowner because "once FWS designated the real property . . . as critical habitat, the ESA instantly precluded Plaintiffs from taking any action that would harm the" listed species. *Id. Cf. Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234–35 (D.C. Cir. 1996) (holding that "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing" and suggesting that, if the threatened injury is severe, "relatively modest increments in risk should qualify for standing").

### B.    These increased regulatory burdens are caused by the Final Rule and would be redressed by a favorable decision from this Court

Causation and redressability flow logically from these economic injuries.

First, these injuries are fairly traceable to the designation of critical habitat. In response to the dramatically increased liability brought about by the Service's public pronouncement that their land is occupied by the black pinesnake, the Skippers and Phalyn have prudently altered their management practices to avoid habitat modification. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. This has resulted in decreased revenue and additional costs. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. These economic costs are "fairly traceable" to the designation. *See Lujan*, 504 U.S. at 560. Indeed, there is a direct and uninterrupted chain of causation between the designation and the Skippers and Phalyn incurring these costs.

Second, the Landowners have demonstrated that there is a sufficient "likelihood" that their injuries would be redressed by an order from this Court vacating the Final Rule. *See Hollywood*

35

*Mobile Estates*, 641 F.3d and 1266. Vacatur of the designation would remove the public presumption that the Landowners' property is occupied habitat. This would allow them to pursue their management activities free from that presumption and with the degree of prudence they deem fit.

The Service attempts to argue that a ruling in the Landowners' favor may not redress their injuries because the Landowners "would likely keep taking the same precautionary measures" even absent the designation. *See* Serv. Reply 5–6. The Court should reject this argument. The Service's speculation as to the Landowners' motives and what they would do absent the designation amount to attacks on the declarants' credibility and are not appropriate at the summary judgment stage. *See Four Parcels of Real Prop.*, 941 F.2d at 1437. The Landowners' declarations—which were made under penalty of perjury and must be taken as true for purposes of summary judgment—assert that they are taking precautionary measures *in response to the critical habitat designation*. *See* Skipper Decl. ¶¶ 18–19, 21; Goodloe Decl. ¶ 16. The Service's bald attempt to look beyond the declarations and speculate as to the Landowners' motives must be resisted. If the Service wishes to establish that the declarants are mistaken or that their actions are motivated not by the critical habitat designation but by other factors, then it must request an evidentiary hearing and cross-examine the declarants. *See Bischoff*, 222 F.3d at 880 (making clear that in the Eleventh Circuit, "disputed factual issues material to standing must be determined not on the record but with an evidentiary hearing." (collecting cases)). It cannot however impeach the declarants' credibility in its summary judgment briefing.

## III. Forest Landowners Association has Associational Standing

Forest Landowners Association meets the three requirements for associational standing. The first element of the associational standing test is satisfied where an organization can establish

that one or more of its members would have standing in their own right. *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1160. FLA's membership includes landowners and businesses who own land and operate timber management businesses within Unit 7 of the designation. Jones Decl. ¶ 14. This includes the Skippers, who maintain membership in FLA through Scotch Land Management, LLC. *Id.* ¶ 17; Skipper Decl. ¶ 26. The Skipper family entities have standing to challenge the Final Rule in their own right. *See supra* 22–36.

The second requirement for associational standing—"germaneness"—is "undemanding and requires mere pertinence between the litigation at issue and the organization's purpose." *Schalamar Creek Mobile Homeowner's Ass'n, Inc. v. Adler*, 855 F. App'x 546, 553 (11th Cir. 2021) (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010)). An important part of FLA's mission is to protect private forest landowners from arbitrary and overreaching regulation. *Id.* ¶¶ 4–7. This lawsuit—which challenges the illegal designation of critical habitat on tens of thousands of acres of family-owned timber property—is "pertinent" to FLA's purpose because it is challenging an alleged overreaching regulation.

The third element of the test—that the nature of the lawsuit does not require the individual participation of the organization's members—is established where a suit seeks prospective relief. *See Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1160 ("we are mindful that when the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary.'" (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996))); *See also Hunt*, 432 U.S. at 343. The Landowners seeks declaratory and injunctive relief. *See* ECF No. 8 at 32–34. As such, the individual participation of FLA's membership is not required. *See id.*

## IV.    The Landowners' Claims are Ripe

The Landowners' claims are ripe. The ripeness inquiry requires a determination of "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *See Digital Properties*, 121 F.3d at 589 (citing *Abbott,* 387 U.S. at 149). First, because the designation is final agency within the meaning of the APA, the issues raised by the Landowners' Complaint are fit for judicial decision. *See* 5 U.S.C. § 704.

Second, courts regularly recognize that there is no substantive difference between the "hardship" analysis for ripeness and the injury in fact requirement for standing. *See Elend v. Basham*, 471 F.3d 1199, 1204–05 (11th Cir. 2006) (noting that the injury in fact requirement for standing and the ripeness doctrine frequently "converge[].")). *See also Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("[w]hen a plaintiff is challenging a governmental act, the issues are ripe for judicial review if 'a plaintiff . . . show[s] he has sustained, or is in immediate danger of sustaining, a direct injury as the result of that act.'" (quoting *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991))). The Landowners have demonstrated an injury in fact and therefore a significant hardship to their interests should the designation remain in place. *See supra* 22–26, 32–35. Indeed, the Service's ripeness objection is predicated solely on its position that the Landowners have not demonstrated an injury in fact. *See* Serv. Op. Br. 11.

**CONCLUSION**

The Landowners are entitled to summary judgment on the question of Article III standing.

They have demonstrated that the Final Rule has injured them in at least two independent ways,

and that a judgment vacating the Final Rule would redress those injuries.

DATED: February 28, 2022.

Respectfully submitted,

/s/ Charles T. Yates
CHARLES T. YATES*
Cal. Bar No. 327704
JEFFREY W. McCOY*
Cal. Bar No. 317377
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: JMccoy@pacificlegal.org
Email: CYates@pacificlegal.org

*Pro Hac Vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

/s/ Charles T. Yates
CHARLES T. YATES*

*Pro Hac Vice*
