IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA

THOMAS GRAY SKIPPER, *et al.*,

   *Plaintiffs,*

v.

UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*,

   *Federal Defendants*, and

CENTER FOR BIOLOGICAL DIVERSITY,

   *Defendant-Intervenor.*

Case No. 1:21-cv-00094

**FEDERAL DEFENDANTS' RESPONSE
TO PLAINTIFFS' SUPPLEMENTAL BRIEF ON ARTICLE III STANDING**

i

**INTRODUCTION**

Plaintiffs have gone to great lengths to try to convince the Court that speculative and generalized allegations of future harm are enough to support judicial intervention in this case. Indeed, Plaintiffs have filed no less than three briefs, but at each turn they have failed to satisfy their burden of establishing Article III standing. Now, after the close of summary judgment briefing, and without seeking leave of the Court, Plaintiffs have submitted a new declaration. But even if the Court were inclined to consider this latest attempt to bolster Plaintiffs' standing arguments, it does not cure the many defects of their earlier filings. The Court was right to view with skepticism whether Plaintiffs' meager declarations and supporting arguments are sufficient to invoke this Court's jurisdiction and it should decline to reach the merits of their claims in light of these deficiencies, which are not cured by Plaintiffs' filing.

**LEGAL BACKGROUND**

**I.      Article III Standing**

"Standing is a jurisdictional inquiry, and a 'party invoking federal jurisdiction bears the burden' of establishing that he has standing to sue." *Am. Civ. Liberties Union of Fla. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1247 (11th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The "irreducible constitutional minimum" of standing requires that Plaintiffs establish three elements: injury-in-fact; causation; and redressability.

"First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560. An injury is particularized when it "affects the plaintiff in a personal and individual way." *Id*. To be concrete, the injury must be "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). Meanwhile, when determining whether a plaintiff has adequately demonstrated that a future injury is *imminent*, the relevant

inquiry is whether there is a "sufficient likelihood that he [or she] will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004).

In the event of a challenge to government action or inaction, the nature and extent of facts that must be alleged in order to establish standing "depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. "If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Id*. at 561-62. However, when, like here, "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id*. at 562.

"Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … traceable to the challenged action of the defendant, and not … the result of the independent action of some third party not before the court.'" *Id*. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id*. at 561.

## II.   Endangered Species Act ("ESA")

### a. Critical Habitat

The ESA requires the U.S. Fish and Wildlife Service ("Service") to designate, to the maximum extent prudent and determinable, specific geographical areas as "critical habitat" for each listed species. 16 U.S.C. § 1533(a)(3)(A). Critical habitat may include occupied and unoccupied habitat. *Id*. § 1532(5)(A). The statute defines "occupied habitat" as "the specific areas within the geographical area occupied by the species, at the time it is listed. . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management

2

considerations or protection." *Id.* § 1532(5)(A)(i). The Service may only designate unoccupied habitat—areas not occupied by the species at the time of listing—if it determines "such areas are essential for the conservation of the species." *Id.* § 1532(5)(A)(ii).

Designating critical habitat is a stepwise process. As relevant here, first the Service identifies "any habitat of such species which is then considered to be critical habitat," *id.* § 1533(a)(3)(A)(i), based on "the best scientific data available." *id.* § 1533(b)(2). After completing this "biologically driven first step of identifying 'critical habitat' for the species," *see* Policy Regarding Implementation of Section 4(b)(2) of the ESA ("Section 4(b)(2) Policy"), 81 Fed. Reg. 7,228, the Service next considers "the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). Finally, the Service "may exclude any area from critical habitat if [it] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [it] determines" the exclusion will result in the species' extinction. *Id.*

Designating an area as critical habitat does not restrict land use or prohibit activities in that area. Any such restrictions arise, if at all, through operation of ESA Section 7, which applies only to actions involving "discretionary Federal involvement or control." 50 C.F.R. § 402.03.[1] ESA Section 7(a)(2) requires federal agencies to consult with the Service or the National Marine Fisheries Service ("consulting agency"), depending on the species, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any [listed] species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13, 402.14. If the action is "likely to adversely affect" listed species or critical habitat, the consulting agency issues a biological opinion for the proposed action. 16 U.S.C. § 1536(a); 50

---

[1] All references to the Code of Federal Regulations refer to the versions of the regulations in place at the time of the final rule designating critical habitat for the black pinesnake.

3

C.F.R. §§ 402.13(a), 402.14(a), (b)(1). If the consulting agency concludes in a biological opinion that the proposed action will result in jeopardy or destruction or adverse modification of critical habitat, it must identify any "reasonable and prudent alternatives" available to the action agency so that the proposed action may proceed. Alternatively, if the consulting agency concludes that the proposed action will *not* result in jeopardy to the species or in the adverse modification of critical habitat, it issues a written statement specifying the extent of the take and any reasonable and prudent measures to minimize take. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g), (h).

### b. ESA Section 4(d) and Prohibitions Against Incidental Take

Once a species is listed as threatened or endangered, a number of provisions of the ESA help ensure the survival or recovery of the species. *See, e.g.*, 16 U.S.C. § 1533(f) (requirement to develop and implement recovery plans for listed species); § 1536 (federal agencies' duty to avoid jeopardizing listed species and destroying or adversely modifying listed species' designated critical habitat). In addition, Section 9(a)(1) prohibits, among other things, "take" of endangered species within the United States or its territorial waters. 16 U.S.C. § 1538(a)(1)(B). The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). While Section 9's prohibitions do not automatically apply to species listed as *threatened*, ESA Section 4(d) authorizes the Service to extend the Section 9 prohibitions to species listed as threatened. *Id*. § 1533(d). The Service extends those prohibitions through a species-specific 4(d) rule setting forth all applicable prohibitions and exceptions. *See* 50 C.F.R. § 17.31(c).

As explained in Federal Defendants' summary judgment briefing, the Service issued a species-specific 4(d) rule for the black pinesnake at the same time it listed the species as threatened in 2015. 80 Fed. Reg. 60,468, 60,487 (Oct. 6, 2015). Among other things, the rule outlined the prohibition of incidental take of the species resulting from conversion of longleaf pine forests and

significant subsurface disturbing activities—two activities identified as posing significant threats to the snake's continued survival. *Id.* at 60,487. The prohibition against incidental take of the black pinesnake is in place by virtue of the Service's determination to list the snake as a threatened species, and is separate and distinct from any decision to designate critical habitat. In other words, even if the Service had declined to designate even a single acre as critical habitat for the species, the Section 4(d) rule prohibiting incidental take resulting from conversion of longleaf pine forests and significant subsurface disturbing activities would remain in effect. And private landowners, like Plaintiffs here, would remain liable for any take incurred as a result of their silviculture operations. 80 Fed. Reg. 60,468, 60,487 (Oct. 6, 2015); *see also* 16 U.S.C. § 1533(d).

## ARGUMENT

### I. Plaintiffs have failed to establish the irreducible minimum of Article III standing.

Plaintiffs offer two different theories of standing based on the Service's critical habitat designation for the black pinesnake but fail to satisfy their burden to demonstrate either one. First, they argue that the designation has reduced the market value and salability of their private property. *See* Plaintiffs' Supplemental Brief on Article III Standing ("Pls.' Supp. Br."), ECF No. 74 at 30.[2] Alternatively, they argue that "increased regulatory burdens stemming from the [designation] have impacted their day-to-day timber operations." *Id*. As Federal Defendants argued extensively in their summary judgment briefing, Plaintiffs have failed to allege sufficient injury-in-fact under either theory and have failed to demonstrate that the Court may redress any alleged injury under the second theory.

### a. Any alleged reduction in the market value of Plaintiffs' property is speculative and unsupported.

---

[2] Note, pagination refers to the ECF-stamped page numbering and not the original page numbering.

5

The Supreme Court has established in no uncertain terms that injury-in-fact must be (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Plaintiffs have failed to satisfy either of these prongs as they apply to unsupported allegations of diminished property values. Indeed, Plaintiffs' allegations that the critical habitat designation has undermined both the salability and market value of their land over negative perceptions about property designated as critical habitat are neither concrete and particularized, nor actual or imminent.

Plaintiffs rely on two primary sources for their claims that the challenged designation has resulted in lost property value. First, they rely on a document titled "Supplemental Information on Land Values – Critical Habitat Designation for the Black Pinesnake." *See generally* AR000044. This document was drafted by Industrial Economics Inc.—an independent company contracted by the Service to conduct a screening analysis of the likely economic effects of designating critical habitat for the black pinesnake. The ten-page memorandum begins by summarizing existing economic literature and prior public comments on previous critical habitat designations, suggesting that costs *may* result from public perception over how critical habitat regulations will be implemented. The authors' analysis, however, is largely limited to an assessment of the market value of privately owned land located within the then-proposed critical habitat area. The authors admit that "due to existing data limitations regarding the probability that [perception-related effects] will occur and the likely degree to which property values will be incrementally affected by this designation … we are unable to estimate the magnitude of perception-related costs resulting from this designation." AR000053. Ultimately, the paper estimates that "public perception of the effect of critical habitat *may* diminish land values by some percent of [this total value]." AR000047 (emphasis added).

Plaintiffs openly misconstrue the authors' conclusions when they state that the Service "reached the conclusion that a loss in value of some fraction of the total value of private land within

6

Units 7 and 8 … *will* be attributable to the Final Rule." Pls.' Supp. Br. at 31 (emphasis added) (citing Supplemental Memorandum on Land Values). That is inaccurate. The authors of the memorandum in question did not state any losses "will" be attributable to the critical habitat designation. AR000047. They could not have been clearer about the inherent limitations in the data they relied on for their analysis or their conclusion that perception-related effects *may* occur, but were not foregone conclusions. AR000047. The Court should reject Plaintiffs' attempt to misrepresent the record.

Plaintiffs' three declarants and their allegations of diminished property values are similarly inadequate. As Federal Defendants argued in their opening summary judgment brief, these declarations go no further to identify and support concrete and immediate injury-in-fact. Instead, they rely exclusively on conjecture about potential future injury. ECF No. 58 at 16-18; ECF No. 71 at 7-9. Plaintiffs have, twice, declined to supplement these declarations with specific evidence of diminished property values, or with the opinions of third party, qualified real estate experts. Instead, they doubled down on speculative and generalized perceptions of the market value of their land.

For example, in his declaration, Thomas Gray Skipper speculates that "*prospective* purchasers will invariably discount for the *potential* effects of [critical habitat designation] when making purchase decisions." ECF No. 48 ¶ 16 (emphasis added). But nowhere in his declaration does Mr. Skipper allege that he has plans to list his property for sale, ever had an evaluation of his property's value conducted, or that he has been approached by prospective buyers at discounted rates (or any rates for that matter). Instead, he claims "investors in southwestern Alabama are *generally* reluctant to purchase timberland property subject to *potential* regulatory limitations on land use conversion or development…" *Id*. ¶ 15 (emphasis added). This is, however, "the kind of uncertain and unspecific prediction of future harm that is inadequate to establish Article III standing." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015).

7

Mr. Goodloe's declaration fares no better. He alleges that the "highest and best use of [Phalyn, LLC's] 270-acre Unit 8 property is not silviculture, but rather conversion to large acreage homesites [sic] for residential development," ECF No. 50 ¶ 15, and that he "*expect[s]*" potential housing developers would "significantly discount the purchase price, to account for the regulatory uncertainty and *potential* delay associated with the critical habitat designation," *id*. ¶ 13 (emphasis added). Not only is Mr. Goodloe speculating about how *potential* housing developers may or may not react to this critical habitat designation, but more importantly, Phalyn, LLC's 270-acre Unit 8 property is not set to be sold for residential development. It is currently managed "to grow loblolly pine for sawtimber and pulp," *id*. ¶ 8, and the suggestion that this could change "should the right circumstances arise," *id*. ¶ 10, is too speculative to meet Plaintiffs' burden to show standing.

Finally, Mr. Jones—in similar fashion to Mr. Goodloe—alleges that "[c]ritical habitat designations … impose significant regulatory burdens on the use of timber property by creating regulatory uncertainty and limiting freedom of operation while increasing scrutiny of any uses of the land that may require a federal permit or would receive federal funding." ECF No. 49 ¶ 18. Absent from Mr. Jones' declaration, however, is any mention of (i) plans for projects on Plaintiffs' land which would require federal permits or which would receive federal funding, or (ii) any evidence of previous instances in which such permits have been requested. ECF No. 49.

The Supreme Court, in *Lujan*, noted that the declarations submitted in that case contained no facts showing how damage to the ESA-listed foreign species would produce *imminent* injury to the declarants. *Lujan*, 504 U.S. at 564. In general, the declarants described previous trips abroad[3] where they enjoyed access and opportunities to view certain ESA-listed species, but when pressed for whether they had any concrete plans to revisit the areas in question, the declarants could only say that they

---

[3] The species at issue in that case included the Nile crocodile, the African elephant, and the leopard.

8

"intend[ed]" to return or "hope[d]" to return. *Id*. at 563-64. In response, the Supreme Court held that "the affiants' profession of an 'intent' to return to the places they had visited before … is simply not enough. Such 'someday' intentions—without any description of concrete plans, or indeed even any specification of *when* the someday will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Id*. (emphasis in original). All three of Plaintiffs' declarations here suffer from the same deficiencies: offering uncertain and unspecified predictions of future harm "should the right circumstances arise." The standard for what is required to adequately plead injury-in-fact is well settled and the Court should reject Plaintiffs' attempt to offer anything less.

### b. *Weyerhaeuser* does not support Plaintiffs' position and is distinguishable from the present set of facts.

Plaintiffs' standing arguments are not saved by the Supreme Court's decision in *Weyerhaeuser v. U.S. Fish and Wildlife Service*, as Plaintiffs are incorrect that the case "involved a virtually identical factual scenario" and that the "Weyerhaeuser Landowners based their arguments for standing on the fact that negative perceptional effects of the designation had reduced the market value of their property." Pls.' Supp. Br. at 36-37 (discussing *Weyerhaeuser v. U.S. Fish and Wildlife Service*, 139 S. Ct. 361 (2018) ("*Weyerhaeuser*").

To start, the issue of whether a party's own (potentially biased) declaration claiming "expertise" and the existence of a perception-based loss in property value can suffice to show injury-in-fact, was not litigated in *Weyerhaeuser*.[4] Indeed, the government only raised the alleged "regulatory risk," and not the "perception of loss" issue at the district court. *Markle Ints. LLC v. U.S. Fish and Wildlife Serv.*, No. 2:13-cv-234 (E.D. La.) (ECF No. 89-1 at 6-8). Meanwhile, no party challenged standing at the circuit court level. *Markle Ints., LLC v. U.S. Fish and Wildlife*

---

[4] Plaintiffs have not qualified any of their three standing declarants (all of whom are plaintiffs) as expert witnesses pursuant to the Federal Rules of Evidence. Fed. R. Evid. 702; ECF No. 48-50, 74-1.

9

*Serv.*, 848 F.3d 635 (5th Cir. 2017). Intervenor-Defendants did not challenge standing until the case arrived at the Supreme Court, and even then made the same "regulatory risk" argument as the government had made in the district court. *Weyerhaeuser*, No. 17-71 (Int.-Resp. Br.[5] at 22-23) (contending the general averment that conduct may decrease property value is insufficient where that harm is not yet concrete and remains speculative). Thus, no defendant at any point raised the "perception of loss" issue.

As such, when the Supreme Court tersely stated that "the decrease in the market value of Weyerhaeuser's land as a result of the designation is a sufficiently concrete injury for Article III purposes," it clearly assumed, without analysis, that the petitioners' property had *in fact* lost value. 139 S. Ct. at 368, n.1. In the body of its decision, the Supreme Court was not focused on petitioners' "perception of loss" contention. It keyed instead on their plans to develop their property. 139 S. Ct. at 367. It stated: "While the critical-habitat designation has no direct effect on the timber operations, St. Tammany Parish is a fast-growing part of the New Orleans metropolitan area, and the landowners have already invested in plans to more profitably develop the site." *Id.*; *see also* ECF No. 71 at 4. By contrast here, Plaintiffs have not alleged similar plans to "more profitably develop" their property. 139 S. Ct. at 367. Indeed, after multiple tries, the most Plaintiffs can muster is the possibility that they *might* develop their property, "should the right circumstances arise." ECF No. 50 ¶ 10. Plaintiffs' heavy reliance on a single-sentence footnote in *Weyerhaeuser* is, for these reasons, not well taken.

Plaintiffs' misguided perspective should also be rejected because it suggests that the Supreme Court intended in one sentence to overturn well-settled precedent concerning the

---

[5] Ctr. for Biol. Div. and Gulf Rest. Network, *Brief for Intervenor-Respondents* (06/29/18), Dkt. 74-2; *see also* https://www.supremecourt.gov/docket/docketfiles/ html/public/17-71.html (last visited Mar. 11, 2022).

substantial quantum of evidence required to establish injury-in-fact.[6] As the Supreme Court has explained, allegations of lost property value are "*fact[s] subject to proof before the District Court*" and only "*convincing evidence* that the economic value of one's own [property] has declined as a result of the conduct of another" is sufficient under Article III to "contest the legality of that conduct." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 (1979) (emphasis added).[7] The Court should reject Plaintiffs' contention that *Weyerhaeuser* altered the fundamental principal that "the party invoking federal jurisdiction bears the burden of establishing elements of standing." *Glynn Environmental Coalition, Inc. v. Sea Island Acquisition, LLC*, No. 2:19-cv-50, 2020 WL 10692079, at *3 (S.D. Ga. Mar. 9, 2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

---

[6] *Friends of the Earth v. Laidlaw Envt'l Serv.*, 528 U.S. 167, 182-83 (2000) (finding standing existed based on petitioner's attestation "that her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy"); *id*. (finding "[t]*hese sworn statements*, as the District Court determined, adequately documented injury-in-fact") (emphasis added); *Del. Riverkeeper Network*, 895 F.3d 102, 107 (D.C. Cir. 2018) (finding plaintiffs had standing because several named members "filed declarations alleging . . . property injuries that they would likely suffer if a specific, identified project were approved by FERC and built"), *overturned on other grounds, Alleghany Def. Project*, 964 F.3d 1, 17-18 (D.C. Cir. 2020); *Barnum Timber Co. v. EPA*, 633 F.3d 894, 910 (9th Cir. 2011) (finding in analogous case that EPA's "retention of Redwood Creek [on plaintiffs' property] as a [Clean Water Act] § 303(d) impaired water body" had injured plaintiffs by decreasing their property values because plaintiff had "submitted two declarations by forestry experts, *testifying to the property value reductions*") (emphasis added) (citing *Lujan*, 504 U.S. at 560); *Pelfresne*, No. 03-cv-6905, 2004 WL 1660812, *6 (N.D. Ill. 2004) ("The court concludes that Plaintiff has standing *if he can show that the fair market value of his property has in fact decreased as a result of* [the project at issue] . . . . If during the discovery process Defendants can demonstrate that the fair market value of Plaintiff's property has not decreased, however, the court will entertain motions to dismiss . . . as well as for sanctions against Plaintiff.") (emphasis added); *cf. Mo. Soybean Ass'n v. EPA*, 289 F.3d 509, 512-13 (8th Cir. 2003) (finding case unripe because "The 'potential' diminution of property values is not a sufficiently immediate or sizeable threatened harm to warrant judicial intervention at this time."); *Protecting Air for Waterville v. EPA*, 763 Fed. Appx. 504, 511 (6th Cir. 2011) (dissent, discussing in case where loss of property value alleged, "the sort of testimonial allegations required to show a concrete injury").

[7] As demonstrated in Federal Defendants' summary judgment briefs and *supra*, that evidence is lacking here.

(1992)); *cf.* Fed. Rule Civ. Proc. 56(e) (at summary judgment stage, plaintiff must "set forth" by affidavit or other evidence "specific facts" demonstrating truth of allegations).

The approach taken by the court in a recent critical habitat case, *Northern New Mexico Stockman's Association*, 494 F. Supp. 3d 850 (D.N.M. 2020), further illuminates the flawed logic behind Plaintiffs' reading of *Weyerhaeuser*. In *Northern New Mexico Stockman's Association*, the court was considering a challenge to the Service's designation of critical habitat for the New Mexico meadow jumping mouse. *Id.* There, the plaintiffs advanced a perception of loss argument like the one Plaintiffs make here. The Service objected to statements by certain plaintiffs that the designation "lower[ed] [their] property values as a result of negative perception of land designated critical habitat . . ." *Id.* at 959. In considering the issue, the court applied *Weyerhaeuser*, and found that the plaintiffs had demonstrated a loss of value, and therefore injury-in-fact, by filing a "declaration from a certified third-party appraiser that the [plaintiffs] commissioned . . . explaining how the critical habitat designation reduces the market value of ranchers' associated base property ranches." *Id.*, citing *Weyerhaeuser*, 139 S. Ct. at 368, n.1; *cf.* Pls.' Supp. Mem. at 21-39 (citing 139 S. Ct. at 368, n.1). The *Northern New Mexico Stockman's Association* court also found Plaintiffs had submitted competent "*evidence* demonstrating that the negative public perception associated *with their property* as a result of the critical habitat designation . . . has resulted in decreased individual land values." 494 F. Supp. 3d at 959 (emphasis added).

The standard applied by the court in *Northern New Mexico Stockman's Association* stands in stark contrast to Plaintiffs' position here. Unlike the facts in *Northern New Mexico Stockman's Association*, Plaintiffs have presented no concrete evidence of a loss in property value besides conjectural assertions of potential future loss. ECF Nos. 48-50, 74-1. Notably, Plaintiffs have not cited to any case supporting their view that a party can demonstrate injury-in-fact by merely *asserting*, without any evidence beyond self-serving affidavits, that a regulation has caused a

12

decrease in property value. Pls.' Supp. Br. at 21-39. Plaintiffs' theory of unverifiable injury-in-fact is thus untethered to relevant judicial precedent. *See* note 8, *supra*. Accordingly, the Court should decline to endorse Plaintiffs' misguided view that *Weyerhaeuser* altered well-settled precedent and established that mere assertions by a party of a loss in property value, without more, suffices to establish injury-in-fact. *Id*. Plaintiffs' position, if accepted, would invite parties to assert injury-in-fact based on pure conjecture.

### c. Plaintiffs have failed to demonstrate that the Court may redress any alleged injury stemming from increased regulatory burdens on their day-to-day timber operations.

Even if Plaintiffs had or could surmount the hurdle to demonstrate injury-in-fact, Plaintiffs have not satisfied the third element of Article III standing—redressability—in the context of the challenge Plaintiffs elected to bring, a challenge to critical habitat, rather than a challenge to the ESA Section 4(d) rule.[8] Redressability requires that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. In this case, even if the Court were to grant Plaintiffs' requested relief in full—vacatur of the Service's final rule designating critical habitat and remand to the agency for redesignation—the Service's 4(d) rule prohibiting incidental take would remain in effect. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

On summary judgment, Plaintiffs argue that "necessary actions taken in response to the designation (by them and entities they contract with) have resulted in costs and lost revenue." Pls.'

---

[8] Plaintiffs cannot challenge the 4(d) rule. As Federal Defendants demonstrated in their summary judgment briefing, any claim challenging the 4(d) rule is time barred by the six-year statute of limitations, which expired in October 2021. *See* 28 U.S.C. § 2401(a) ("every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues").

13

Reply, ECF No. 63 at 15. But as Federal Defendants explained in both their opening and response/reply briefs, Plaintiffs confuse any alleged burdens imposed as a consequence of the ESA Section 4(d) rule with those allegedly imposed by the final rule designating critical habitat. *See, e.g.*, ECF No. 71 at 9-11.

The Service's designation of critical habitat for the black pinesnake requires that *federal agencies*, in consultation with the Service, ensure that actions authorized, funded, or carried out by those agencies are not likely to jeopardize the continued existence of black pinesnakes or result in the destruction or adverse modification of the snake's critical habitat. 16 U.S.C. § 1536(a)(2). ESA Section 7(a)(2)—the statutory provision governing the consultation process described above—does not impose any regulatory burdens on private landowners unless there is some federal nexus (*e.g.*, requiring a federal permit) to a proposed activity on their land. And as explained in Federal Defendants' opening brief, even if a federal permit were required, formal ESA consultation may still be unnecessary.[9] *See* Fed. Defs.' Mem., ECF No. 58 at 17-18. The ESA Section 4(d) rule, however—issued in tandem with the Service's rule listing the black pinesnake as a threatened species—does prohibit the incidental take of the species resulting from conversion of longleaf pine forests and significant subsurface disturbing activities. 80 Fed. Reg. 60,468, 60,487 (Oct. 6, 2015). Federal Defendants maintain that the "necessary actions" of which Plaintiffs complain have resulted in "costs and lost revenue" were taken in response to this 4(d) rule—not the Service's rule designating critical habitat. And Plaintiffs acknowledge this when they complain of potential liability stemming from incidental take that may occur during their ordinary timber management activities. *See* Pls.' Reply, ECF No. 63 at 15 (citing *not* to critical habitat statutory provisions but to the ESA Section 4(d) rule and its prohibition against incidental take of the black pinesnake resulting from conversion of longleaf pine forests and significant subsurface

---

[9] Still, actions requiring formal consultation to ensure against jeopardy of the species would require consultation, even if the Service had not designated critical habitat. *Id*. § 1536(a)(2).

14

disturbing activities).

Plaintiffs argue that the Service is speculating about what motivated these precautionary measures and that it is improper to question the motivation of Plaintiffs' declarants absent an evidentiary hearing. Pls.' Supp. Br. at 45. To be clear: Federal Defendants do not doubt that Plaintiffs' declarants may be under the impression that the steps they have taken to avoid incidental take were taken in response to the critical habitat designation—only that Plaintiffs' impression is mistaken. Federal Defendants have explained at length that critical habitat designations do not directly regulate private landowners. *See supra* at 3-5; *see also* ECF No. 58 at 9-12. Nor do critical habitat designations shift the responsibility of recovery to landowners or require the proactive implementation of restoration, recovery, or enhancement measures by private landowners. To the extent critical habitat designations impose any regulatory burden whatsoever, the burden is on federal action agencies to ensure their projects do not risk jeopardy to ESA-listed species or the destruction or adverse modification of their critical habitat. Plaintiffs have provided no evidence to the contrary.

One of Plaintiffs' declarants alleges that they "recently" (the declaration does not specify when exactly) declined to take advantage of a timber sale because of "liability risks and uncertainties associated with the critical habitat designation." ECF No. 50 ¶ 16. Another declarant alleges that they needed to modify their silvicultural management practices because the "presumption of occupation imposed by the critical habitat designation increases the potential for take liability resulting from adverse habitat modification under the pinesnake's ESA Section 4(d) rule." ECF No. 48 ¶ 18. Once again: liability for incidental take of the black pinesnake is a consequence of the prohibitions outlined in the ESA Section 4(d) rule. Plaintiffs seem to suggest that in the event the Court vacated the pinesnake's critical habitat designation, they would no longer feel the need to take these precautionary measures. *See* Pls.' Supp. Br. at 45 (stating that "[t]he Landowners' declarations … assert that they are taking precautionary measures *in response to the critical habitat designation.*") (emphasis in original).

15

This suggestion is entirely unfounded as the prohibitions of the 4(d) rule, and any liability stemming from their violation, would remain in place even if the Court were to issue such sweeping relief.

## CONCLUSION

Plaintiffs have failed, both to allege sufficient injury-in-fact, and to show that the Court may adequately redress any regulatory burdens arising from the Service's ESA Section 4(d) rule to prevent take of the species by vacating the critical habitat designation. For these reasons, the Court should not reach the merits of Plaintiffs' claims and should grant summary judgment for Federal Defendants.

Dated: March 14, 2022.

    Respectfully submitted,

    SEAN P. COSTELLO
    UNITED STATES ATTORNEY

    KEITH A. JONES
    Assistant United States Attorney
    63 S. Royal St., Suite 600
    Mobile, Alabama 36602
    Tel: (251) 415-7206
    Email: keith.jones2@usdoj.gov

    TODD KIM, Assistant Attorney General
    Environment & Natural Resources Division
    United States Department of Justice
    SETH M. BARSKY, Chief
    MEREDITH L. FLAX, Assistant Chief
    Wildlife & Marine Resources Section

    */s Davis A. Backer*
    DAVIS A. BACKER
    *Trial Attorney* (CO Bar No. 53502)
    J. BRETT GROSKO
    *Senior Trial Attorney* (MD Bar No. 0106180001)
    United States Department of Justice
    Environment & Natural Resources Division
    Wildlife & Marine Resources Section
    Ben Franklin Station
    P.O Box 7611
    Washington, DC 20044-7611
    Tel: (202) 514-5243 (Backer) / (202) 305-0342 (Grosko)

Fax: (202) 305-0275
Email: davis.backer@usdoj.gov / brett.grosko@usdoj.gov

*Attorneys for Federal Defendants*

*Of Counsel*

Helen Speights
Attorney-Advisor
U.S. Department of the Interior
Office of the Solicitor

17

## CERTIFICATE OF SERVICE

    I hereby certify that on March 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

*/s/ Davis A. Backer*
_____
DAVIS A. BACKER
*Attorney for Federal Defendants*