IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| THOMAS GRAY SKIPPER, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. 21-00094-JB-B** |
| UNITED STATES FISH AND WILDLIFE SERVICE, | ) | |
| et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

### I.    INTRODUCTION

This matter is before the Court on the Plaintiffs' Motion for Summary Judgment (Doc. 47) and the cross-motions for summary judgment filed by the Federal Defendants (Doc. 57) and the Defendant-Intervenor (Doc. 59).  The parties seek judgment as a matter of law on the Plaintiffs' challenge to the U.S. Fish and Wildlife Service's ("FWS" or the "Service") final rule designating critical habitat for the black pinesnake under the Endangered Species Act ("ESA").  Having reviewed the motions, briefs, declarations, administrative record, and the applicable law, the Court finds that the Service's designation of Units 7 and 8 as "occupied" critical habitat and its economic impact analysis were arbitrary and capricious.

Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.  The Federal Defendants' and Defendant-Intervenor's Cross-Motions for Summary

Judgment are **DENIED in part and GRANTED in part**.  The Final Rule is **VACATED** as it pertains to

Units 7 and 8 and **REMANDED** to the Service for further proceedings consistent with this opinion.[1]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the FWS's designation of critical habitat for the black pinesnake, a

large, nonvenomous constrictor native to longleaf pine ecosystems in portions of Mississippi and

Alabama.  *See* 80 Fed. Reg. 60,468-69 (Final Listing Rule); Administrative Record (hereafter "AR")

147-150.  Because it spends most of its time underground, the black pinesnake is said to be

"difficult to locate even in areas where it is known to occur."  (AR 396).  Historical threats include

habitat fragmentation from urbanization, agriculture, fire suppression, and road mortality,

resulting in isolated populations vulnerable to inbreeding and stochastic events.  *See* 80 Fed. Reg.

at 60,481; *see also* Doc. 81 at 20.

In 1999, the Service placed the black pinesnake on the list of candidate species for listing

under the ESA.  (AR 61).  On October 7, 2014, the Service published a proposed rule to list the

pine snake as threatened.  (*Id;* 70 Fed. Reg. 60,406).  In March 2015, the Service published a

proposed rule to designate critical habitat of 338,100 acres and opened a public comment period.

(*Id.*).  Finally, on October 6, 2015, the Service officially listed the black pinesnake as a threatened

species under the ESA.  *See* 80 Fed. Reg. 60,468 (Oct. 6, 2015).  The proposed designation

identified physical and biological features essential to conservation, including upland pine-

---

[1] As a preliminary matter, the Federal Defendants move to strike portions of Plaintiffs' brief that refer to documents not included in the administrative record. (Doc. 61). Judicial review of agency action under the APA is generally confined to the administrative record. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." (quoting *Camp v. Pitts*, 411 U.S. 138, 142, (1973))). However, given the Court's findings below, which are based solely on the un-supplemented administrative record, the motion is moot. The Court has not relied on the extra-record materials in reaching its decision. Accordingly, the Motion to Strike is DENIED as moot.

dominated forests with reduced shrub layers and suitable burrowing sites. *Id*. at 60,480–81. At the same time, the Service issued a "4(d) rule" restricting certain land use activities such as longleaf pine conversion and significant subsurface disturbance. *See id*. at 60,489; 50 C.F.R. § 17.42. On October 11, 2018, the Service revised its proposed rule and the critical habitat designation and re-opened a new comment period. (AR 389).

On February 26, 2020, the Service published its Final Rule designating critical habitat for the species, encompassing approximately 324,679 acres across eight units in Alabama and Mississippi. (AR 411; *see also* 85 Fed. Reg. 11,238 (Feb. 26, 2020)). Units 7 and 8 are located in Clarke County, Alabama. Unit 7 comprises approximately 33,395 acres—entirely privately owned timberland—and Unit 8 comprises 5,943 acres, of which 2,100 acres are privately held, and 3,843 acres are state-owned lands in the Fred T. Stimpson Special Opportunity Area. (AR 411; Doc. 47 at 7-8).

The plaintiffs are timberland owners and family trusts whose land falls within Units 7 and 8. (*Id.* at 11–12). They allege the designation reduces property values, interferes with land use, and stigmatizes their property. (*Id*. at 12–13). The Service concluded that both Units 7 and 8 were "occupied" by the pinesnake at the time of listing, relying primarily on a small number of historical sightings. (AR 413). In Unit 7, the Service cited one pinesnake sighting in the twenty years preceding the listing and four older anecdotal sightings—all on the perimeter of the designated area. (Doc. 47 at 8–9 (citing AR 413)). For Unit 8, the Service relied on two sightings from the 1990s, neither of which occurred on the designated private land. (*Id*.). No pinesnakes were observed during a 2008–2009 field survey of either unit. (*Id*.; *see also* AR 398; AR 1968).

The Service produced an economic analysis by it's contractor, Industrial Economics, Inc., in support of its designation. (AR 27). That analysis used the "baseline" approach, excluding costs attributable to the ESA listing itself and focused only on incremental costs associated with the habitat designation. (AR 27; Doc. 47 at 9–10; Doc. 57 at 17). The Service's draft economic analysis estimated incremental administrative costs of $33,000 to $42,000 annually from Section 7 consultations, concluding no exclusions were warranted under ESA section 4(b)(2).[2] (*See* AR 21–43). Although the analysis acknowledged the potential for diminished land values and public stigma, it did not quantify those losses and concluded that the designation would not impose significant costs. (AR 38–40; AR 44–53; Doc. 57 at 21).

Finally, the Service certified under 5 U.S.C. § 605(b) that no regulatory flexibility analysis was required under the RFA, reasoning that critical habitat designations do not directly regulate small entities but rather solely regulate federal agencies. (AR 418–20; Doc 47. at 10; Doc. 57 at 8, 25). Plaintiffs objected to that conclusion during the rulemaking process, submitting comments regarding the economic impact on small timber operations. (AR 400–02).

After the Service issued its Final Rule, Plaintiffs sent a 60-day notice of intent to sue and subsequently filed this action challenging the designation under the ESA, APA, and RFA. (Doc. 47 at 10–11).

III.    **APPLICABLE LAW**

A.    **The Endangered Species Act**

The Endangered Species Act represents what the Supreme Court has called "the most comprehensive legislation for the preservation of endangered species ever enacted by any

---

[2] *See* page 6, *infra*, regarding Section 7 consultation.

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978); 16 U.S.C. §§ 1531–1544. The Act's stated purpose is to provide a program for the conservation of such species and the ecosystems upon which they depend, reflecting a congressional policy "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184; *see also* 16 U.S.C. § 1531(b).

Under Section 4 of the ESA, the Secretary of the Interior, acting through the Service, determines whether to list a species as "endangered" (in danger of extinction) or "threatened" (likely to become endangered in the foreseeable future). *See* 16 U.S.C. § 1532(6), (20). This biological determination must be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). This is a strict standard likely intended to ensure the decision is insulated from political or economic pressures. Once a species is listed, it is generally unlawful for any person to "take" that species. *See* 16 U.S.C. §§ 1538(a)(1)(B), 1532(19). The term "take" is defined expansively to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19). The Service's regulations have further clarified that "harm" includes not only direct physical injury but also significant habitat modification or degradation that "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (2024). This broad prohibition is a primary source of the ESA's regulatory impact on private land use. *See* 50 C.F.R. § 17.3; *see also* Doc. 47 at 3; Doc 57 at 5 n.2.

In addition to listing, the ESA requires the Service to concurrently designate "critical habitat" for listed species. 16 U.S.C. § 1533(a)(3)(A)(i). Unlike the purely scientific listing decision, the designation of critical habitat involves a multi-faceted analysis. The designation must be

based on "the best scientific data available," but it can only be made "after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* at § 1533(b)(2). Exclusions can be made to a "critical habitat" designation "if [the Secretary] determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." *Id*. However, this exclusion provision itself has an exclusion clause; if the Secretary "determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned," that area cannot be excluded from the designation. *Id.*

The statute defines two distinct types of critical habitat: "occupied" and "unoccupied." Occupied critical habitat consists of "the specific areas within the geographical area occupied by the species at the time it is listed" that contain the physical or biological features essential for its conservation. 16 U.S.C. § 1532(5)(A)(i). Unoccupied critical habitat consists of "specific areas outside the geographical area occupied by the species," but only upon a more demanding determination that such areas are "essential for the conservation of the species" can this latter type of habitat be properly designated. *Id*. at § 1532(5)(A)(ii).

A critical habitat designation does not create a park or a wildlife refuge and does not, on its own, prohibit private activities on private land. The primary legal effect of a critical habitat designation is triggered by Section 7, which establishes a consultation process for federal agencies. *Id*. at § 1536. Section 7 requires every federal agency to ensure that any action it authorizes, funds, or carries out is not likely to "jeopardize the continued existence" of a listed species or "result in the destruction or adverse modification of [critical] habitat." *Id*. at §

1536(a)(2). This "consultation" requirement means that a private landowner may face project delays, modifications, or additional mitigation requirements if their proposed activity requires a federal permit or funding. *See* 50 C.F.R. pt. 402.

### B.    The Administrative Procedure Act

Enacted in 1946, the Administrative Procedure Act ("APA") is "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). It provides the default framework for judicial review of final agency actions. *See* 5 U.S.C. §§ 701–706. The APA empowers federal courts to ensure that agencies act within the bounds of their statutory authority and engage in a process of reasoned decision-making. *See, e.g.*, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-96 (2024) (explaining "the traditional conception of the judicial function" as adopted in the APA). The APA instructs reviewing courts to "hold unlawful and set aside" agency actions, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. at § 706(2)(A).

This standard, while at times deferential, is not toothless. A court may not substitute its own policy judgment for that of the agency, but it must conduct a "thorough, probing, in-depth review" of the agency's reasoning—often referred to as the "hard look" doctrine. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). An agency's action is arbitrary and capricious if it:

> …has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency must articulate a "rational connection between the facts found and the choice made" in the administrative record. *Id*.

      **C.**      **The Regulatory Flexibility Act**

      The Regulatory Flexibility Act (RFA) was enacted by Congress in 1980 in response to concerns that federal agencies were promulgating uniform regulations without sufficient consideration of their disproportionate impact on small entities, which frequently lack the institutional resources of larger organizations to absorb compliance burdens. 5 U.S.C. §§ 601–612; *see also* Pub. L. No. 96-354, 94 Stat. 1164 (1980). The objective of the RFA is to oblige agencies to tailor their regulatory actions to the scale of the entities being regulated. *See* 5 U.S.C. § 601.

      To this end, the RFA imposes specific procedural requirements upon the rulemaking process. When an agency issues a notice of proposed rulemaking, it is generally required to prepare an "initial regulatory flexibility analysis" (IRFA) that evaluates the rule's anticipated impact on small businesses, small governmental jurisdictions, and small nonprofit organizations. *Id*. at § 603(a). Such an analysis must contain, *inter alia*, a description of the affected small entities and a discussion of any significant alternatives to the proposed rule that would achieve the statutory objectives while minimizing the economic burden. *Id*. at § 603(b). Upon promulgation of a final rule, the agency must then prepare a "final regulatory flexibility analysis" (FRFA) that addresses public comments and specifies the measures adopted to mitigate the rule's impact. *Id*. at § 604(a).

The RFA contains a significant exemption from these analytical duties. An agency is relieved of the obligation to prepare an IRFA or FRFA if the head of the agency certifies that the rule will not "have a significant economic impact on a substantial number of small entities." *Id*. at § 605(b). This certification is not a perfunctory exercise; it must be published in the Federal Register and be substantiated by a statement articulating the factual basis for the agency's conclusion. *Id*. A dispositive issue in RFA jurisprudence is the scope of the requisite analysis. The prevailing judicial interpretation holds that the RFA's requirements are activated only when a rule directly regulates small entities. *See, e.g.*, *Mid-Tex Elec. Coop., Inc. v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985). Consequently, an agency is typically not obligated to conduct an RFA analysis for impacts that are deemed an indirect consequence of a regulation primarily directed at other parties. For instance, a rule that directly regulates states, which in turn regulate small businesses, has been held not to trigger the RFA's requirements for the promulgating federal agency. *Id*. at 342–43.[3]

An agency's adherence to the RFA is subject to judicial review under the arbitrary and capricious standard of the APA. *Id*. § 611(a).

## IV.    STANDARD OF REVIEW

Summary judgment is appropriate when the administrative record shows that there is no "genuine issue material fact" and the movant is entitled to judgement as a matter of law. Fed R. Civ. P. 56(a). Review of agency action under the ESA is governed by the standards of the APA.

---

[3] Regarding the Plaintiffs' third claim of an invalid RFA certification under Section 605(b), the Court finds their arguments unpersuasive and DENIES this portion of their motion for summary judgment. The Court finds the Secretary acted within its proper discretionary scope when it certified that the critical habitat designation did not have a "significant economic impact on a substantial number of small entities." 5 U.S.C. §§ 604(a). However, for the reasons explained throughout the remainder of this opinion, the Court still find the remedy of vacatur in regard to Unit 7 and 8 is unaffected by the validity of the RFA.

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 12 (2018).  As previously stated, the APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be deiced at trial."  *Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the moving party has met its burden, Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in [his] favor."  *ThyssenKrupp Steel USA, LLC v. United Forming, Inc.*, 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (U.S. 1986)).  Nevertheless, if the nonmoving party fails "to make a sufficient showing on an essential element of her case with

respect to which she has the burden of proof," the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

This Court's review of the Service's legal interpretations of the statutes it administers is shaped by the Supreme Court's recent decision in *Loper Bright Enterprises*, 603 U.S. 369 , which overruled the doctrine of *Chevron* deference.[4]  Whatever statutory ambiguities exist in the present case are not "implicit delegations" to the Service for their own unbridled explanation.  *Id*. at 373.  Thus, this Court will not defer to the Service's statutory interpretations but will instead exercise its independent judgment to "determine the best reading of [a] statute and resolve [any] ambiguity."  *Id*.  While not given complete deference, this Court will still consider the FWS's "body of experience and informed judgment," among other information in the record.  *Skidmore v. Swift & Co.*, 323 U.S. at 140. (1944).  As elucidated in *Loper Bright*, "an agency's interpretation of a statute 'cannot bind a court,' but may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.'"  603 U.S. at 402 (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n. 8 (1983)).

## V.    ANALYSIS

### A.    Standing and Jurisdiction

Standing consists of three elements: the plaintiff must have suffered an injury in fact, the defendant must have caused that injury, and a favorable decision must be likely to redress it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs bear the burden to establish these three elements of Article III standing.  *Id*.  The Court is satisfied that Plaintiffs have standing under Article III to bring these claims and that the Court has jurisdiction to review the critical

---

[4] *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

habitat designation. Plaintiffs own land within Units 7 and 8 that were designated as critical habitat. (Doc. 48; Doc. 50). Although Plaintiffs seek vacatur of the Final Rule in its entirety, their standing is limited to the designation of Units 7 and 8. They claim the designation causes them concrete injury by diminishing the economic value of their property from negative perceptions attached to the critical habitat designation and by imposing additional regulatory burdens on any use of their land. (Doc. 47 at 11-19). These injuries are neither speculative nor generalized; they are specific to the Plaintiffs' properties. *See Lujan*, 504 U.S. at 560-61.

      **1. Actual Injury**

Designation of private land as critical habitat has an immediate impact on property value and potential development opportunities. *See Weyerhaeuser Co.*, 586 U.S. at 19 n.1 (2018). The record contains evidence that the mere presence of a critical habitat label can create a public perception of regulatory risk, leading to reduced market value of the land. (AR 44). The Service's own economic analysis acknowledged 65,000 acres of privately owned land within the designation, with a total value of $180 million that could be subject to such perception effects, though the Service was "unable to estimate" the degree of economic harm. (*Id*. at 53). Units 7 and 8 comprise approximately 35,495 acres of privately owned land. AR 413. Even absent a current sales transaction, the reduced value of Plaintiff's land caused by the designation is a real economic harm. *See Weyerhauser*, 586 U.S. at 19 n.1 (noting decrease in market value of land as a result of critical habitat designation was a concrete injury sufficient for Article III standing). Plaintiffs' land, thousands of acres of timber and rural land, stands to lose economic value or face significant use restrictions. This economic injury is sufficiently concrete and imminent and is

particularized to Plaintiffs.  It is not a diffuse harm shared by the general public.  *See Lujan*, 504 U.S. at 560-61.

### 2. Traceability and Redressability

Plaintiffs' injuries are traceable to the Service's actions—specifically, to the designation of Plaintiffs' land as critical habitat.  But for that designation, Plaintiffs' property would not be subject to the adverse modification standard or any constraints beyond those already in place from the species listing.  If the designation is vacated on Plaintiffs' lands, any future federal-agency actions on those lands would no longer require consideration of adverse modification of critical habitat.  Thus, the injury flows from the challenged rule. Vacating the Final Rule on Units 7 and 8 would also sufficiently redress Plaintiffs' injuries. It would eliminate the critical habitat designation on their lands, thereby lifting the regulatory burden and any stigma attached to the land. Plaintiffs' property would still be subject to the ESA's other provisions. However, the critical habitat-specific duties would no longer apply. This is significant relief. Economically, removing the designation should allow property values to recover from any stigma associated with being designated as critical habitat.

Accordingly, the Court concludes that Plaintiffs have satisfied Article III standing. The designation of their land in Units 7 and 8 imposes concrete economic harms that are directly traceable to the Service's actions. This harm would be sufficiently redressed by vacatur. Although Plaintiffs lack standing to challenge the Final Rule beyond their property, their claims as to Units 7 and 8 are properly before the Court.

### B. The Record does not Support the Service's "Occupied" Critical Habitat Determination

First, the Court must consider whether the Service properly concluded that Units 7 and 8 were "occupied" by the species at the time of listing. Plaintiffs contend that these areas were unoccupied by the black pinesnake in 2015 and that the Service's decision to treat them as occupied was not based on the best available science. (Doc. 47 at 25). The ESA's text draws a clear distinction between occupied and unoccupied areas. If an area falls within the geographical area occupied by the species at the time of listing, it can be designated if it contains the features essential to conservation. *See* 16 U.S.C. § 1532(5)(A)(i). If an area is outside that occupied geographical area, the Service must make an affirmative determination that the area is essential for the conservation of the species to designate it. *Id*. at § 1532(5)(A)(ii). In the absence of a statutory definition, the ordinary meaning of "occupied… by the species" would be areas where the species is present or at least routinely present.[5] The Service presents an unconvincing argument that if an area is suitable habitat for the black pinesnake, the snake is likely to occupy that area.

The ESA requires the Service to use the "best available science" when making such determinations, yet the record lacks concrete evidence that the black pinesnake was present in Units 7 and 8 at the time of listing. The Service's assumption of the black pinesnake's occupying Units 7 and 8 is unsupported by observational data and falls short of the evidentiary standard required under the ESA. Although there is no binding Eleventh Circuit precedent on this issue, persuasive authority from other circuits exposes the weakness of the Service's determinations.

---

[5] *See Loper Bright Enters.*, 603 U.S. at 406-12 (overruling *Chevron*, 467 U.S. at 837, and holding that courts must exercise independent judgment in determining the best reading of a statute, without deferring to an agency's interpretation). Accordingly, the Court need not defer to the Service's interpretation of "occupied" habitat under the ESA, but must instead apply traditional tools of statutory construction to determine its meaning.

For example, in *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, at 561 (9th Cir. 2016), the Ninth circuit upheld an "occupied" critical habitat designation for polar bears based on detailed tracking studies showing consistent movement through the designated area. By contrast, the Service's reliance on sparse, decades-old anecdotal sightings of an elusive species renders its occupancy determination speculative at best. While standards for occupancy may vary by species, the complete lack of recent observational data significantly undermines the Service's "occupied" determination under the ESA's "best available science" requirement.

Indeed, this case is a far cry from *Jewell*, where the FWS's occupancy determination for polar bears was upheld based on robust satellite telemetry data showing their regular movement and use of the designated areas. *Id.* The record here contains no such compelling evidence. The facts here are more closely analogous to those in *Otay Mesa Property, L.P. v. U.S. Dep't of Interior*, 344 F. Supp. 3d 355 (D.D.C. 2018). In *Otay Mesa*, the FWS designated 57 acres as "occupied" or, alternatively, "unoccupied" critical habitat for the Riverside fairy shrimp, even though the shrimp themselves were only found within a single one-acre stock pond on the property. *Id.* at 360. The agency justified its expansive designation by pointing to the presence of essential physical features—the watershed—on the surrounding 56 acres. *Id.* The court rejected this as an improper conflation of the statutory requirements. It held that the agency must first identify the area the species actually occupies and then determine where the essential features are found within that occupied area. *Id.* at 371. An agency cannot use the presence of suitable habitat to expand the boundaries of "occupied" territory beyond where the species is actually found. *Id.* The Service makes the same analytical error here. It has taken a few sporadic sightings on the edges of the designated units and, by pointing to the existence of suitable pine forest throughout

the area, has extrapolated those sightings to declare tens of thousands of acres "occupied." Just as the FWS could not declare 56 acres of dry land "occupied" by an aquatic shrimp in *Otay Mesa*, it cannot declare thousands of acres of forest "occupied" by an elusive snake based on a handful of fleeting encounters. Such a determination "runs counter to the evidence before the agency" and is the essence of arbitrary action. *Motor Vehicle Mfrs' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### C.    The Service's Economic Impacts Analysis under 4(b) was Insufficient

The Services's economic analysis of the potential impacts of the critical habitat designation on Plaintiffs' land missed the mark. The Service claims in its analysis that no economic harm stems from negative land perceptions attached to the designation. (Doc. 57-2 at 16). ("Plaintiffs assert that the Designation will likely cause a reduction in property values as a result of negative perceptions of land designated critical habitat . . . however their argument is unsupported by competent evidence"). However, the Service based this conclusion on an analysis that was never conducted. As evidenced in the record, due to data limitations, the Service could not estimate the magnitude of any economic injury that could be caused from negative perceptions of the land due to the critical habitat designation. (AR 53).

The ESA requires the Service to consider the "economic impact...of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2). This mandate has created a circuit split regarding the proper methodology for such analysis. There is presently no binding authority in the Eleventh Circuit regarding the type of economic analysis method mandated by the ESA. The Service urges this Court to adopt the "baseline" approach endorsed by the Ninth Circuit which seeks to isolate the costs attributable solely to the designation itself, over and above the

economic burdens already imposed by the species' listing. (Doc 57 at 16–17). The Plaintiffs argue for the "co-extensive" approach required by the Tenth Circuit that considers all economic impacts of the designation, regardless of whether those costs are also attributable to the listing. (Doc. 47 at 20). This Court finds the Tenth Circuit's reasoning to be more faithful to the statutory text and purpose.

In *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, the Tenth Circuit invalidated the baseline (sometimes called "incremental") approach. 248 F.3d 1277 (10th Cir. 2001). The court found that the Service's own regulations at the time defined the "adverse modification" standard for critical habitat so similarly to the "jeopardy" standard for species listing that nearly all economic impacts could be attributed to the pre-existing listing, leaving no meaningful costs to be analyzed at the critical habitat stage. (*Id*. at 1283). This regulatory overlap, the court concluded, rendered the economic analysis required by Congress "a meaningless exercise." *Id*. at 1285. The core of the Tenth Circuit's holding is that any methodology that prevents a full accounting of the economic consequences of a designation—thereby precluding a meaningful balancing of benefits and costs—is contrary to the statute. *Id*.

The Ninth Circuit took a different view in *Arizona Cattle Growers' Ass'n v. Salazar*. 606 F.3d 1160 (9th Cir. 2010). It rejected the Tenth Circuit's reasoning, but did so on narrow grounds. The Ninth Circuit argued that the premise of the *New Mexico Cattle Growers* decision was faulty because the underlying FWS regulation that conflated the "adverse modification" and "jeopardy" standards had since been invalidated by other courts. *Id*. at 1173. Because the two standards were now distinct, the Ninth Circuit reasoned, the baseline approach was no longer meaningless and was therefore permissible. *Id*.

This Court finds the Ninth Circuit's reasoning in *Arizona Cattle Growers* unpersuasive because it mistakes a symptom for the disease. The Tenth Circuit's logic does not depend on the existence of the specific, now-invalidated regulation. Rather, it addresses the fundamental structural flaw of the baseline approach itself. The baseline methodology, by its very design, will always seek to attribute as many costs as possible to the pre-existing listing, thereby minimizing the "incremental" costs of the critical habitat designation. This creates an analytical framework that is inherently biased against a full and fair consideration of economic impacts. Whether the overlap between the jeopardy and adverse modification standards is 99% (as it was under the old regulation) or some lesser amount, the baseline approach still systematically undercounts the true economic burden of the designation and prevents the Service from conducting the robust cost-benefit analysis that Section 4(b)(2) requires. The Tenth Circuit's approach, in contrast, ensures that all economic consequences flowing from the designation are considered, which is the only way to give effect to Congress's clear directive to "tak[e] into consideration the economic impact" before making a final decision. 16 U.S.C. § 1533(b)(2). This Court therefore adopts the reasoning of the Tenth.

### D.    Failure to Analyze or Weigh Exclusion of Units 7 and 8

Even if the Service had employed a valid economic methodology, its ultimate decision not to exclude Units 7 and 8 was arbitrary and capricious. The ESA grants the Secretary discretion to exclude an area if "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." 16 U.S.C. § 1533(b)(2). In *Weyerhaeuser*, the Supreme Court confirmed that this discretionary decision is not immune from judicial review; it must be the product of a rational process. 586 U.S. at 25-26. An agency action is arbitrary if it has "entirely

failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.  Here, the Service entirely failed to consider the important aspect of public attitudes and their impact on the economic analysis.  The administrative record contains the Service's own economic analysis, which explicitly identifies "public attitudes about the limits and costs that the Act may impose" as a source of "real economic effects," including diminished property values.  (AR 44).  Having identified this significant impact, the Service was obligated to grapple with it.  Instead, it threw up its hands, claiming that "due to data limitations, we are not able to estimate the magnitude of any potential impact on property values."  (AR 53).

An agency cannot make a rational decision if it is unaware of a key part of the equation. The Service's statutory duty is to weigh the benefits of exclusion (*e.g.*, avoiding economic harm) against the benefits of inclusion (conservation).  By failing to quantify or even qualitatively analyze a known, significant economic cost, the Service effectively left one side of the scale empty.  Its subsequent "weighing" process was therefore a hollow exercise.  As the Supreme Court made clear in *Weyerhaeuser*, the Service must be able to articulate a rational basis for its decision not to exclude.  *See* 586 U.S. at 25-26.  No rational basis can be found when the agency ignores a critical factor in its analysis.  As a result, its decision not to exclude Units 7 and 8, reached without a full and fair consideration of a major benefit of exclusion, was not the product of reasoned judgment.  The Court finds the Service failed to properly analyze the potential economic impact of the critical habitat designation on Plaintiffs' land. Therefore, the Service's failure to analyze this important aspect of the problem renders its decision not to exclude Units 7 and 8 an abuse of discretion.

## VI.    CONCLUSION

The APA provides that courts "shall… hold unlawful and set aside" agency actions found to be arbitrary, capricious, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  This remedy is not discretionary.  Courts routinely vacate agency actions when they are unsupported by the administrative record or suffer from legal error.  *See Weyerhaeuser Co.,* 586 U.S. at 26.

As set forth above, the Services' action suffers from multiple deficiencies.  The designation of Units 7 and 8 was not supported by evidence of occupancy at the time of listing and the Service also relied on an economic analysis that failed to consider quantifiable impacts.  These failures mirror those in *Kansas Natural Resource Coalition*, where the district court vacated the rule outright due to the Service's refusal to consider economic costs.  *See Kansas Nat. Res. Coal.,* 2024 U.S. Dist. LEXIS 9486, at *50–52.  Given the scope and severity of the Service's decisions, the Court concludes that vacatur — not mere remand — is appropriate.  Vacatur will eliminate the current regulatory burden on Plaintiffs' land and ensure that any future designation complies with statutory and procedural requirements.

The Supreme Court has instructed that vacatur should be limited to the unlawful portion of a rule where the remainder is severable.  *See Weyerhaeuser*, 586 U.S. at 26.  Although Plaintiffs seek vacatur of the Final Rule in its entirety, their standing is limited to the designation of Units 7 and 8.

Accordingly, the Court VACATES the Final Rule only as to Units 7 and 8.  The remainder of the critical habitat designation remains in effect.

**DONE and ORDERED** this 21st day of August, 2025.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE